UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Joy Zelikovsky, PsyD, Individually and on behalf of others similarly situated, | § § § § | |
| Plaintiff, | § § § | CIVIL CASE NO. 3:23-cv-02624-N |
| | § § § | |
| INTERNATIONAL ASSOCIATION OF EATING DISORDER PROFESSIONALS' FOUNDATION, INC, a California Corporation, BONNIE HARKEN, JOEL JAHRAUS, DENA CABRERA, and RALPH CARSON, | § § § § § § § | **FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | § | |

Comes now, Joy Zelikovsky, PsyD, ("Plaintiff") Individually and On Behalf of Others Similarly Situated, who file this First Amended Class Action Complaint against the International Association of Eating Disorders Professionals Foundation, Inc. ("iaedp"), Bonnie Harken ("Harken"), Joel Jahraus ("Jahraus"), Dena Cabrera ("Cabrera") and Ralph Carson ("Carson") [or hereinafter referred to collectively as "Defendants"] as follows:

## SUMMARY OF THE ACTION

**1.**   Plaintiff and the Plaintiff Class Members are dues paying members of iaedp and are board certified in eating disorders. Plaintiff and Plaintiff Class Members sustained actual damages because of Defendants' monopoly of a certification process and other fraudulent conduct.

**2.**    Defendant Harken took over *iaedp* in 2002. During the following 21 years, Defendant Harken acquired and then through subterfuge, deceit and through a carefully crafted conspiracy with the other defendants, obtained complete control over *iaedp* and its "independent" iaedp corporate chapters. Defendant Harken's stewardship over iaedp has been marked by ethically questionable and illegal conduct. The purpose of Defendant Harken's illicit conduct was to unjustly enrichen herself at the expense of a non-profit organization allegedly dedicated to the research, education and understanding of eating disorders.

**3.**    Defendant Harken has control over all operations of iaedp including iaedp certification[1], its process and maintenance. All board-certified eating disorder specialists are required to maintain their membership in iaedp and to pay annual membership dues to iaedp. In addition, and depending on the type of certification, those who are board certified must also pay annual supervision fees and certification dues and fees. All board-certified specialists are required to attend in person, iaedp's annual symposium held in either Orlando, Florida or Palm Springs, California once every four years. This conduct constitutes an unlawful tying arrangement and violates anti-trust laws.

**4.**    A failure or refusal to pay any of these fees or attend the symposium results in iaedp cancelling or denying iaedp certification.

**5.**    As such, Plaintiff brings this class action proceeding on behalf of herself and on behalf of all persons similarly situated who are or were dues paying members of iaedp and are or were iaedp certified in eating disorders. Plaintiff and the Class Members allege that

---

[1] Certification in the mental health field is usually overseen by an independent organization and is based on input and expertise from collaborative experts. The certification process regarding eating disorders is based strictly on Ms. Harken and iaedp. Therefore, eating disorder certification will be referred to throughout this Complaint more accurately, as "iaedp certification."

Defendants fraudulently operated iaedp, engaged in acts constituting cronyism, tax evasion, engaged in a civil conspiracy, engaged in fraud through non-disclosure, violated antitrust laws by through an unlawful tying arrangement, and violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO").

**6.**     Plaintiff individually and as Class Representative, seeks class certification, seeks a declaration that Defendants, individually and collectively violated the common laws of Texas and other states, violated federal and state statutes, seeks a return of all monies paid by the Class Members for iaedp certification, seeks the payment of attorney's fees, treble damages, exemplary damages and for whatever other relief to which Plaintiff and the Plaintiff Class are entitled.

## **PARTIES**

**7.**     Plaintiff is a resident of the State of Connecticut.

**8.**     Defendant iaedp is a 501(c)(3) corporation organized under the laws of the State of California. Pursuant to Fed.R.Civ.P. 4, counsel for Defendant iaedp signed a Waiver of Summons which was filed with this Court on December 18, 2023.

**9.**     Defendant Harken is an individual residing in the State of Illinois. Pursuant to Fed.R.Civ.P. 4, counsel for Defendant Harken signed a Waiver of Summons which was filed with this Court on December 22, 2023.

**10.**     Defendant Jahraus is an individual residing in the State of Florida. Pursuant to Fed.R.Civ.P. 4, counsel for Defendant Jahraus signed a Waiver of Summons which was filed with this Court on December 18, 2023.

**11.**     Defendant Cabrera is an individual residing in the State of Arizona. Pursuant to Fed.R.Civ.P. 4, counsel for Defendant Cabrera signed a Waiver of Summons which was filed with this Court on December 18, 2023.

12.    Defendant Carson is an individual residing in the State of Alabama. Pursuant to Fed.R.Civ.P. 4, counsel for Defendant Carson signed a Waiver of Summons which was filed with this Court on December 18, 2023.

## JURISDICTION

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this proceeding is a class action lawsuit as defined under 28 U.S.C. § 1332(d)(1)(B), the amount in controversy collectively for the class members exceeds $5,000,000 and at least one member of the Class of Plaintiff is a citizen of states different than all named Defendants.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Plaintiff asserts a claim arising under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367 because the state common law claims alleged herein are so related to the federal claims that they form part of the same case or controversy.

14.    Venue is proper in this district pursuant to 42 U.S.C. § 1391(b) because Defendant iaedp actively conducts business in this district; the individual defendants are all directors on the Board of Directors of the DFW Chapter of iaedp, an organization which has its principal place of business in this district; Defendant iaedp entered into contracts with residents in the Northern District of Texas, to wit: the DFW Chapter of iaedp and its members. Defendant iaedp solicits and receives revenue from residents in the Northern District of Texas; Defendant iaedp solicits and requires persons who reside in the Northern District of Texas to attend its annual symposiums and numerous board-certified eating disorder specialists reside in the Northern District of Texas; Defendant iaedp

engaged in its unlawful tying arrangement with numerous residents in the Northern District of Texas. As such, substantial parts of the events or omissions giving rise to the claims in general and Class Members' causes of action arose in this district.

## Background Facts

15.    Eating disorders have the second highest mortality rate among mental illnesses. One person dies every fifty-two (52) minutes as a direct result of eating disorders. Eating disorders are a complex medical/mental illness with biological, genetic and societal components. Research continually grows and gains insight into the risk factors that contribute to this illness. These risk factors thus far are multifactorial and include factors, such as genetics, temperament, biology, trauma, and coping mechanisms. Because of the evolving nature of eating disorders, the understanding and utilization of "evidence-based" treatment is paramount and is the best recourse for the growing understanding of the causes and manifestations of this disease and improved treatment regiments.

16.    The complexities and multivarious elements of this illness require that medical and mental health practitioners who wish to specialize in eating disorder treatment receive the best education and information possible. So too, the process to acquire a certification of expertise in treating eating disorders must be held to the highest standard possible. Establishing and maintaining this highest standard should be overseen and regulated by an independent, unbiased administrative or private organization free from any financial ties to that standard. Regarding iaedp certification, this type of oversight and regulation does not exist.

17.    There is only one nationally recognized certification credential for eating disorders. This credentialing was generated by, issued by and overseen exclusively by Defendants Harken and iaedp. In the United States, medical professionals and mental

health practitioners who wish to obtain certification in treating eating disorders are first required to obtain and then maintain annual membership in iaedp.

**18.**    In the past, iaedp's board certified specialist designations included:

- Certified Eating Disorders Specialist (CEDS), which applied to licensed therapists, medical doctors, and nurse practitioners;

- Certified Eating Disorders Registered Dietitian (CEDRD), which applied to registered dietitians;

- Certified Eating Disorders Registered Nurse (CEDRN), which applied to registered nurses, and;

- Certified Eating Disorders Creative Arts Therapist (CEDCAT), which applied to Music, Art, Recreation and Dance/Movement Therapists.

**19.**    Defendant iaedp eliminated these designations and now just have a general certification designation, Certified Eating Disorder Specialist or "CEDS". The iaedp certification process and program also have undergone a number of other questionable changes.

**20.**    The certification core course content and exam questions are allegedly overseen by an iaedp committee. The certification committee members review applications to assess if an applicant meets (or exceeds) iaedp's requirements. Providers who qualify for credentialing do so through one of two routes: Equivalency or Traditional. Each of those two tracks have their own separate study, patient consultation, supervision and demonstrated expertise requirements.

<u>Certification requires mandatory membership in iaedp and in person attendance at annual symposiums.</u>

**21.**   Iaedp is the only organization offering certification in the care and treatment of eating disorders. As such, iaedp has a complete monopoly pertaining to eating disorder certification, its process and maintenance. All board-certified eating disorder specialists are required to maintain their membership in iaedp and to pay annual membership dues to iaedp. In addition, and depending on the type of certification, those who are board certified must also pay annual supervision fees and membership fees.

**22**.   A failure or refusal to pay any of these fees results in iaedp cancelling or denying iaedp certification.

**23.**   To maintain iaedp certification, eating disorder professionals are required to attend, in person, iaedp's annual symposium once every four (4) years. These symposiums alternate between a resort location in Palm Springs, California and a resort location in Orlando, Florida.

<u>Iaedp's Certification Program is designed to be a revenue generating program for Defendant Harken</u>

**24.**   On or about December 17, 2023, an iaedp member started a petition calling for the removal of Defendant Harken and the disassociation of the certification process from iaedp.  A true and correct copy of said petition is attached hereto as Exhibit "1." Prospective class members commented on the petition. These comments include the costs for obtaining certification and maintaining membership in iaedp. This comment utilized 2019 statistics. The financial obligations were listed as follows:

A.   Annual membership fee: $195;

B.   Certification application fee: $150;

C.     Certification renewal fee due every 2 years: $150;

D.     Attendance at an IAEDP conference required every 4 years -- 2019 Rates $725;

E.     Hotel: $330/night;

F.     Flight: $300+;

G.     Meals: $60/day+;

H.     Lost Income from time off: $1200+;

**Total Conference cost: $3395;**

I.     2,500 supervised practice hours over at least 2 years: $150/hour x 21 hours with approved supervisor = $3150;

J.     $400 for core courses;

K.     14 required tests: $350+;

L.     Exam Fees $100.00

**Total Cost to become iaedp Certified: $4150**

Total Annual cost for membership including IAEDP conference and certification renewal fee: $3,800 ($1,118.75/year if conference and renewal fee are divided into per year totals)

Total cost to obtain and maintain certification and membership: $7950.

**25.**     Since membership fees and symposium fees are not reasonably related nor an integral part of iaedp certification, the mandatory inclusion of same is merely to increase the coffers of iaedp and enrichen its managing director, Defendant Harken.

**26.**     According to Defendant Harken, board certified eating disorder specialists number at least 1,200 annually who have been required to purchase iaedp

membership. From 2017 – 2021, iaedp has received a total of $516,003 in certification fees.

27.     In addition, on iaedp's Form 990 tax filings, Defendant Harken received (not including payment of alleged expenses and bonuses) $617,000 from 2018 through 2021.

<u>Defendant Harken's stewardship over iaedp has been continually marked by ethically questionable and illegal conduct.</u>

28.     Defendant Harken made material misrepresentations on *iaedp*'s Form 990 tax filings from 2017 to present. To this end, Defendant Harken represented that she works an alleged 40.00 hours per week, is listed as an officer, but takes no salary[2]. In addition, her dissolved, wholly owned management company, Crossroads Programs, Inc. purportedly has a consulting agreement with *iaedp* and is paid a base income of $156,000.00.

However, Defendant Harken admitted through prior counsel that her corporation was and has been dissolved since June 6, 2016.  Defendant Harken's explanation was that she in fact, was operating as a "sole proprietor" and independent contractor. Therefore, iaedp's Form 990 tax returns are incorrect beginning in 2017. But the troubles and issues of Defendants iaedp and Harken are much more extensive.

29.     Notwithstanding the fact that Defendant Harken has this consulting agreement with Defendant iaedp, on September 22, 2023, Defendant Harken made material misrepresentations on Defendant iaedp's Annual Registration Renewal Report to Attorney General of California. ("Annual Report") *See*, Exhibit 2. On the Annual Report, the following question was included: "During this reporting period, were there any

---

[2] On iaedp's latest Form 990 tax filing, Defendant Harken corrected this hourly number to 32 hours instead of 40 hours.

contracts, loans, leases or other financial transactions between the organization and any officer, director or trustee thereof, either directly or with an entity in which any such officer, director or trustee had any financial interest?" <u>Defendant Harken checked the No box.</u>

And yet, on the Annual Report, Defendant Harken represented that she is an officer and that her defunct corporation, Crossroads Programs, Inc. is paid management fees by Defendant iaedp in the amount of $156,000.00. *Id.*

Defendants Harken and iaedp violate California tax laws.

**30.**    Iaedp was organized in the State of California in 1996. According to iaedp's records, it has ZERO full time paid employees. No officer, employee or director has any reportable compensation from iaedp. However, Defendant Harken maintains that she is an independent contractor of iaedp and not an employee. And yet, the facts do not support Defendant Harken's sworn statement.

**31.**    The State of California utilizes the "ABC test" to determine if workers are employees or independent contractors. California law presumes that a worker is an employee and not an independent contractor. The employer (in this case, iaedp) has the burden to prove a worker is in fact, an independent contractor. Under the ABC test, a worker is considered an employee and not an independent contractor, unless the employer satisfies all three of the following conditions:

- The worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact;

- The worker performs work that is outside the usual course of the hiring entity's business; and

- The worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

**32.**    Iaedp cannot satisfy even one of these criteria. Assuming *arguendo* that Defendant Harken was an independent contractor, she is performing all substantive work for *iaedp*. If allowable, that would result in a Board of Directors having no power or authority over the only person acting in a full-time capacity. Further, to whom would this independent contractor, this dissolved corporation or sole proprietor or individual report and who would oversee her work?

**33.**    Defendant Harken, her dissolved corporation and sole proprietorship cannot show under any circumstances that she was performing work outside the usual course of business of an eating disorder organization. To the contrary.

**34.**    On iaedp's tax forms, Defendant Harken committed perjury and misrepresented Crossroad's status, misrepresented its existence, misrepresented that she was not an employee and illegally operated in the State of California. In iaedp's tax filing in California it reports that iaedp has zero paid employees and has not withheld any state income or any other related taxes. That is a significant issue.

**35.**    California requires employers to withhold state income tax from wages paid to employees and in most cases, to independent contractors. There are also three other state payroll taxes: State disability insurance, which are withheld from employees' wages; Unemployment insurance, which the employer pays; and Employment training tax, which the employer also pays. Upon information and belief, neither Iaedp nor Defendant Harken paid any of those taxes.

**36.**    When the California Labor Board conducts its investigation into iaedp, in all reasonable likelihood, it will assess past due taxes, penalties and interest from both iaedp and Defendant Harken. With iaedp's limited resources, this will in all reasonable

probability, result in iaedp being forced to cease operations, including the certification program. In addition, under the Employment Taxes and the Trust Fund Recovery Penalty, iaedp's Board of Directors could have joint and several liability for any taxes, penalties and interest due.

37.    In order to generate revenue, which such revenue was intended to only benefit Defendant Harken, Defendant Harken committed perjury, committed tax evasion by knowingly and intentionally classifying herself as an independent contractor, accepted revenue from a non-profit organization to benefit her for profit entity and operated a certification program that violates antitrust laws through an unlawful tying arrangement.

38.    Defendant Harken's iron fisted control over iaedp includes requiring at least twenty-nine (29) allegedly separate, "independent" iaedp corporate chapters to incorporate in the State of Illinois.

However, the only nexus these "independent" iaedp corporate chapters have with the State of Illinois is that Defendant Harken resides in Pekin, Illinois[3]. In addition, Defendant Harken is on the Board of Directors for each of these 29 "independent" iaedp corporate chapters. The only other members of the Board of Directors of the "independent" iaedp corporate chapters are her co-Defendants Jahraus, Cabrera and Carson. Despite the fact that Defendant Cabrera is a resident of the State of Arizona, Defendant Jahraus is a resident of the State of Florida and Defendant Carson is a resident of the State of Alabama.

39.    However, the "independent" iaedp corporate chapter filings with the Illinois Secretary of State list these individual defendants' addresses as: P.O. Box 1295, Pekin,

_____

[3] Defendant iaedp was organized under the laws of the State of California in 1996.

Illinois 6155. This P.O. Box is the principal business address for Defendant iaedp. Defendant Harken has custody and control over this post office box. By having exclusive control over the boards of directors for these "independent" iaedp corporate chapters, Defendant Harken maintains sole control over the manner in which iaedp, as state and national organizations operate.

**40.** This sole control has resulted in grossly negligent oversight of the operations of the "independent" iaedp corporate chapters. Numerous mandatory filings and fees have not been paid resulting in several "independent" iaedp corporate chapters being placed in inactive or suspended status, including but not limited to:

      A.    The California Attorney General listed Defendant *iaedp* as delinquent beginning on February 15, 2019. California law is strict in that delinquent organizations "may not operate or solicit for charitable purposes." "An organization that is delinquent, suspended or revoked is not in good standing and is prohibited from engaging in conduct for which registration is required, including soliciting or disbursing charitable funds." Defendants Harken and iaedp violated these laws;

      B.    Defendants Harken, Carson, Cabrera and Jahraus as the board of directors of the "independent" corporate chapters located in San Francisco, Los Angeles and Orange County were grossly negligent in permitting those three chapters to go into "Franchise Tax Board" (FTB) suspension status, a status which those chapters still maintain.  As FTB suspended organizations, those three chapters are not allowed to conduct any legal business, do not maintain the right to use their business name and have had their tax-exempt status revoked in the State of California;

      C.    The Puget Sound (State of Washington) Chapter was placed in an inactive status once in 2020, once in 2021 and once in 2022;

D.     The Southwest Washington Chapter was placed in an inactive status once in 2020 and again in 2022;

E.     The San Diego Chapter had its status placed in suspension pending status in 2021;

F.     The Maricopa County (Phoenix) Chapter was placed in a pending inactive status in 2021. In addition, in filings with the Arizona Secretary of State, this Chapter listed a director who is not on the Board of Directors;

G.     The South Carolina Chapter was never registered as a foreign organization authorized to conduct business in South Carolina;

H.     The Rhode Island Chapter was placed in a delinquency pending status in 2022;

I.     The Atlanta Chapter was never registered as a foreign organization in the State of Georgia and as such, does not have authority to conduct business in Georgia.

41.     When Defendant Harken's corruption and fraud began to be exposed, a number of iaedp "independent" chapters made the decision to disband or dissolve. These chapters include, but are not limited to, the New Haven Chapter, the St. Louis Chapter and the Los Angeles Chapter. Upon information and belief, other chapters have begun to discuss similar dissolutions.

42.     To cover up her illicit business practices, Defendant Harken has not authorized nor allowed any CPA firm to conduct an independent audited financial statement for iaedp in over twelve (12) years.

43.     Further, Defendants Harken and iaedp violated, and continue to violate IRS rules and regulations pertaining to disclosure of financial and governing documents to the general public. On iaedp's Form 990 tax filings, the following language appears:

19. Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

Section O states:

| FORM 990, PART VI, SECTION C, LINE 19 | AVAILABLE UPON REQUEST FROM THE CORPORATE OFFICE. |
|---|---|

**44.** Plaintiff's counsel made demand for the information set forth on Defendant iaedp's Form 990 tax filing on October 5, 2023. However, Defendant iaedp failed and refused, and continues to fail and refuse to respond in any manner to said request.

<u>Unlawful Tying Arrangement</u>

**45.** Iaedp certification process is an unlawful tying arrangement under 15 U.S.C. § 1.

**46.** The Board Certification Market consists of several organizations overseeing certification of medical and mental health care in the United States. The American Board of Professional Psychology ("ABPP") is the primary organization for Specialty Board Certification in Psychology. There are currently 15 Specialty Boards and 1 Subspecialty Board.

**47.** The ABPP was incorporated in 1947 with the support of the American Psychological Association. The ABPP is a unitary governing body of separately incorporated specialty examining boards which assures the establishment, implementation, and maintenance of specialty standards and examinations by its member boards. Through its Central Office, a wide range of administrative support services are provided to ABPP Boards, Board Certified Specialists, and the public. A

Specialty is a defined area in the practice of psychology that connotes special competency acquired through an organized sequence of formal education, training, and experience.

**48.**    The ABPP's specialty boards are Addiction Psychology; Behavioral & Cognitive Psychology; Clinical Child & Adolescent; Clinical Health; Clinical Neuropsychology; Clinical Psychology; Counseling; Couple & Family; Forensic Psychology; Geropsychology; Group Psychology; Organizational & Business; Police & Public Safety; Psychoanalysis; Rehabilitation; School Psychology and Serious Mental Illness.

**49.**    Since 1933, The American Board of Medical Specialties (ABMS), has been awarding board certification and is the recognized leader in developing and setting the physician specialty certification gold standard in the United States. The ABMS consists of 24 Member Boards offering board certification in 40 specialties and 88 subspecialties. These Member Boards adhere to rigorous training and assessment standards.

**50.**    Defendant Harken through Defendant iaedp, bypassed these established credentialing organizations and leveraged monopolistic power by conditioning maintenance of iaedp certification (the "tying product") on membership in iaedp (the "tied product"). As a result, iaedp has been able to inflate the price it charges for membership in iaedp as well as the costs associated with certification, and has thereby earned, without any offsetting pro-competitive benefits, inflated revenues from membership dues and association fees that Defendant iaedp and Harken would not otherwise have earned. Since at least January 1, 2016, iaedp has required all board-certified eating disorder specialists to purchase and maintain annual membership in iaedp and pay iaedp's annual membership dues in order to avoid iaedp's deactivation of their iaedp certification.

**51.**    There is no legitimate procompetitive justification, no medical justification, and no rational justification for iaedp's requirement that iaedp certified eating disorder

specialists purchase annual membership in iaedp. The costs of annual membership dues incurred by Plaintiff and board-certified eating disorder specialists to maintain their board certifications are in addition to the examination, processing and administrative fees that each board-certified specialist already pays to iaedp as part of the initial certification process.

52.    The costs of iaedp membership are also in addition to the annual registration and certification fee that each board-certified eating disorder specialist already pays to iaedp to maintain his or her certification. Iaedp's requirement that certified eating disorder specialists purchase iaedp membership annually, and pay the corresponding annual membership fee, has no bearing on, and has no relationship to, a specialist's competency to practice mental health/medical care in a specialty area.

53.    Iaedp has approximately 3,000 members. Of these members, approximately 1,200 are board certified. Iaedp's membership fee requirement has no legitimate purpose and does nothing but produce additional revenue for iaedp and *ipso facto*, Defendant Harken, exceeding $230,000 dollars in annual certification and institute fees and dues.  Thus, by virtue of the unlawful tying arrangement reducing choice, Plaintiff and board-certified eating disorders specialists have been forced to purchase and maintain iaedp membership.

<u>Iaedp's unlawful Tying Arrangement has Foreclosed Competition, Raised Prices and Reduced Consumer Welfare in the Membership Market</u>

54.    Upon information and belief, no other professional physician association conditions board certification on membership in a specific organization. In fact, the tying arrangement at issue in the case at bar, was the subject of class-based litigation in 2016. That case involved the American Osteopathic Association. The parties entered into a

settlement agreement whereby the AOA was divested of the certification process with membership no longer being a requirement and AOA agreed to pay damages on a class wide basis.

**55.**     By requiring membership as a condition for board certification, iaedp has reduced the number of individuals considering purchasing membership in other professional eating disorder associations such as the Academy for Eating Disorders and the National Eating Disorder Association.  This has erected market-wide barriers to entry in the Membership Market, as potential competitors of iaedp are dissuaded from entering the market because they cannot be guaranteed a share of the market sufficient to viably compete.

**56.**     Iaedp's tying arrangement has reduced competition in the Association Membership Market, as other rival associations have lost potential members, and the pricing and output of market participants is not reflective of a competitive market. The diminished competition in the Association Membership Market and the exercise of market power by iaedp have harmed consumers and decreased consumer welfare. By deterring entry and raising its rivals' costs, the actions of iaedp have resulted in iaedp's increased prices and increased prices in the Association Membership Market as a whole. This increased pricing, without any offsetting pro-competitive benefit, has reduced consumer welfare in a manner in which the antitrust laws are intended to protect.

## CLASS ACTION ALLEGATIONS

### THE CLASS

**57.**     Paragraphs 15 through 56 are hereby incorporated for all purposes.

**58.**     Plaintiff bring this action on behalf of herself, and all others similarly situated as a class action proceeding pursuant to Fed.R.Civ.P. 23. This action may properly be

maintained as a class action under the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed class is ascertainable.

**59.**    Plaintiff seeks to represent a class defined as follows:

**All individual persons who became board certified through iaedp between January 1, 2017 to present and who also paid membership dues to iaedp and attended at least one national symposium during that time period.**

The proposed class is not limited to those persons who reside in the State of Texas but include those persons nationally and internationally wherever they may be located.

**60.**    Plaintiff and the Plaintiff Class all have common and general interests.  Further, the named Plaintiff reserve the right to modify the definition of the proposed class based on information that they or their counsel learn through discovery. The named Plaintiff will fairly represent the interests of the class members involved.  The class meets all the requirements of Federal Rules of Civil Procedure 23 as follows.

The Class Members Share Common and General Interests

**61.**    The first prerequisite for a class action is that the Class Members share a common or general interest.  The members of the Class need not share all interests, but only a common interest.

**62.**    In this case, the common interests include, but are not limited to, the following:

A.    All Plaintiff Class Members paid membership association dues to iaedp;

B.    All Plaintiff Class Members attended in person at least one national symposium hosted by iaedp;

C.    All Plaintiff Class Members successfully completed iaedp's certification program;

D.    All Plaintiff Class Members became board certified by iaedp and paid fees and dues associated with said certification to iaedp;

E.    With regard to Defendants' liability, Plaintiff Class Members all sustained actual damages.

## Numerosity

**63.**    The Class members are so numerous that joinder of all is impractical. According to Defendant Harken, iaedp annually has approximately 3000 members and 1200 members in the certification program.  Confirmation of the number and identity of the members of the class are readily determinable from the records of Defendants. Clearly, the numerosity element has been met.

## Commonality

**64.**    There are questions of law and fact common to the proposed class that predominate over any questions affecting only the individual class members. The common questions of law and fact include, without limitation:

a.    Whether iaedp's eating disorder Board Certification Market and the Association Membership Market are separate product markets;

b.    Whether, during the relevant period, iaedp had market power in the eating disorder Board Certification Market;

c.    Whether, during the relevant period, iaedp exploited its market power in the eating disorder Board Certification Market by conditioning eating disorder board certification on the purchase of annual membership in iaedp;

d.    Whether iaedp's tying arrangement affected a substantial amount of interstate commerce and/or commerce in Texas;

e.    Whether iaedp's tying arrangement caused anticompetitive effects nationally and/or in Texas;

f.    Whether there were any procompetitive justifications for iaedp's tying arrangement;

g.    Whether iaedp's tying arrangement was primarily meant to drive revenue to Defendants;

h.    Whether Defendant Harken committed tax evasion;

i.    Whether iaedp's conduct violated 15 U.S.C. §§ 1, 3;

j.    Whether Defendants were unjustly enriched because of payments made by the Plaintiff Class;

k.    Whether Defendants engaged in a civil conspiracy, and;

l.    Whether Defendants violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*.

<u>Typicality</u>

**65.**    Plaintiff's claims are typical of the claims of each Class member.  Plaintiff has the same claims for damages that she seeks for absent class members.

<u>Adequacy</u>

**66.**    Plaintiff will fairly and adequately represent and protect the interests of the Class Members. There are no conflicts of interest between the interests of Plaintiff and the other Class Members. Counsel representing Plaintiff are competent and experienced in class litigation.

<u>Superiority of Class Action</u>

**67.**    A class action is superior to other available means for the fair and efficient adjudication of this controversy. The members of the Class are so numerous that it is

impracticable to bring all members before the court. Individual joinder of all proposed Class Members is not practicable, and questions of law and fact common to the proposed class predominate over any questions affecting only individual members of the proposed class. Each member of the proposed class has been damaged, which such damages were proximately caused by Defendants, and are entitled to recovery of said damages.

68.     The Class Members have little incentive, if any, to prosecute their claims independently and would be unlikely to find counsel to represent them. Further, the Class Members, are located in many different states, and bringing all claims together in this forum saves judicial resources. The only practical mechanism is for the Class Members to vindicate their rights through class treatment of their claims which is convenient, economical and consolidates all claims in a single suit, and serves to avoid a multiplicity of suits.

69.     Defendants have acted or refused to act on grounds that apply generally to the class, so that declaratory relief, statutory penalties, and awarding actual, treble and punitive damages is appropriate respecting the class as a whole. Class certification will allow those persons similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT ONE

### *PER SE* VIOLATION OF 15 USC § 1

**70.**     Plaintiff realleges and incorporates by reference paragraphs 15 – 69 herein as if set forth verbatim.

**71.**     Plaintiff and the Plaintiff Class Members are iaedp certified eating disorder specialists who purchased membership in iaedp since January 1, 2017.

**72.**     The eating disorder Board Certification Market is separate from the Association Membership Market.

**73.**     At all times during the relevant period, iaedp has had sole and exclusive market power, a 100% monopoly, in the eating disorder Board Certification Market, as there are no nationally recognized alternatives for eating disorder board certification available to eating disorder specialists.

**74.**     Plaintiff and the board-certified eating disorder specialists have been forced to purchase annual membership in iaedp, incur iaedp's annual membership dues and been required to attend in person a symposium once every four years to avoid having their iaedp board certification invalidated or canceled.

**75.**     According to Defendant Harken, board certified eating disorder specialists number at least 1,200 annually who have been required to purchase iaedp membership. From 2017 – 2021, iaedp has received a total of $516,003 in certification fees. As such, iaedp's unlawful tying arrangement has had a substantial impact on interstate commerce.

**76.**      iaedp's tying arrangement foreclosed competition in the Association Membership Market, and the eating disorder membership market resulting in market-wide pricing and product offerings that are not reflective of a competitive market.

77.     By conditioning iaedp certification on continuous membership in iaedp and the cost of iaedp's annual membership dues, as well as mandatory in person attendance at a symposium, iaedp established an unreasonable restraint of trade that constitutes a *per se* violation of 15 U.S.C. § 1.

78.     As a result of iaedp's violation of 15 U.S.C. § 1, Plaintiff and Plaintiff' Class Members have paid iaedp supra-competitive prices for membership in iaedp and the board certification.

79.     As recently as 2022, Defendant iaedp, through Defendant Harken had actual knowledge that their tying arrangement ran afoul of antitrust laws.   Defendant Harken had actual knowledge of the case, *Talone, et. al. v. The American Osteopathic Association*, Case No. 1:16-cv-04644 (D. N.J. Jun. 12, 2017) and the issues involving unlawfully tying association membership with board certification. Defendant Harken dismissed any concerns by attempting to justify that since the costs for association membership and certification had allegedly not increased, she could link the two.

80.     Defendant Harken chose to ignore the reality that in the *Talone* case, there was an alternative certifying organization. Iaedp has a 100% monopoly. Also, in the *Talone* case, the defendant did not require attendance at an annual symposium once every four years.

81.      Prospective class members have publicly expressed their dismay and dissatisfaction with Defendants Harken and iaedp, including their concern about the illegal tying arrangement, and demanded change. In the Petition, Exhibit 1, the following comments were made:

        A.       "I want the CEDS credential to mean something and to be associated with an organization that is upstanding. IAEDP needs change." – Rebecca A.;

B.    "I am currently a CEDS-C and have continued to stay credentialled to support the future of the eating disorder field. But at this point the lack of commitment to the betterment of the field, the racism and fat phobia embedded within the organization as well as the inappropriate certification process that requires attendance to conference and membership dues needs to stop." – Gina M.;

C.    "I have dedicated my career to the treatment of eating disorders and have worked incredibly hard to earn my certification. Over the past few years, it's become harder and harder to support the actions of iaedp as they do not represent the beliefs and values of their members. With a change of leadership, hopefully iaedp can again become an organization we can be proud to support, and the hard-earned credentials of certified members can mean something again." – Tracy B.;

D.    "Since iaedp has been the only way to attain the only nationally recognized certification indicating competence in treating eating disorders, I chose to dive in, wanting to fix what so many of us said we were not satisfied with/saw as needing improvement, particularly in the core courses and CEDS process. (When the public hits the crisis of an eating disorder, the LAST thing they need to do is have to vet providers' competence. I have always seen the CEDS as a way of assuring public safety eventually if it could improve its contents, process, and presentation). ... I have now given thousands of hours to this org and the CEDS only to feel defeated, sad, and tired. I've been stumped about why things I and others saw as basic got roadblocked or ignored so often. At this point, it seems to me that iaedp may be being run for various people's personal agendas over the greater good—and that is what has broken my spirit the most. ... However, the CEDS renewal already requires ED-specific CEs. So why the Symposium, too? Forcing

people to attend online or in-person may stop some budding or genuine specialist clinicians from attaining their CEDS." – Alli S.;

E.    "I have been an RDN for 40 years, and over that time, I have seen the harm the field of nutrition, as well as eating disorder treatment, has caused. Weight stigma is still baked into this organization, as is gatekeeping, as the cost of becoming a CEDS is prohibitive to many highly qualified clinicians. I am letting my IAEDP certification lapse." – Erica L.;

F.    "I am not an IADEP member largely because of this requirement to attend symposium in order to maintain membership/credentialing. The cost and time is prohibitive especially for providers who are self employed." – Tori W.;

82.    Defendant Harken knew that her scheme violated the antitrust laws. The prospective Class Members have complained about certification and are demanding change. Defendant Harken gambled her organization would escape judicial scrutiny on the unlawful tying arrangement. Just like Defendant Harken gambled that her dissolved corporation and her status as an alleged independent contractor would escape judicial scrutiny. Just like Defendant Harken gambled her perjury on her Form 990 tax filings would not be discovered. Defendant Harken erred.

## COUNT TWO

## VIOLATION OF 15 USC § 1 UNDER THE RULE OF REASON

83.    Plaintiff realleges and incorporates by reference paragraphs 15 – 82 herein as if set forth verbatim.

84.    Plaintiff and the Plaintiff Class Members are Board Certified eating disorder specialists who purchased membership in iaedp since January 1, 2017.

**85.**     The eating disorder Board Certification Market is separate from the Association Membership Market.

**86.**     At all times during the relevant period, iaedp has had a 100% monopoly, the sole and exclusive market power in the eating disorder Board Certification Market, as there are no substitutes for eating disorder board certification available to eating disorder specialists.

**87.**     Plaintiff and the board-certified eating disorder specialists have been forced to purchase annual membership iaedp, incur iaedp's annual membership dues and been required to attend in person a symposium once every four years in order to avoid having their iaedp board certification be invalidated and canceled.

**88.**     There is no dispute that iaedp's tying arrangement exists and is causing actual damages to the Class Members. There is no dispute that no other board certification program pertaining to the treatment of eating disorders exists. There is no dispute that board certification is dependent on iaedp association membership. There is no dispute that board certification is dependent on attending iaedp's annual symposium once every four years. There is no dispute that Defendants iaedp and Harken maintain sole control over board certification. There is no dispute that Defendant Harken has been able to establish the price points for board certification, membership fees and symposium costs. There is no dispute that Defendant Harken has been unjustly enriched by the unlawful monopoly she established. And there is no dispute that Defendant Harken has engaged in cronyism by allowing at least one of her co-conspirators to receive certification even though dues and fees were not paid, and her co-conspirator did not satisfy the maintenance requirements.

## COUNT THREE

## UNJUST ENRICHMENT

**89.** Plaintiff incorporates paragraphs 15 – 88 as if set forth verbatim.

**90.** Plaintiff and the Plaintiff Class Members herein sue Defendants Harken and iaedp under the theory of unjust enrichment.

**91.** As a result of Defendants' improper conduct described hereinabove, a monetary benefit was conferred upon Defendants Harken and iaedp, and will continue to be unjustly enriched if allowed to retain the monies paid to Defendants by Plaintiff and the Plaintiff Class.

**92.** Plaintiff demanded that Defendants repay the money paid to Defendants but Defendants at all material times, failed and refused to repay said monies. As such, Plaintiff and the Plaintiff Class were damaged in an amount to be determined by the trier of facts.

## COUNT FOUR

## CIVIL CONSPIRACY

**93.** Plaintiff incorporates paragraphs 15 – 92 as if set forth verbatim.

**94.** All Defendants created and then perpetuated an enterprise designed to fraudulently enrichen herself by abusing the instrumentalities of a 501(c)(3) organization and the 501(c)(6) status of the "independent" iaedp corporate chapters.

**95.** Save for three (3) corporate chapters[4], each of the twenty-nine (29) "independent" corporate chapters organized in the State of Illinois by Defendant Harken have the same Board of Directors. That is, Defendant Harken, Defendant Cabrera, Defendant Carson

---

[4] These three chapters merely omit Defendant Carson. Otherwise, they are identical to the other chapters.

and Defendant Jahraus. These defendants also recently served as high-ranking officers of Defendant iaedp.

96.     Defendant Cabrera served as president of Defendant iaedp, and past-president and is on the executive board of Defendant iaedp. Part of Defendant Cabrera's job duties included signing the Annual Reports filed with the Illinois Secretary of State for the "independent" iaedp corporate chapters. As such, Defendant Cabrera had actual knowledge that each "independent" iaedp corporate chapter had the same board of directors and were completely subservient to her whims and demands as well as the demands and whims of her co-conspirators. Defendant Cabrera actively participated in the civil conspiracy by reviewing each Annual Report, signing and attesting to the accuracy of said reports.

95.     Defendant Jahraus serves as past-president of Defendant iaedp and is on the executive board of Defendant iaedp. Part of Defendant Jahraus' job duties include signing the Annual Reports filed with the Illinois Secretary of State for the "independent" iaedp corporate chapters. As such, Defendant Jahraus' has actual knowledge that each "independent" iaedp corporate chapter had the same board of directors and were completely subservient to his whims and demands as well as the demands and whims of his co-conspirators. Defendant Jahraus actively participated in the civil conspiracy by reviewing each Annual Report and signing said reports.

96.     Defendant Carson recently served as Treasurer of Defendant iaedp and is on the executive board of Defendant iaedp. Part of Defendant Carson's job duties include reviewing the Annual Reports filed with the Illinois Secretary of State for the "independent" iaedp corporate chapters and is tasked with overseeing the financial operations of Defendant iaedp. As such, Defendant Carson had actual knowledge that

each "independent" iaedp corporate chapter had the same board of directors and were completely subservient to his whims and demands as well as the demands and whims of his co-conspirators. Defendant Carson knew or should have known that Defendant iaedp's resources and revenue were being denuded by Defendant Harken. And yet, Defendant Carson did nothing.  Defendant Carson actively participated in the civil conspiracy by reviewing each Annual Report and through acts and omissions, allowed Defendant iaedp's resources to be misdirected.

**97.**    Defendant Harken participated in the civil conspiracy by funneling revenue from Defendant iaedp, a 501(c)(3) organization, through a non-existent for-profit corporation Defendant Harken opened and then to herself. As recently as September 2023, Defendant Harken was still making misrepresentations on iaedp's tax filings that her for profit corporation was in existence. When Defendant Harken dissolved this for-profit corporation in 2016, she categorized herself as a sole proprietor and continued to receive revenue from iaedp. The purpose of the conspiracy was to cover up and hide Defendants Harken's agenda of prioritizing revenue for herself while presenting on the surface, a reputable eating disorder organization.

**98.**    Defendants' conspiracy to defraud was further perpetrated by significantly reducing their costs by employing all iaedp key employees as 1099 entities, by mischaracterizing the employment status of those alleged "independent contractors," by failing to pay state taxes due the State of California, by allowing the iaedp status in California to become not in good standing, by refusing to comply with the nonprofit organization laws in the states of California and Illinois and by and through their acts as previously set forth hereinabove. Defendants' other acts in furtherance of this conspiracy include, but are not limited to, the following:

A.    Agreeing on the substance of the scheme beginning in or about 2012 by utilizing a corporation to funnel money to herself from iaedp, a 501(c)(3) organization;

B.    Employing persons loyal to Defendant Harken by providing them upgraded suites and amenities at annual symposiums;

C.    Concealing their scheme and pattern of wrongful activity by intentionally providing false and incomplete information to Defendant iaedp's CPA for the purpose of falsifying information on iaedp's Form 990 tax filings;

D.    Wrongfully diverting revenue from iaedp to Defendant Harken so that she could financially profit from operating a competing therapy center named Crossroads Programs for Women;

E.    Permitting Defendant Cabrera to maintain certification status without paying the dues and fees required and without satisfying the maintenance requirements of iaedp.

**99.**    Defendants' acts originated, upon information and belief, in the States of Texas, California, Illinois, Missouri, New York and in all other states in which board-certified eating disorder specialists reside.

**100.**    All Defendants knowingly entered into an agreement whereby they failed to disclose to Plaintiff and the Plaintiff Class material information regarding the operations of iaedp, including but not limited to, diverting Plaintiff's and Plaintiff Class Members' monies to and for their own use. Acts in furtherance of this conspiracy were perpetrated in the States of Texas, California, Illinois and in whatever states the Plaintiff Class resides. Therefore, Defendants agreed to accomplish either an unlawful act or a lawful act by unlawful means and specifically intended to harm Plaintiff and the Plaintiff class. Defendants had knowledge of the common object or purpose of the conspiracy and each of the individuals committed one or more wrongful acts in furtherance of the conspiracy.

**101.**    All Defendants intended to participate in the conspiracy and as a proximate result of such individuals' conduct or acts, Plaintiff and the Plaintiff Class sustained damages in a uniform amount, to wit: the amount of their annual dues and amounts paid in furtherance of obtaining board certification for which amount Plaintiff and Plaintiff Class herein sue. Moreover, Defendant Harken engaged in such conduct knowingly, willfully, maliciously and intentionally.  Therefore, Plaintiff and Plaintiff Class are entitled to recover punitive damages in an amount to be determined by the trier of fact.

**COUNT FIVE**

**Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.***

BACKGROUND FACTS AND CLAIMS RELATED TO VIOLATIONS OF the FEDERAL RACKETEERING STATUTES

A.    The RICO Enterprise

**102.**    Defendants, individually through their own actions, conduct and failure to act, and through their joint conspiracy operated and engaged in legitimate and illegitimate activities, including the racketeering activities herein alleged which such activities caused damage to Plaintiff and the Plaintiff Class.

**103.**    Defendant Harken, as Managing Director and Defendants Cabrera, Carson and Jahraus through the authority vested in them in the capacities as former officers and current board members of the "independent" iaedp corporate chapters, were at all relevant times operating Defendant iaedp as a single enterprise and its rights, obligations, employees, contractors, agents and assets were routinely commingled and transferred and utilized by Defendant Harken without fair consideration to Plaintiff and the Plaintiff Class.

**104.**   At all times relevant to this Complaint, Defendant Harken, in conspiracy with the other defendants, exercised dominion and control over the conduct and activities, both legitimate and illegitimate, of herself and the operations of iaedp. Decisions concerning both the illegitimate and legitimate conduct of the enterprise operated by Defendant Harken were made by Defendants Harken, Cabrera, Carson and Jahraus with the approval and/or acquiescence of Defendant iaedp. As such, Defendant Harken violated 18 U.S.C. § 1962(a) by, " ... receiv[ing] any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

**105.**   At all times relevant to this Complaint, Defendant Harken violated 18 U.S.C. § 1962(c) by, "... being associated with an enterprise engaged in or the activities of which affect interstate or foreign commerce to conduct or to participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity.

**106.**   At all times relevant to this Complaint, Defendants Harken, Cabrera, Carson and Jahraus violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C § 1962(a) and 18 U.S.C. § 1962(c).

**107.**   A RICO Act claim under 18 U.S.C. §§ 1962(a), (c) and (d) requires a plaintiff to prove the following:

      (1).    A person engaged in;

      (2).    A pattern of racketeering activity connected to;

(3).    The conduct or control of an enterprise.

<u>Persons</u>

**108.**    Defendants Harken, Cabrera, Carson, Jahraus and iaedp qualify as "persons" under 18 U.S.C. § 1961(3). Each of Defendants Harken, Cabrera, Carson and Jahraus and iaedp is an "individual or entity capable of holding a legal or beneficial interest in property" and as such, each constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

<u>Racketeering Activity</u>

**109.**    A "racketeering activity" as defined by 18 U.S.C. § 1961(1) includes, *inter alia,* any act which is indictable under 18 U.S.C. § 1341 (relating to mail fraud); 18 U.S.C. § 1343 (relating to wire fraud); 18 U.S.C. § 1952 (relating to racketeering), and/or; 18 U.S.C. § 1952 (relating to racketeering).

<u>Texas Penal Code §32.45 – Misapplication of Fiduciary Property</u>

**110.**    Defendants Harken and iaedp committed the racketeering activity of misapplying fiduciary property under Texas Penal Code § 32.45 and the crime is punishable with imprisonment for more than one year. To this end, Defendant Harken knowingly utilized iaedp as an instrument to further and accomplish their scheme by diverting monies from third parties, including but not limited, Plaintiff and Plaintiff Class Members.

**111.**    Contrary to iaedp's public representations, Defendant Harken solicited and accepted monies acquired through fraud by non-disclosure and misapplied monies to and for their own use. <u>To this end, Defendant Harken received (not including payment of alleged expenses and bonuses) $617,000 from 2018 through 2021.</u>

## Texas Penal Code § 32.32. False Statement to Obtain Property

**112.**    Defendant Harken committed the racketeering activity of making false statements to obtain property under Texas Penal Code § 32.32 and the crime is punishable with imprisonment for more than one year. Defendant Harken knew that in order to increase her profits and revenue, she had to make board certification and association membership inextricably intertwined. The largest money maker for Defendants iaedp and Harken was and is the annual symposium. To assure constant and growing attendance, Defendant Harken made in person attendance mandatory for board certification. Therefore, in order to continue to solicit revenue, iaedp maintained a façade of being an eating disorder research organization which embraced evidence-based, medical and mental health treatment for eating disorders. In truth, Defendant iaedp became *ipso facto*, an ATM to be utilized by Defendant Harken to enrichen herself with little or no accountability from any third parties.

**113.**    Defendant Harken knowingly utilized iaedp as an instrument to further her unethical and illegal agenda to accumulate revenue through the above-mentioned conduct.

## Texas Penal Code § 32.42. Deceptive Business Practices

**114.**    Defendants committed the racketeering activity of engaging in deceptive trade practices under Texas Penal Code § 32.42. To this end, Defendants in the course of business intentionally, knowingly, recklessly, or with criminal negligence committed one or more of the following deceptive business practices: (7)  represented that a commodity or service is of a particular style, grade, or model if it is of another.

**115.**    In order to continue the illicit revenue flowing to Defendants Harken and M. Harken without having to be accountable for their illicit conduct, all Defendants refused

to have an independent, audited financial statement prepared. All Defendants engaged in conduct designed to maintain 100% control over the "independent" iaedp chapters. Defendant Harken, despite having actual knowledge that iaedp's tying arrangement was unlawful, continued to enforce its unlawful enforcement. All the while, all Defendants were maintaining the façade that iaedp was a reputable organization which continued to embrace and support evidence-based, medical and mental health treatment for eating disorders. Therefore, all Defendants specifically represented that Defendant iaedp was an organization of a particular style, grade or model.

<u>Wire Fraud – 18 U.S.C. § 1343</u>

**116.**    All Defendants devised a scheme or artifice to defraud by means of wire, radio or television communication in interstate and foreign commerce. By reason of the conduct described hereinabove, all Defendants violated, are violating, and continue to violate 18 U.S.C. § 1343 on an on-going basis by engaging in and facilitating a scheme and artifice to defraud and obtain money or property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use interstate or foreign wire communications.

**117.**    All Defendants engaged in conduct having a substantial impact upon interstate commerce, including by, among other methods, soliciting and accepting membership payments, certification payments, payments from "independent" iaedp corporate chapters from Plaintiff and the Plaintiff Class and third parties residing throughout the United States, selling services in interstate commerce, entering into contracts with the Plaintiff Class Members which involve the movement of services in interstate commerce, and entering into agreements affecting interstate commerce.

118.    Defendant Harken obtained and used the proceeds of the racketeering activity herein alleged in and for the promotion of all Defendants' conspiracy and scheme to enter into arrangements providing ill-gotten revenue to Defendant Harken. Defendant Harken illegally exercised dominion and control over payments, fees and dues from Plaintiff and the Plaintiff Class.

## Mail Fraud – 18 U.S.C. § 1341

119.    All Defendants devised a scheme or artifice to defraud by means of soliciting payments utilizing the United States Postal Service. Defendants' scheme further utilized the United States Postal Service by transferring and accepting revenue in interstate and foreign commerce. By reason of the conduct described hereinabove, all Defendants violated, are violating, and continue to violate 18 U.S.C. § 1341 on an on-going basis by engaging in and facilitating a scheme and artifice to defraud and obtain money or property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use interstate or foreign communications.

## Monetary Transactions Derived from Unlawful Activity – 18 U.S.C. § 1957.

120.    Defendant Harken knowingly engaged in monetary transactions in criminally derived property (false statements to obtain property, deceptive business practices, fraud) of a value greater than $10,000 in the United States.

## Enterprise or Association in Fact

121.    All Defendants participated in an enterprise or association in fact. Each Defendant participated in an on-going organization and each associate functioned as a continuing unit. The individual defendants and iaedp, the organizational entity run by Defendant Harken associated together to commit several criminal acts as set forth hereinabove

which gave their association an ongoing nature allowing it to come within the purview of the RICO Act.

122.    Defendants, their agents and co-conspirators formed an association in fact for a common purpose of committing financial fraud perpetrated against Plaintiff and the Plaintiff Class. All defendants associated together to commit numerous acts constituting financial fraud over several years and their acts are on-going.

123.    The specific predicate acts perpetrated by Defendant Harken include, but are not limited to the following:

(a). They were all done by or at the direction of Defendant Harken, with the approval and/or acquiescence of the remaining Defendants for their benefit and the personal benefit of Defendant Harken;

(b). The illegal conduct and actions were all perpetrated by Defendant Harken outside of the scope of the legitimate authority of their office or employment and/or for their personal benefit;

(c). The illegal conduct and actions were all directed at Plaintiff and the Plaintiff Class in such a manner as to cause Plaintiff, the Plaintiff Class and third parties ultimate harm or injury;

(d). The illegal conduct and actions all relate to each other as part of a common course of conduct, plan, and objective to engage in a continued and concerted course of conduct with the purpose and effect of defrauding Plaintiff, the Plaintiff Class and third parties;

(e). The illegal actions and conduct all shared common methods in that each were committed by and under the direction of Defendant Harken;

(f). The illegal actions and conduct all included acts of concealment, fraud by non-disclosure and/or coercion, the illegitimate economic effect of which was the diversion of financial resources toward Defendant Harken and her competing for profit businesses;

(g). The illegal actions and conduct had sufficient continuity and duration in that they occurred from 2012 to date current, and;

(h.) The illegal actions and conduct each pose a threat of on-going repetition against Plaintiff and the Plaintiff Class.

**124.** These facts establish a period of repeated conduct that began as early as 2012 and are still on-going. These facts also establish that without this litigation and an award of relief, Defendants' illicit and illegal conduct will continue. To this end, these matters were brought to the attention of the Board of Directors of iaedp. The Board only conducted a cursory investigation through counsel, admitted that many of the errors and wrongdoings brought to their attention were in fact, accurate.  However, the Board of Directors took no action against Defendant Harken.

**125.** As a result, Defendant Harken engaged in a misinformation campaign directed to the "independent" iaedp corporate chapters, including but not limited to, advising them not to be open to information which supported the allegations set forth in this Complaint.

**126.** Plaintiff and the Plaintiff Class suffered and continue to suffer injury as a direct, proximate, and foreseeable result of the foregoing acts perpetrated by all Defendants. Accordingly, Plaintiff and the Plaintiff Class seek class certification and subsequent thereto, an award of actual damages, costs of this litigation, and reasonable attorneys' fees.

**127.**    Plaintiff and the Plaintiff Class seek treble damages pursuant to 18 U.S.C. § 1964(c).

## <u>REQUEST FOR TRIAL BY JURY</u>

**128.**    Plaintiff and the Plaintiff Class hereby request a trial by jury.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff, individually and on behalf of others similarly situated, respectfully request that all Defendants appear and answer herein, and that the Court grant the following relief:

1.    Assume jurisdiction over Plaintiff's claims and the claims of the Class Members;

2.    Certification of this case and the claims for class treatment, with the class defined as set forth in this complaint;

3.    Designate Plaintiff as representatives for the class;

4.    Designate the undersigned as counsel for the class;

5.    Find that the tying arrangement set forth hereinabove violates provisions of the Sherman Antitrust Act and to make provisions to have the Board Certification process divested from iaedp;

6.    Find that Defendant Harken was unjustly enriched as a proximate result of their illegal and criminal conduct;

7.    Declare that Defendants entered into an illegal civil conspiracy;

8.    Declare that Defendants violated the afore-mentioned sections of the Racketeer Influenced Corrupt Organizations Act;

9.    Declare that Plaintiff and the Class Members sustained actual damages as a proximate result of Defendants' conduct;

10.   Return to Plaintiff and the Plaintiff Class all monies paid to iaedp from January 1, 2017, to present;

11.   Award to Plaintiff and the Class Members their actual damages as a proximate result of Defendants' conduct;

12.   Award to Plaintiff' counsel all reasonable and necessary attorney's fees incurred prosecuting this action;

13.   Award to Plaintiff treble damages;

14.   Award to Plaintiff exemplary damages, and;

15.   Award such other relief, at law or in equity, as the Court deems just and proper.

Respectfully submitted,

*Steven Dunn*

_____
Steven R. Dunn
State Bar No. 06252250
5830 Preston Fairways
Dallas, Texas 75252

Telephone (214) 769.7810
*steven@dunnlawfirm.net*

**ATTORNEY FOR PLAINTIFF**

# EXHIBIT

# 1

**change.org**

Petition details    Comments



# Remove Bonnie Harken as Managing Director of iaedp & Change Certification Policy

Started                    December 17, 2023

**165**                                              **200**
Signatures                                          Next Goal

Support now

Sign this petition

## Why this petition matters

 Started by **Monika Saigal, MS, RD, CEDS-S, CDN**

We are calling for the immediate removal of Bonnie Harken from her position as Managing Director of the International Association of Eating Disorders Professionals (iaedp). We believe that her leadership has not been in the best interest of members of iaedp or the eating disorder community. Over the years, many iaedp members have sought to communicate with Ms. Harken to improve iaedp. We have often been met with disrespect and a dismissive tone and our concerns were not appropriately addressed. Many members and chapter leaders within the organization believe that we deserve a leader who is open to new ideas and collaboration, and one who can be respectful when communicating with constituents who are interested in promoting excellence within the organization.

Furthermore, we demand an immediate separation between Certification and membership requirements and symposium attendance. Currently, professionals are required to be members of iaedp and attend the iaedp symposium every four years to obtain and maintain certification - a policy that places undue financial burden on many professionals who are dedicated to helping those with eating disorders. This system creates a barrier to entry for many qualified individuals whose contributions are essential to our field. Additionally, this policy and practice may also be illegal per antitrust laws.

Sign this petition if you believe that a change to the current certification policy and the removal of Bonnie Harken from iaedp's leadership are necessary to promote inclusivity and progress in the eating disorder field and better serve our community.

🏳 Report a policy violation



**Download this QR code** to help others easily find and sign the petition.

🎭 Support now

Sign this petition



Victories Every Day — **100% Funded by You**

Not beholden to politics or power brokers, Change.org is free for people everywhere to make change. Every day there are real victories for issues you care about, only possible because we are 100% funded by everyday people like you.

**Will you stand with us to protect the power of everyday people to make a difference?**



| $3 | $5 | $10 |
| $20 | Other | |

Support Change.org

Pay with credit card or *PayPal*

## Updates

**Action Steps to Help Our Voices Be Heard**

Until Bonnie Harken is removed or steps down from leadership and the current certification policy is changed, here are some additional steps you can take to help our voices be heard: Share this petition with others in the eating disorder community. There is strength in numbers. If you are an iaedp member (or considering membership), pause o...

**Monika Saigal, MS, RD, CEDS-S, CDN**
2 weeks ago

Monika Saigal, MS, RD, CEDS-S, CDN started this petition            2 weeks ago

## Reasons for signing

 Support now

**Meghan Cichy**
2 weeks ago

Here is my letter to IAEDP from Feb 2022.

2/25/2022

Dear IAEDP Board of Directors, Affiliates, and Members,

I started my IAEDP membership in 2014 and earned my CEDRD certification in 2015. My membership and certification are set to expire on 6/30/2021 and after speaking with Black colleagues, I have decided not to renew. Here's why:

The presence of Black clinicians in leadership positions, in trainings, and as approved supervisors within IAEDP is inadequate.

There are no Black dietitian supervisors, therefore Black dietitians would need to pay for supervision from white dietitians, which inherently causes harm. There is only one Black board member at IAEDP Representation of Black clinicians within IADEP appears limited to the African-American Eating Disorders Professionals (AAEDP) Committee established in 2016.

There are no Black authors or editors listed in the required texts for the certification core courses.

The clinicians scheduled to teach the core courses at the 2021 symposium all appear to be white.

There are no Black folks keynote speaking at the 2021 symposium Only 8 of 128 speakers listed for the 2021 symposium are Black Speakers are not paid to present at the symposium and are still required to pay to attend the symposium. This is a form of financial gatekeeping that puts limitations on who is able to present each year.

IAEDP displays a lack of commitment to racial justice. Black folks are not listed as one of IAEDPs special populations.

IAEDP made a choice to host their 2016 symposium at a plantation/enslaved labor camp and has made no apology or claimed accountability for these harmful actions. The cost of IAEDP membership and certification is significant and prohibitive for many skilled and experienced providers in the eating disorder field. This is more financial gatekeeping that harms both providers and patients. The certification process no longer includes the equivalence route which forces all providers, independent of personal or professional experience, to pay for supervision from a pool of primarily white clinicians.

Annual membership fee: $195

Certification application fee: $150

Certification renewal fee due every 2 years: $150

Attendance at an IAEDP conference required every 4 years: 2019 Rates $725

Hotel: $330/night

Flight: $300+
Meals: $60/day+
Lost Income from time off: $1200+
Total Conference cost: $3395
2,500 supervised practice hours over at least 2 years: $150/hour x 21 hours with approved supervisor = $3150
$400 for core courses
14 required texts: $350+
$100 Exam
Total Cost to become Certified: $4150

Total Annual cost for membership including IAEDP conference and certification renewal fee: $3,800 ($1,118.75/year if conference and renewal fee are divided into per year totals)

Total cost to obtain and maintain certification and membership: $7950

If IAEDP members holding certifications are contributing $1,118.75 per year to IAEDP, who appears to be making no perceivable changes to racial justice issues within their organization or to issues facing Black folks in the eating disorders field more broadly, would that money not be better spent with organizations that are led by Black folks and doing work to meet the needs of Black folks in the community?

The IAEDP certification itself is a form of gatekeeping of "expertise" and experience. The insinuation that IAEDP certified providers are the "experts" in the field communicates that providers without the certification are not "experts" and thus less competent or capable of providing excellent care.

While IAEDP has made their certifications inaccessible to many people, they are also reinforcing a false notion that the certification is required to demonstrate proficiency and capability in caring for folks with eating disorders while centering their training on whiteness and other privileged identities.

The certification only communicates that folks have checked the boxes for the certification and paid a significant amount of money. It does not ensure that they are actually ethical, aware, and capable providers.

This certification prioritizes checkboxes over lived experience of eating disorders and over professional experience working with the eating disorder population. Referring providers cannot rely on a CEDRD or CEDS to communicate that a provider is safe or safer for eating disorder patients and especially not for patients with marginalized identities.

If the certification cannot guarantee ethical and capable care to all folks with eating disorders, then what is the use of the certification?

What if instead of promoting an exclusionary certification program, IAEDP focused time, energy, and money towards making eating disorder training that goes beyond a white-centric perspective available to all clinicians, providers, and community members who desire it?

And as an aside: My own experience of obtaining certification in 2015 was disheartening. I did not feel stretched or pressed to learn more or expand my knowledge or understanding of the complexities of eating disorders and eating disorder care. I was not learning from authors, teachers, clinicians who held marginalized identities. It very much felt like checking the boxes and paying the money to be able to add these letters of "expertise" to my name without actually developing my capabilities as a provider.

The following is a working list of calls to action developed by Black providers in the field: Reallocate the funds, energy and admin support to investment in trainings by Black folks and others most impacted by white supremacy culture in the eating disorder field Prioritize Black speakers at conferences for all topics, not only those related to "diversity" Acknowledge and apologize for the harm done by having a conference on a plantation Support the creation of BIPOC led, staffed eating disorder treatment center.

I look forward to your response and deep consideration and integration of the concerns and calls to action shared here.


Thank you,


Meghan Cichy, RDN, CD
She/Her
Registered Dietitian at Meghan Cichy, LLC
Meghan@MeghanCichyRDN.com

**Tori White**
2 weeks ago

I am not an IADEP member largely because of this requirement to attend symposium in order to maintain membership/credentialing. The cost and time is prohibitive especially for providers who are self employed.

Report

**Gina Mateer**
2 weeks ago

I am currently a CEDS-C and have continued to stay credentialled to support the future of the eating disorder field. But at this point the lack of commitment to the betterment of the field, the racism and fat phobia embedded within the organization as well as the inappropriate certification process that requires attendance to conference and membership dues needs to stop.

Report

**Rachel Engelhart**
2 weeks ago

IADEP as it stands is a prohibitive/exclusive organization that takes significant means to be a part of. If we want to be an inclusive group of providers, we need to make certification and opportunities to learn and grow open to everyone.

Report

**Tracy Bergeron**
2 weeks ago

I have dedicated my career to the treatment of eating disorders and have worked incredibly hard to earn my certification. Over the past few years, it's become harder and harder to support the actions of iaedp as they do not represent the beliefs and values of their members. With a change of leadership, hopefully iaedp can again become an organization we can be proud to support, and the hard-earned credentials of certified members can mean something again.

Report

**Erica Leon**
1 week ago

iaedp needs to be responsive to issues of gatekeeping and perpetuating harm to marginalized communities, including people of color, women, LGBTQ+, low-income individuals, disabled, as well as fat individuals.

I have been an RDN for 40 years, and over that time, I have seen the harm the field of nutrition, as well as eating disorder treatment, has caused. Weight stigma is still baked into this organization, as is gatekeeping, as the cost of becoming a CEDS is prohibitive to many highly qualified clinicians. I am letting my IAEDP certification lapse; Instead, I will continue to learn from and support organizations such as Project Heal and the BIPOC Eating Disorder Conference, which help educate clinicians about the lived experiences of marginalized communities and describe treatment interventions that prevent harm and promote healing.

Report

**Caitlyn Shoemaker**
1 week ago

It is disgraceful for someone in power to stay on when they are no longer serving for the good of the organization.

Report

**Emily Arkin**
1 week ago

iaedp needs to be responsive to issues of gatekeeping and perpetuating anti-fat attitudes that harm individuals with eating disorders. I'm a dietitian who's qualified to apply for the CEDS certification but have no plans to until the organization addresses these problems.

Report

**Rebecca Armstrong**
2 weeks ago

I want the CEDS credential to mean something and to be associated with an organization that is upstanding. IAEDP needs change.

Report

EXHIBIT

2

STATE OF CALIFORNIA
RRF-1
(Rev. 02/2021)

**DEPARTMENT OF JUSTICE**
PAGE 1 of 5
(For Registry Use Only)

MAIL TO:
Registry of Charitable Trusts
P.O. Box 903447
Sacramento, CA 94203-4470

STREET ADDRESS:
1300 I Street
Sacramento, CA 95814
(916) 210-6400

WEBSITE ADDRESS:
www.oag.ca.gov/charities

**ANNUAL REGISTRATION RENEWAL FEE REPORT TO ATTORNEY GENERAL OF CALIFORNIA**

Sections 12586 and 12587, California Government Code
11 Cal. Code Regs. sections 301-306, 309, 311, and 312

Failure to submit this report annually no later than four months and fifteen days after the end of the organization's accounting period may result in the loss of tax exemption and the assessment of a minimum tax of $800, plus interest, and/or fines or filing penalties. Revenue & Taxation Code section 23703; Government Code section 12586.1. IRS extensions will be honored.

RECEIVED
Attorney General's Office

SEP 22 2023

Registry of Charitable Trusts

Name of Organization: **INTERNATIONAL ASSOCIATION OF EATING DISORDERS PROFESSIONALS FOUND INC**

Check if:
- [ ] Change of address
- [ ] Amended report

List all DBAs and names the organization uses or has used

Address (Number and Street): **PO BOX 1295**

City or Town, State, and ZIP Code: **PEKIN, IL 61555-1295**

Telephone Number: **(800)800-8126**    E-mail Address: **BONNIE@IAEDP.COM**

State Charity Registration Number CT **105244**

Corporation or Organization No. **1996971**

Federal Employer ID No. **33-0143040**

**ANNUAL REGISTRATION RENEWAL FEE SCHEDULE (11 Cal. Code Regs. sections 301-307, 311, and 312)**
**Make Check Payable to Department of Justice**

| Total Revenue | Fee | Total Revenue | Fee | Total Revenue | Fee |
|---|---|---|---|---|---|
| Less than $50,000 | $25 | Between $250,001 and $1 million | $100 | Between $20,000,001 and $100 million | $800 |
| Between $50,000 and $100,000 | $50 | Between $1,000,001 and $5 million | $200 | Between $100,000,001 and $500 million | $1,000 |
| Between $100,001 and $250,000 | $75 | Between $5,000,001 and $20 million | $400 | Greater than $500 million | $1,200 |

**PART A - ACTIVITIES**

For your most recent full accounting period (beginning **01/01/2021** ending **12/31/2021** ) list:

Total Revenue (including noncash contributions) $ **1,346,829**   Noncash Contributions $ **0**   Total Assets $ **1,131,784**

Program Expenses $ **750,499**   Total Expenses $ **1,007,279**

**PART B - STATEMENTS REGARDING ORGANIZATION DURING THE PERIOD OF THIS REPORT**

Note: All questions must be answered. If you answer "yes" to any of the questions below, you must attach a separate page providing an explanation and details for each "yes" response. Please review RRF-1 instructions for information required.

| | | Yes | No |
|---|---|---|---|
| 1. | During this reporting period, were there any contracts, loans, leases or other financial transactions between the organization and any officer, director or trustee thereof, either directly or with an entity in which any such officer, director or trustee had any financial interest? | | X |
| 2. | During this reporting period, was there any theft, embezzlement, diversion or misuse of the organization's charitable property or funds? | | X |
| 3. | During this reporting period, were any organization funds used to pay any penalty, fine or judgment? | | X |
| 4. | During this reporting period, were the services of a commercial fundraiser, fundraising counsel for charitable purposes, or commercial coventurer used? | | X |
| 5. | During this reporting period, did the organization receive any governmental funding? | | X |
| 6. | During this reporting period, did the organization hold a raffle for charitable purposes? | | X |
| 7. | Does the organization conduct a vehicle donation program? | | X |
| 8. | Did the organization conduct an independent audit and prepare audited financial statements in accordance with generally accepted accounting principles for this reporting period? | | X |
| 9. | At the end of this reporting period, did the organization hold restricted net assets, while reporting negative unrestricted net assets? | | X |

I declare under penalty of perjury that I have examined this report, including accompanying documents, and to the best of my knowledge and belief, the content is true/correct and complete, and I am authorized to sign.

Signature of Authorized Agent    Printed Name: **BONNIE HARKEN**    Title: **MANAGING DIRECTOR**    Date: **09/20/2023**

129291
01-17-22

$200- 971569   Ck- 10706

Form **8868**
(Rev. January 2022)

## Application for Automatic Extension of Time To File an Exempt Organization Return

▶ File a separate application for each return.
▶ Go to www.irs.gov/Form8868 for the latest information.

OMB No. 1545-0047

Department of the Treasury
Internal Revenue Service

**Electronic filing (e-file).** You can electronically file Form 8868 to request a 6-month automatic extension of time to file any of the forms listed below with the exception of Form 8870, Information Return for Transfers Associated With Certain Personal Benefit Contracts, for which an extension request must be sent to the IRS in paper format (see instructions). For more details on the electronic filing of this form, visit *www.irs.gov/e-file-providers/e-file-for-charities-and-non-profits.*

**Automatic 6-Month Extension of Time.** Only submit original (no copies needed).

All corporations required to file an income tax return other than Form 990-T (including 1120-C filers), partnerships, REMICs, and trusts must use Form 7004 to request an extension of time to file income tax returns.

| Type or print | Name of exempt organization or other filer, see instructions. | Taxpayer identification number (TIN) |
|---|---|---|
| | INTERNATIONAL ASSOCIATION OF EATING DISORDERS PROFESSIONALS FOUND INC | 33-0143040 |
| File by the due date for filing your return. See instructions. | Number, street, and room or suite no. If a P.O. box, see instructions.<br>PO BOX 1295 | |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions.<br>PEKIN, IL 61555-1295 | |

Enter the Return Code for the return that this application is for (file a separate application for each return) | **0** | **1** |

| Application<br>Is For | Return<br>Code | Application<br>Is For | Return<br>Code |
|---|---|---|---|
| Form 990 or Form 990-EZ | 01 | Form 1041-A | 08 |
| Form 4720 (individual) | 03 | Form 4720 (other than individual) | 09 |
| Form 990-PF | 04 | Form 5227 | 10 |
| Form 990-T (sec. 401(a) or 408(a) trust) | 05 | Form 6069 | 11 |
| Form 990-T (trust other than above) | 06 | Form 8870 | 12 |
| Form 990-T (corporation) | 07 | | |

BONNIE HARKEN
● The books are in the care of ▶ 1103 S 5TH ST - PEKIN, IL 61554

Telephone No. ▶ (800)800-8126     Fax No. ▶

● If the organization does not have an office or place of business in the United States, check this box ....................... ▶ ☐
● If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN) _____ . If this is for the whole group, check this box ▶ ☐ . If it is for part of the group, check this box ▶ ☐ and attach a list with the names and TINs of all members the extension is for.

**1** I request an automatic 6-month extension of time until    **NOVEMBER 15, 2022** , to file the exempt organization return for the organization named above. The extension is for the organization's return for:
▶ ☒ calendar year **2021** or
▶ ☐ tax year beginning _____ , and ending _____ .

**2** If the tax year entered in line 1 is for less than 12 months, check reason: ☐ Initial return ☐ Final return
☐ Change in accounting period

| | | | |
|---|---|---|---|
| **3a** | If this application is for Forms 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | **3a** $ | 0. |
| **b** | If this application is for Forms 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit. | **3b** $ | 0. |
| **c** | **Balance due.** Subtract line 3b from line 3a. Include your payment with this form, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | **3c** $ | 0. |

**Caution:** If you are going to make an electronic funds withdrawal (direct debit) with this Form 8868, see Form 8453-TE and Form 8879-TE for payment instructions.

LHA    **For Privacy Act and Paperwork Reduction Act Notice, see instructions.**    Form **8868** (Rev. 1-2022)

123841 01-12-22

16371117 781445 56506.000          2021.05000 INTERNATIONAL ASSOCIATION 56506.01

EXTENDED TO NOVEMBER 15, 2022

Form **990**

Department of the Treasury
Internal Revenue Service

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

**2021**

Open to Public
Inspection

**A** For the 2021 calendar year, or tax year beginning _____ and ending _____

| B Check if applicable: | C Name of organization | | D Employer identification number |
|---|---|---|---|
| ☐ Address change | INTERNATIONAL ASSOCIATION OF EATING DISORDERS PROFESSIONALS FOUND INC | | |
| ☐ Name change | Doing business as | | 33-0143040 |
| ☐ Initial return | Number and street (or P.O. box if mail is not delivered to street address) | Room/suite | E Telephone number |
| ☐ Final return/terminated | PO BOX 1295 | | (800)800-8126 |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code | | G Gross receipts $ 1,346,829. |
| ☐ Application pending | PEKIN, IL 61555-1295 | | |
| | F Name and address of principal officer: BONNIE HARKEN | | H(a) Is this a group return for subordinates? ☐ Yes ☒ No |
| | 1103 S 5TH ST, PEKIN, IL 615544525 | | H(b) Are all subordinates included? ☐ Yes ☐ No |

**I** Tax-exempt status: ☒ 501(c)(3)   ☐ 501(c) (   )◀ (insert no.)   ☐ 4947(a)(1) or ☐ 527

If "No," attach a list. See instructions

**J** Website: ▶ WWW.IAEDP.COM

H(c) Group exemption number ▶

**K** Form of organization: ☒ Corporation  ☐ Trust  ☐ Association  ☐ Other ▶     **L** Year of formation: 1996  **M** State of legal domicile: CA

### Part I | Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities: RESEARCH/EDUCATION REGARDING EATING DISORDERS

2 Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets.

| | | | |
|---|---|---|---|
| 3 Number of voting members of the governing body (Part VI, line 1a) | | 3 | 17 |
| 4 Number of independent voting members of the governing body (Part VI, line 1b) | | 4 | 17 |
| 5 Total number of individuals employed in calendar year 2021 (Part V, line 2a) | | 5 | 0 |
| 6 Total number of volunteers (estimate if necessary) | | 6 | 40 |
| 7 a Total unrelated business revenue from Part VIII, column (C), line 12 | | 7a | 0. |
| b Net unrelated business taxable income from Form 990-T, Part I, line 11 | | 7b | 0. |

**Revenue**

| | | Prior Year | Current Year |
|---|---|---|---|
| 8 | Contributions and grants (Part VIII, line 1h) | 152,500. | 107,865. |
| 9 | Program service revenue (Part VIII, line 2g) | 1,155,336. | 1,238,939. |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 25. | 25. |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0. | 0. |
| 12 | Total revenue - add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 1,307,861. | 1,346,829. |

**Expenses**

| | | | |
|---|---|---|---|
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1-3) | 5,000. | 2,000. |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 0. | 0. |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 5,833. | 0. |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0. | 0. |
| b | Total fundraising expenses (Part IX, column (D), line 25) ▶ 0. | | |
| 17 | Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 1,183,417. | 1,005,279. |
| 18 | Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 1,194,250. | 1,007,279. |
| 19 | Revenue less expenses. Subtract line 18 from line 12 | 113,611. | 339,550. |

**Net Assets or Fund Balances**

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| 20 | Total assets (Part X, line 16) | 795,629. | 1,131,784. |
| 21 | Total liabilities (Part X, line 26) | 3,395. | 0. |
| 22 | Net assets or fund balances. Subtract line 21 from line 20 | 792,234. | 1,131,784. |

### Part II | Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | ▶ | Signature of officer | | Date |
|---|---|---|---|---|
| | ▶ | BONNIE HARKEN, MANAGING DIRECTOR | | |
| | | Type or print name and title | | |

| | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| Paid Preparer Use Only | JEANNE DEE | | | | P01082093 |
| | Firm's name ▶ ANDERS MINKLER HUBER & HELM LLP | | | Firm's EIN ▶ 43-0831507 | |
| | Firm's address ▶ 800 MARKET STREET, SUITE 500 ST. LOUIS, MO 63101-2501 | | | Phone no. (314)655-5500 | |

May the IRS discuss this return with the preparer shown above? See instructions ........ ☒ Yes ☐ No

132001 12-09-21   LHA   **For Paperwork Reduction Act Notice, see the separate instructions.**   Form **990** (2021)

INTERNATIONAL ASSOCIATION OF EATING

Form 990 (2021)   DISORDERS PROFESSIONALS FOUND INC        33-0143040   Page **2**

| Part III | Statement of Program Service Accomplishments |

Check if Schedule O contains a response or note to any line in this Part III ........................................................................................ [X]

**1**  Briefly describe the organization's mission:

RESEARCH/EDUCATION REGARDING EATING DISORDERS

**2**  Did the organization undertake any significant program services during the year which were not listed on the
prior Form 990 or 990-EZ? .......................................................................................................................... [ ] Yes [X] No
If "Yes," describe these new services on Schedule O.

**3**  Did the organization cease conducting, or make significant changes in how it conducts, any program services? ................. [ ] Yes [X] No
If "Yes," describe these changes on Schedule O.

**4**  Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses.
Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and
revenue, if any, for each program service reported.

**4a**  (Code: _____ ) (Expenses $        750,499. including grants of $        2,000. ) (Revenue $      1,238,939. )
OFFERED SYMPOSIUM WORKSHOPS AND SPEAKERS AS EDUCATIONAL AND TRAINING
OPPORTUNITIES; OFFERED PRE-SYMPOSIUM PROFESSIONAL DEVELOPMENT
INSTITUTES DESIGNED TO PROVIDE MORE INTENSIVE SKILLS TRAINING FOR
EATING DISORDERS PROFESSIONALS; PROVIDED PRE-CERTIFICATION WORKSHOPS
FOR PROFESSIONALS SEEKING CERTIFICATION; OFFERED TRACK FOR PHYSICIANS
TO LEARN ABOUT DIAGNOSING AND MANAGING EATING DISORDERS; PROVIDED
MONTHLY NEWSLETTERS TO UPDATE PREVENTION, RESEARCH, TRAINING AND
TREATMENT ISSUES; PROVIDED REFERRALS TO PROFESSIONALS AND GENERAL
PUBLIC. REFERRALS INCLUDE THERAPISTS, TREATMENT CENTERS AND
NUTRITIONISTS/DIETICIANS VIA SEARCH FUNCTION FROM ONLINE MEMBERSHIP
DIRECTORY; PROVIDED COMPREHENSIVE INFORMATIONAL AND INTERACTIVE WEBSITE
FOR EDUCATIONAL AND REFERENCE INFORMATION; PROVIDED CONSULTATION TO

**4b**  (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4c**  (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4d**  Other program services (Describe on Schedule O.)
(Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4e**  Total program service expenses ▶        750,499.

Form **990** (2021)

132002 12-09-21

SEE SCHEDULE O FOR CONTINUATION(S)

16371117 781445 56506.000         2021.05000 INTERNATIONAL ASSOCIATION 56506.01

INTERNATIONAL ASSOCIATION OF EATING
DISORDERS PROFESSIONALS FOUND INC

Form 990 (2021)       33-0143040    Page **3**

**Part IV | Checklist of Required Schedules**

| | | Yes | No |
|---|---|---|---|
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? | | |
| | If "Yes," complete Schedule A ................................................................ **1** | X | |
| **2** | Is the organization required to complete *Schedule B, Schedule of Contributors*? See instructions ........................... **2** | X | |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for | | |
| | public office? If "Yes," complete Schedule C, Part I ................................................ **3** | | X |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect | | |
| | during the tax year? If "Yes," complete Schedule C, Part II .......................................... **4** | | X |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or | | |
| | similar amounts as defined in Rev. Proc. 98-19? If "Yes," complete Schedule C, Part III ................ **5** | | X |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to | | |
| | provide advice on the distribution or investment of amounts in such funds or accounts? If "Yes," complete Schedule D, Part I ......... **6** | | X |
| **7** | Did the organization receive or hold a conservation easement, including easements to preserve open space, | | |
| | the environment, historic land areas, or historic structures? If "Yes," complete Schedule D, Part II ........ **7** | | X |
| **8** | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete | | |
| | Schedule D, Part III ......................................................................... **8** | | X |
| **9** | Did the organization report an amount in Part X, line 21, for escrow or custodial account liability, serve as a custodian for | | |
| | amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? | | |
| | If "Yes," complete Schedule D, Part IV .......................................................... **9** | | X |
| **10** | Did the organization, directly or through a related organization, hold assets in donor-restricted endowments | | |
| | or in quasi endowments? If "Yes," complete Schedule D, Part V ..................................... **10** | | X |
| **11** | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X, | | |
| | as applicable. | | |
| **a** | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? If "Yes," complete Schedule D, | | |
| | Part VI ................................................................................... **11a** | X | |
| **b** | Did the organization report an amount for investments - other securities in Part X, line 12, that is 5% or more of its total | | |
| | assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VII .......................... **11b** | | X |
| **c** | Did the organization report an amount for investments - program related in Part X, line 13, that is 5% or more of its total | | |
| | assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VIII ......................... **11c** | | X |
| **d** | Did the organization report an amount for other assets in Part X, line 15, that is 5% or more of its total assets reported in | | |
| | Part X, line 16? If "Yes," complete Schedule D, Part IX ............................................ **11d** | | X |
| **e** | Did the organization report an amount for other liabilities in Part X, line 25? If "Yes," complete Schedule D, Part X .......... **11e** | | X |
| **f** | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses | | |
| | the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? If "Yes," complete Schedule D, Part X ........ **11f** | | X |
| **12a** | Did the organization obtain separate, independent audited financial statements for the tax year? If "Yes," complete | | |
| | Schedule D, Parts XI and XII .................................................................. **12a** | | X |
| **b** | Was the organization included in consolidated, independent audited financial statements for the tax year? | | |
| | If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional .......... **12b** | | X |
| **13** | Is the organization a school described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E ................ **13** | | X |
| **14a** | Did the organization maintain an office, employees, or agents outside of the United States? ................ **14a** | | X |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, | | |
| | investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 | | |
| | or more? If "Yes," complete Schedule F, Parts I and IV ............................................ **14b** | | X |
| **15** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any | | |
| | foreign organization? If "Yes," complete Schedule F, Parts II and IV ................................ **15** | | X |
| **16** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to | | |
| | or for foreign individuals? If "Yes," complete Schedule F, Parts III and IV .......................... **16** | | X |
| **17** | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, | | |
| | column (A), lines 6 and 11e? If "Yes," complete Schedule G, Part I. See instructions ................... **17** | | X |
| **18** | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines | | |
| | 1c and 8a? If "Yes," complete Schedule G, Part II ................................................ **18** | | X |
| **19** | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? If "Yes," | | |
| | complete Schedule G, Part III .................................................................. **19** | | X |
| **20a** | Did the organization operate one or more hospital facilities? If "Yes," complete Schedule H ................ **20a** | | X |
| **b** | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? .......... **20b** | | |
| **21** | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or | | |
| | domestic government on Part IX, column (A), line 1? If "Yes," complete Schedule I, Parts I and II ........... **21** | | X |

132003 12-09-21           Form **990** (2021)

Form 990 (2021)  INTERNATIONAL ASSOCIATION OF EATING
                  DISORDERS PROFESSIONALS FOUND INC         33-0143040     Page 4

## Part IV | Checklist of Required Schedules *(continued)*

|  |  |  | Yes | No |
|---|---|---|---|---|
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* | 22 | | X |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5, about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* | 23 | | X |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* | 24a | | X |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? | 24d | | |
| 25a | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* | 25a | | X |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* | 25b | | X |
| 26 | Did the organization report any amount on Part X, line 5 or 22, for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* | 26 | | X |
| 27 | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L, Part III* | 27 | | X |
| 28 | Was the organization a party to a business transaction with one of the following parties (see the Schedule L, Part IV, instructions for applicable filing thresholds, conditions, and exceptions): | | | |
| a | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* | 28a | | X |
| b | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* | 28b | X | |
| c | A 35% controlled entity of one or more individuals and/or organizations described in line 28a or 28b? *If "Yes," complete Schedule L, Part IV* | 28c | X | |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* | 29 | | X |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* | 30 | | X |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | 31 | | X |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* | 32 | | X |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* | 33 | | X |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* | 34 | | X |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | 35a | | X |
| b | If "Yes" to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* | 35b | | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* | 36 | | X |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | 37 | | X |
| 38 | Did the organization complete Schedule O and provide explanations on Schedule O for Part VI, lines 11b and 19? **Note:** All Form 990 filers are required to complete Schedule O. | 38 | X | |

## Part V | Statements Regarding Other IRS Filings and Tax Compliance

Check if Schedule O contains a response or note to any line in this Part V ☐

|  |  |  |  | Yes | No |
|---|---|---|---|---|---|
| 1a | Enter the number reported in box 3 of Form 1096. Enter -0- if not applicable | 1a | 14 | | |
| b | Enter the number of Forms W-2G included on line 1a. Enter -0- if not applicable | 1b | 0 | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? | | | 1c | X | |

132004 12-09-21                                                                 Form **990** (2021)

INTERNATIONAL ASSOCIATION OF EATING
DISORDERS PROFESSIONALS FOUND INC

Form 990 (2021)                                                                                          33-0143040          Page **5**

| Part V | Statements Regarding Other IRS Filings and Tax Compliance *(continued)* |

|  |  | Yes | No |
|---|---|---|---|
| **2a** Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return ........... | **2a** | 0 |  |  |
| **b** If at least one is reported on line 2a, did the organization file all required federal employment tax returns? ........................ | **2b** |  |  |
| **Note:** If the sum of lines 1a and 2a is greater than 250, you may be required to *e-file.* See instructions. ........................ |  |  |  |
| **3a** Did the organization have unrelated business gross income of $1,000 or more during the year? ........................ | **3a** |  | X |
| **b** If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation on Schedule O* ........................ | **3b** |  |  |
| **4a** At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? ........... | **4a** |  | X |
| **b** If "Yes," enter the name of the foreign country ▶ | | | |
| See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | |
| **5a** Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? ........................ | **5a** |  | X |
| **b** Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? ........................ | **5b** |  | X |
| **c** If "Yes" to line 5a or 5b, did the organization file Form 8886-T? ........................ | **5c** |  |  |
| **6a** Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? ........................ | **6a** |  | X |
| **b** If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? ........................ | **6b** |  |  |
| **7** **Organizations that may receive deductible contributions under section 170(c).** | | | |
| **a** Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? | **7a** |  | X |
| **b** If "Yes," did the organization notify the donor of the value of the goods or services provided? ........................ | **7b** |  |  |
| **c** Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? ........................ | **7c** |  | X |
| **d** If "Yes," indicate the number of Forms 8282 filed during the year ........... | **7d** | | | |
| **e** Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? ........... | **7e** |  |  |
| **f** Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? ........... | **7f** |  |  |
| **g** If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? ........... | **7g** |  |  |
| **h** If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? | **7h** |  |  |
| **8** **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? ........................ | **8** |  |  |
| **9** **Sponsoring organizations maintaining donor advised funds.** | | | |
| **a** Did the sponsoring organization make any taxable distributions under section 4966? ........................ | **9a** |  |  |
| **b** Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? ........................ | **9b** |  |  |
| **10** **Section 501(c)(7) organizations.** Enter: | | | |
| **a** Initiation fees and capital contributions included on Part VIII, line 12 ........... | **10a** | | | |
| **b** Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities ........... | **10b** | | | |
| **11** **Section 501(c)(12) organizations.** Enter: | | | |
| **a** Gross income from members or shareholders ........................ | **11a** | | | |
| **b** Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) ........................ | **11b** | | | |
| **12a** **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | **12a** | | | |
| **b** If "Yes," enter the amount of tax-exempt interest received or accrued during the year ........... | **12b** | | | |
| **13** **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | |
| **a** Is the organization licensed to issue qualified health plans in more than one state? ........................ | **13a** | | | |
| **Note:** See the instructions for additional information the organization must report on Schedule O. | | | |
| **b** Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans ........... | **13b** | | | |
| **c** Enter the amount of reserves on hand ........................ | **13c** | | | |
| **14a** Did the organization receive any payments for indoor tanning services during the tax year? ........................ | **14a** |  | X |
| **b** If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation on Schedule O* ........... | **14b** |  |  |
| **15** Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? ........................ | **15** |  | X |
| If "Yes," see the instructions and file Form 4720, Schedule N. | | | |
| **16** Is the organization an educational institution subject to the section 4968 excise tax on net investment income? ........... | **16** |  | X |
| If "Yes," complete Form 4720, Schedule O. | | | |
| **17** **Section 501(c)(21) organizations.** Did the trust, any disqualified person, or mine operator engage in any activities that would result in the imposition of an excise tax under section 4951, 4952 or 4953? ........................ | **17** | | | |
| If "Yes," complete Form 6069. | | | |

132005 12-09-21

Form **990** (2021)

16371117 781445 56506.000              2021.05000 INTERNATIONAL ASSOCIATION 56506.01

INTERNATIONAL ASSOCIATION OF EATING
DISORDERS PROFESSIONALS FOUND INC                    33-0143040    Page **6**

Form 990 (2021)

**Part VI** | **Governance, Management, and Disclosure.** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes on Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI ............................................ ☒

## Section A. Governing Body and Management

| | | | Yes | No |
|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body at the end of the tax year ............ **1a** | 17 | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain on Schedule O. | | | |
| b | Enter the number of voting members included on line 1a, above, who are independent ............ **1b** | 17 | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | **2** | | X |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors, trustees, or key employees to a management company or other person? | **3** | X | |
| 4 | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? ............ | **4** | | X |
| 5 | Did the organization become aware during the year of a significant diversion of the organization's assets? ............ | **5** | | X |
| 6 | Did the organization have members or stockholders? | **6** | | X |
| 7a | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? | **7a** | | X |
| b | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? | **7b** | | X |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | |
| a | The governing body? | **8a** | X | |
| b | Each committee with authority to act on behalf of the governing body? | **8b** | X | |
| 9 | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses on Schedule O* | **9** | | X |

## Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | | Yes | No |
|---|---|---|---|---|
| 10a | Did the organization have local chapters, branches, or affiliates? | **10a** | X | |
| b | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? ............ | **10b** | X | |
| 11a | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | **11a** | X | |
| b | Describe on Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| 12a | Did the organization have a written conflict of interest policy? *If "No," go to line 13* | **12a** | X | |
| b | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | **12b** | X | |
| c | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe on Schedule O how this was done* | **12c** | X | |
| 13 | Did the organization have a written whistleblower policy? ............ | **13** | | X |
| 14 | Did the organization have a written document retention and destruction policy? ............ | **14** | | X |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a | The organization's CEO, Executive Director, or top management official ............ | **15a** | X | |
| b | Other officers or key employees of the organization ............ | **15b** | | X |
| | If "Yes" to line 15a or 15b, describe the process on Schedule O. See instructions. | | | |
| 16a | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? | **16a** | | X |
| b | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? | **16b** | | |

## Section C. Disclosure

17   List the states with which a copy of this Form 990 is required to be filed ▶ **CA**

18   Section 6104 requires an organization to make its Forms 1023 (1024 or 1024-A, if applicable), 990, and 990-T (section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.
☐ Own website   ☒ Another's website   ☐ Upon request   ☐ Other *(explain on Schedule O)*

19   Describe on Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

20   State the name, address, and telephone number of the person who possesses the organization's books and records ▶ _____
**BONNIE HARKEN - (800)800-8126**
**1103 S 5TH ST, PEKIN, IL  61554**

132006 12-09-21                                                                                    Form **990** (2021)

16371117 781445 56506.000          2021.05000 INTERNATIONAL ASSOCIATION 56506.01

INTERNATIONAL ASSOCIATION OF EATING
DISORDERS PROFESSIONALS FOUND INC

Form 990 (2021)

33-0143040  Page **7**

## Part VII Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors

Check if Schedule O contains a response or note to any line in this Part VII ................................................................ ☐

### Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

• List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation.
Enter -0- in columns (D), (E), and (F) if no compensation was paid.

• List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."

• List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (box 5 of Form W-2, Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.

• List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

• List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

☒ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC/ 1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/ 1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) DENA CABRERA, PSYD, CEDS<br>IMMEDIATE PAST PRESIDENT | 2.50 | X | | X | | | | 0. | 0. | 0. |
| (2) VICKI BERKUS, MD, PHD, CEDS F.I<br>SECRETARY | 2.50 | X | | X | | | | 0. | 0. | 0. |
| (3) RALPH CARSON, PHD CEDS<br>TREASURER | 1.25 | X | | X | | | | 0. | 0. | 0. |
| (4) JOEL JAHRAUS, MD, FAED, CEDS<br>PRESIDENT | 1.25 | X | | | | | | 0. | 0. | 0. |
| (5) ADRIENNE RESSLER, LMSW, CEDS, F<br>DIRECTOR | 1.25 | X | | | | | | 0. | 0. | 0. |
| (6) ROY ERLICHMAN, PHD, CAP, CEDS,<br>DIRECTOR | 1.25 | X | | | | | | 0. | 0. | 0. |
| (7) KOURTNEY GORDON, MS, RD/LD, CED<br>DIRECTOR | 1.25 | X | | | | | | 0. | 0. | 0. |
| (8) NICOLE SIEGFRIED, PHD, CEDS-S<br>DIRECTOR | 1.25 | X | | | | | | 0. | 0. | 0. |
| (9) CHARLYNN SMALL, PHD, CEDS-S<br>DIRECTOR | 1.25 | X | | | | | | 0. | 0. | 0. |
| (10) OVIDIO BERMUDEZ, MD, FAAP, FSAH<br>DIRECTOR | 1.25 | X | | | | | | 0. | 0. | 0. |
| (11) GAYLE BROOKS, PHD, CEDS<br>SAC REPRESENTATIVE | 1.25 | X | | | | | | 0. | 0. | 0. |
| (12) BONNIE HARKEN<br>MANAGING DIRECTOR | 40.00 | | | X | | | | 0. | 0. | 0. |
| (13) CAROLINA GAVIRIA, LMHC, NCC, CE<br>DIRECTOR | 1.25 | X | | | | | | 0. | 0. | 0. |
| (14) ROSANNA MAURO DE MAYA, MS, CEDR<br>INTERNATIONAL CHAIRS REP | 1.25 | X | | | | | | 0. | 0. | 0. |
| (15) DALIT SZKOLNIK, MA, RD, LD/N, C<br>CHAPTER REP | 1.25 | X | | | | | | 0. | 0. | 0. |
| (16) ELISAVETA V PAVLOVA, PHD, CEDS<br>INTERNATIONAL CHAIRS REP | 1.25 | X | | | | | | 0. | 0. | 0. |
| (17) EMMETT R BISHOP MD, CEDS, FAED<br>DIRECTOR | 1.25 | X | | | | | | 0. | 0. | 0. |

132007 12-09-21

Form **990** (2021)

INTERNATIONAL ASSOCIATION OF EATING
DISORDERS PROFESSIONALS FOUND INC

Form 990 (2021)

33-0143040   Page **8**

## Part VII  Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC/ 1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/ 1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (18) ELISHA CONTNER WILKINS, MS, LMF | 1.25 | | | | | | | | | |
| CHAPTER REP | | X | | | | | | 0. | 0. | 0. |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 1b  Subtotal ▶ | | | | | | | | 0. | 0. | 0. |
| c  Total from continuation sheets to Part VII, Section A ▶ | | | | | | | | 0. | 0. | 0. |
| d  Total (add lines 1b and 1c) ▶ | | | | | | | | 0. | 0. | 0. |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶   **0**

| | | | Yes | No |
|---|---|---|---|---|
| **3** | Did the organization list any *former* officer, director, trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* | **3** | | X |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* | **4** | | X |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* | **5** | | X |

### Section B. Independent Contractors

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| CROSSROADS PROGRAMS, INC 1103 SOUTH 5TH STREET, PEKIN, IL 61554 | MANAGEMENT | 156,000. |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶   1

Form **990** (2021)

132008 12-09-21

16371117 781445 56506.000          2021.05000 INTERNATIONAL ASSOCIATION 56506.01

INTERNATIONAL ASSOCIATION OF EATING
DISORDERS PROFESSIONALS FOUND INC

Form 990 (2021)       33-0143040     Page **9**

| Part VIII | Statement of Revenue |
| --- | --- |

Check if Schedule O contains a response or note to any line in this Part VIII ☐

| | | | **(A)** Total revenue | **(B)** Related or exempt function revenue | **(C)** Unrelated business revenue | **(D)** Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | 1 a Federated campaigns | 1a | | | | |
| | b Membership dues | 1b | | | | |
| | c Fundraising events | 1c | | | | |
| | d Related organizations | 1d | | | | |
| | e Government grants (contributions) | 1e | | | | |
| | f All other contributions, gifts, grants, and similar amounts not included above | 1f | 107,865. | | | |
| | g Noncash contributions included in lines 1a-1f | 1g $ | | | | |
| | h **Total.** Add lines 1a-1f ▶ | | 107,865. | | | |
| **Program Service Revenue** | | **Business Code** | | | | |
| | 2 a SYMPOSIUM | 541900 | 580,157. | 580,157. | | |
| | b ASSOCIATION MEMBERSHIP | 541900 | 421,075. | 421,075. | | |
| | c CERTIFICATION | 541900 | 117,316. | 117,316. | | |
| | d IAEDP INSTITUTE | 541900 | 113,327. | 113,327. | | |
| | e WEBINARS | 541900 | 6,160. | 6,160. | | |
| | f All other program service revenue | 541900 | 904. | 904. | | |
| | g **Total.** Add lines 2a-2f ▶ | | 1,238,939. | | | |
| **Other Revenue** | 3 Investment income (including dividends, interest, and other similar amounts) ▶ | | 25. | | | 25. |
| | 4 Income from investment of tax-exempt bond proceeds ▶ | | | | | |
| | 5 Royalties ▶ | | | | | |
| | | (i) Real | (ii) Personal | | | |
| | 6 a Gross rents | 6a | | | | |
| | b Less: rental expenses | 6b | | | | |
| | c Rental income or (loss) | 6c | | | | |
| | d Net rental income or (loss) ▶ | | | | | |
| | 7 a Gross amount from sales of assets other than inventory | (i) Securities | (ii) Other | | | |
| | | 7a | | | | |
| | b Less: cost or other basis and sales expenses | 7b | | | | |
| | c Gain or (loss) | 7c | | | | |
| | d Net gain or (loss) ▶ | | | | | |
| | 8 a Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 | 8a | | | | |
| | b Less: direct expenses | 8b | | | | |
| | c Net income or (loss) from fundraising events ▶ | | | | | |
| | 9 a Gross income from gaming activities. See Part IV, line 19 | 9a | | | | |
| | b Less: direct expenses | 9b | | | | |
| | c Net income or (loss) from gaming activities ▶ | | | | | |
| | 10 a Gross sales of inventory, less returns and allowances | 10a | | | | |
| | b Less: cost of goods sold | 10b | | | | |
| | c Net income or (loss) from sales of inventory ▶ | | | | | |
| **Miscellaneous Revenue** | | **Business Code** | | | | |
| | 11 a | | | | | |
| | b | | | | | |
| | c | | | | | |
| | d All other revenue | | | | | |
| | e **Total.** Add lines 11a-11d ▶ | | | | | |
| | 12 **Total revenue.** See instructions ▶ | | 1,346,829. | 1,238,939. | 0. | 25. |

132009 12-09-21       Form **990** (2021)

INTERNATIONAL ASSOCIATION OF EATING
Form 990 (2021)    DISORDERS PROFESSIONALS FOUND INC    33-0143040    Page **10**

**Part IX | Statement of Functional Expenses**

*Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).*

Check if Schedule O contains a response or note to any line in this Part IX ...................................................... ☒

| *Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.* | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 ... | 2,000. | 2,000. | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 ................. | | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16 ........ | | | | |
| **4** Benefits paid to or for members ................ | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees ................. | | | | |
| **6** Compensation not included above to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) ........ | | | | |
| **7** Other salaries and wages ................ | | | | |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) | | | | |
| **9** Other employee benefits ................ | | | | |
| **10** Payroll taxes ................ | | | | |
| **11** Fees for services (nonemployees): | | | | |
| **a** Management ................ | 156,000. | 109,200. | 46,800. | |
| **b** Legal ................ | 1,081. | 757. | 324. | |
| **c** Accounting ................ | 27,200. | 19,040. | 8,160. | |
| **d** Lobbying ................ | | | | |
| **e** Professional fundraising services. See Part IV, line 17 ... | | | | |
| **f** Investment management fees ................ | | | | |
| **g** Other. (If line 11g amount exceeds 10% of line 25, column (A), amount, list line 11g expenses on Sch O.) | 453,564. | 317,495. | 136,069. | |
| **12** Advertising and promotion ................ | 73. | 51. | 22. | |
| **13** Office expenses ................ | 7,383. | 5,168. | 2,215. | |
| **14** Information technology ................ | 147,367. | 103,157. | 44,210. | |
| **15** Royalties ................ | | | | |
| **16** Occupancy ................ | | | | |
| **17** Travel ................ | | | | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials ... | | | | |
| **19** Conferences, conventions, and meetings ..... | 30,495. | 30,495. | | |
| **20** Interest ................ | | | | |
| **21** Payments to affiliates ................ | | | | |
| **22** Depreciation, depletion, and amortization ..... | 6,184. | 6,184. | | |
| **23** Insurance ................ | 3,659. | 2,561. | 1,098. | |
| **24** Other expenses. Itemize expenses not covered above. (List miscellaneous expenses on line 24e. If line 24e amount exceeds 10% of line 25, column (A), amount, list line 24e expenses on Schedule O.) | | | | |
| **a** EATING DISORDERS REVIEW | 107,655. | 107,655. | | |
| **b** BANK & CREDIT CARD FEES | 42,110. | 29,477. | 12,633. | |
| **c** DUES AND SUBSCRIPTIONS | 16,532. | 11,572. | 4,960. | |
| **d** TESTING SERVICES | 5,014. | 5,014. | | |
| **e** All other expenses | 962. | 673. | 289. | |
| **25** **Total functional expenses.** Add lines 1 through 24e | 1,007,279. | 750,499. | 256,780. | 0. |
| **26** **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) | | | | |

132010 12-09-21    Form **990** (2021)

16371117 781445 56506.000    2021.05000 INTERNATIONAL ASSOCIATION 56506.01

INTERNATIONAL ASSOCIATION OF EATING
Form 990 (2021)    DISORDERS PROFESSIONALS FOUND INC          33-0143040    Page **11**

| Part X | Balance Sheet |
|---|---|

Check if Schedule O contains a response or note to any line in this Part X ........................................................ ☐

|  |  | (A) Beginning of year |  | (B) End of year |
|---|---|---|---|---|
| **1** | Cash - non-interest-bearing .................................................. | 795,629. | **1** | 1,119,416. |
| **2** | Savings and temporary cash investments ................................... |  | **2** |  |
| **3** | Pledges and grants receivable, net ......................................... |  | **3** |  |
| **4** | Accounts receivable, net ...................................................... |  | **4** |  |
| **5** | Loans and other receivables from any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons |  | **5** |  |
| **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) ..... |  | **6** |  |
| **7** | Notes and loans receivable, net ............................................ |  | **7** |  |
| **8** | Inventories for sale or use ................................................... |  | **8** |  |
| **9** | Prepaid expenses and deferred charges ................................... |  | **9** |  |
| **10a** | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D ......... **10a** 47,587. |  |  |  |
| **b** | Less: accumulated depreciation ......... **10b** 35,219. | 0. | **10c** | 12,368. |
| **11** | Investments - publicly traded securities ................................... |  | **11** |  |
| **12** | Investments - other securities. See Part IV, line 11 ...................... |  | **12** |  |
| **13** | Investments - program-related. See Part IV, line 11 ..................... |  | **13** |  |
| **14** | Intangible assets .............................................................. |  | **14** |  |
| **15** | Other assets. See Part IV, line 11 ......................................... |  | **15** |  |
| **16** | **Total assets.** Add lines 1 through 15 (must equal line 33) ............ | 795,629. | **16** | 1,131,784. |
| **17** | Accounts payable and accrued expenses .................................. | 3,395. | **17** | 0. |
| **18** | Grants payable ................................................................ |  | **18** |  |
| **19** | Deferred revenue ............................................................. |  | **19** |  |
| **20** | Tax-exempt bond liabilities ................................................. |  | **20** |  |
| **21** | Escrow or custodial account liability. Complete Part IV of Schedule D ...... |  | **21** |  |
| **22** | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons |  | **22** |  |
| **23** | Secured mortgages and notes payable to unrelated third parties ....... |  | **23** |  |
| **24** | Unsecured notes and loans payable to unrelated third parties ......... |  | **24** |  |
| **25** | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17-24). Complete Part X of Schedule D .................................................................... |  | **25** |  |
| **26** | **Total liabilities.** Add lines 17 through 25 ............................. | 3,395. | **26** | 0. |
|  | Organizations that follow FASB ASC 958, check here ▶ ☐ and complete lines 27, 28, 32, and 33. |  |  |  |
| **27** | Net assets without donor restrictions ...................................... |  | **27** |  |
| **28** | Net assets with donor restrictions .......................................... |  | **28** |  |
|  | Organizations that do not follow FASB ASC 958, check here ▶ ☒ and complete lines 29 through 33. |  |  |  |
| **29** | Capital stock or trust principal, or current funds ........................ | 0. | **29** | 0. |
| **30** | Paid-in or capital surplus, or land, building, or equipment fund ....... | 0. | **30** | 0. |
| **31** | Retained earnings, endowment, accumulated income, or other funds ...... | 792,234. | **31** | 1,131,784. |
| **32** | Total net assets or fund balances ......................................... | 792,234. | **32** | 1,131,784. |
| **33** | Total liabilities and net assets/fund balances ............................ | 795,629. | **33** | 1,131,784. |

Assets (lines 1–16); Liabilities (lines 17–26); Net Assets or Fund Balances (lines 27–33)

Form **990** (2021)

132011 12-09-21

INTERNATIONAL ASSOCIATION OF EATING
Form 990 (2021)   DISORDERS PROFESSIONALS FOUND INC                33-0143040    Page 12

| Part XI | Reconciliation of Net Assets | | |
|---|---|---|---|

Check if Schedule O contains a response or note to any line in this Part XI ...............................................................

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) | 1 | 1,346,829. |
| 2 | Total expenses (must equal Part IX, column (A), line 25) | 2 | 1,007,279. |
| 3 | Revenue less expenses. Subtract line 2 from line 1 | 3 | 339,550. |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A)) | 4 | 792,234. |
| 5 | Net unrealized gains (losses) on investments | 5 | |
| 6 | Donated services and use of facilities | 6 | |
| 7 | Investment expenses | 7 | |
| 8 | Prior period adjustments | 8 | |
| 9 | Other changes in net assets or fund balances (explain on Schedule O) | 9 | 0. |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column (B)) | 10 | 1,131,784. |

| Part XII | Financial Statements and Reporting | | |
|---|---|---|---|

Check if Schedule O contains a response or note to any line in this Part XII ...............................................................

| | | Yes | No |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990:  [X] Cash    [ ] Accrual    [ ] Other _____ | | |
| | If the organization changed its method of accounting from a prior year or checked "Other," explain on Schedule O. | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? ............................ | 2a | | X |
| | If "Yes," check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: | | | |
| | [ ] Separate basis    [ ] Consolidated basis    [ ] Both consolidated and separate basis | | | |
| b | Were the organization's financial statements audited by an independent accountant? ............................................ | 2b | | X |
| | If "Yes," check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: | | | |
| | [ ] Separate basis    [ ] Consolidated basis    [ ] Both consolidated and separate basis | | | |
| c | If "Yes" to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? ............................... | 2c | | |
| | If the organization changed either its oversight process or selection process during the tax year, explain on Schedule O. | | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? ................................................................................................ | 3a | | X |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why on Schedule O and describe any steps taken to undergo such audits .................................. | 3b | | |

Form **990** (2021)

132012  12-09-21

**SCHEDULE A**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section
4947(a)(1) nonexempt charitable trust.
▶ Attach to Form 990 or Form 990-EZ.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

# 2021

**Open to Public
Inspection**

| Name of the organization | Employer identification number |
|---|---|
| INTERNATIONAL ASSOCIATION OF EATING DISORDERS PROFESSIONALS FOUND INC | 33-0143040 |

| Part I | Reason for Public Charity Status. (All organizations must complete this part.) See instructions. |
|---|---|

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990).)

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state: _____

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☐ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

9 ☐ An agricultural research organization described in **section 170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land-grant college of agriculture (see instructions). Enter the name, city, and state of the college or university: _____

10 ☒ An organization that normally receives (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions, subject to certain exceptions; and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

11 ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

12 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box on lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

a ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

f Enter the number of supported organizations ............................................................ ☐

g Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1-10 above (see instructions)) | (iv) Is the organization listed in your governing document? | | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | Yes | No | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

LHA **For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**    132021 01-04-22    **Schedule A (Form 990) 2021**

INTERNATIONAL ASSOCIATION OF EATING
Schedule A (Form 990) 2021   DISORDERS PROFESSIONALS FOUND INC   33-0143040   Page 2

**Part II** | **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)**
(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization fails to qualify under the tests listed below, please complete Part III.)

## Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2017 | (b) 2018 | (c) 2019 | (d) 2020 | (e) 2021 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") ...... | | | | | | |
| 2 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf ............ | | | | | | |
| 3 The value of services or facilities furnished by a governmental unit to the organization without charge ... | | | | | | |
| 4 **Total.** Add lines 1 through 3 ......... | | | | | | |
| 5 The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) .......................... | | | | | | |
| 6 **Public support.** Subtract line 5 from line 4. | | | | | | |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2017 | (b) 2018 | (c) 2019 | (d) 2020 | (e) 2021 | (f) Total |
|---|---|---|---|---|---|---|
| 7 Amounts from line 4 ...................... | | | | | | |
| 8 Gross income from interest, dividends, payments received on securities loans, rents, royalties, and income from similar sources ... | | | | | | |
| 9 Net income from unrelated business activities, whether or not the business is regularly carried on ... | | | | | | |
| 10 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) ............ | | | | | | |
| 11 **Total support.** Add lines 7 through 10 | | | | | | |

| | | |
|---|---|---|
| 12 Gross receipts from related activities, etc. (see instructions) ............................................................... | **12** | |

13 **First 5 years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** ............................................................................................................. ▶ ☐

## Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| 14 Public support percentage for 2021 (line 6, column (f), divided by line 11, column (f)) ..................... | **14** | | % |
| 15 Public support percentage from 2020 Schedule A, Part II, line 14 ...................................................... | **15** | | % |

16a **33 1/3% support test - 2021.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization ................................................................................ ▶ ☐

b **33 1/3% support test - 2020.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization .......................................................................... ▶ ☐

17a **10% -facts-and-circumstances test - 2021.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the facts-and-circumstances test, check this box and **stop here.** Explain in Part VI how the organization meets the facts-and-circumstances test. The organization qualifies as a publicly supported organization ................................................ ▶ ☐

b **10% -facts-and-circumstances test - 2020.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the facts-and-circumstances test, check this box and **stop here.** Explain in Part VI how the organization meets the facts-and-circumstances test. The organization qualifies as a publicly supported organization ................................................. ▶ ☐

18 **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions .......... ▶ ☐

**Schedule A (Form 990) 2021**

132022 01-04-22

Schedule A (Form 990) 2021   **INTERNATIONAL ASSOCIATION OF EATING**
**DISORDERS PROFESSIONALS FOUND INC**       33-0143040   Page **3**

**Part III | Support Schedule for Organizations Described in Section 509(a)(2)**

(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2017 | (b) 2018 | (c) 2019 | (d) 2020 | (e) 2021 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") ...... | 105,000. | 154,550. | 80,000. | 152,500. | 107,865. | 599,915. |
| 2 Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | 872,654. | 1292899. | 1061567. | 1155336. | 1238939. | 5621395. |
| 3 Gross receipts from activities that are not an unrelated trade or business under section 513 ............. | | | | | | |
| 4 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf .......... | | | | | | |
| 5 The value of services or facilities furnished by a governmental unit to the organization without charge ... | | | | | | |
| 6 **Total.** Add lines 1 through 5 | 977,654. | 1447449. | 1141567. | 1307836. | 1346804. | 6221310. |
| 7a Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | 0. |
| b Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year ............... | | | | | | 0. |
| c Add lines 7a and 7b | | | | | | 0. |
| 8 **Public support.** (Subtract line 7c from line 6.) | | | | | | 6221310. |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2017 | (b) 2018 | (c) 2019 | (d) 2020 | (e) 2021 | (f) Total |
|---|---|---|---|---|---|---|
| 9 Amounts from line 6 .................. | 977,654. | 1447449. | 1141567. | 1307836. | 1346804. | 6221310. |
| 10a Gross income from interest, dividends, payments received on securities loans, rents, royalties, and income from similar sources ... | 25. | 325. | 25. | 25. | 25. | 425. |
| b Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 ........... | | | | | | |
| c Add lines 10a and 10b | 25. | 325. | 25. | 25. | 25. | 425. |
| 11 Net income from unrelated business activities not included on line 10b, whether or not the business is regularly carried on ................ | | | | | | |
| 12 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) ........... | | | | | | |
| 13 **Total support.** (Add lines 9, 10c, 11, and 12.) | 977,679. | 1447774. | 1141592. | 1307861. | 1346829. | 6221735. |

14 **First 5 years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** ............................................................................................................... ▶ ☐

### Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| 15 Public support percentage for 2021 (line 8, column (f), divided by line 13, column (f)) ...................... | **15** | 99.99 | % |
| 16 Public support percentage from 2020 Schedule A, Part III, line 15 | **16** | 99.99 | % |

### Section D. Computation of Investment Income Percentage

| | | | |
|---|---|---|---|
| 17 Investment income percentage for **2021** (line 10c, column (f), divided by line 13, column (f)) ...................... | **17** | .01 | % |
| 18 Investment income percentage from **2020** Schedule A, Part III, line 17 | **18** | .01 | % |

19a **33 1/3% support tests - 2021.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ............... ▶ ☒

b **33 1/3% support tests - 2020.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3%, and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ............. ▶ ☐

20 **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions ................ ▶ ☐

132023 01-04-22                                                           **Schedule A (Form 990) 2021**

Schedule A (Form 990) 2021    INTERNATIONAL ASSOCIATION OF EATING DISORDERS PROFESSIONALS FOUND INC    33-0143040   Page **4**

| **Part IV** | Supporting Organizations |

(Complete only if you checked a box in line 12 on Part I. If you checked box 12a, Part I, complete Sections A and B. If you checked box 12b, Part I, complete Sections A and C. If you checked box 12c, Part I, complete Sections A, D, and E. If you checked box 12d, Part I, complete Sections A and D, and complete Part V.)

**Section A. All Supporting Organizations**

|  |  | Yes | No |
|---|---|---|---|
| **1** | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in* **Part VI** *how the supported organizations are designated. If designated by class or purpose, describe the designation. If historic and continuing relationship, explain.* **1** | | |
| **2** | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? *If "Yes," explain in* **Part VI** *how the organization determined that the supported organization was described in section 509(a)(1) or (2).* **2** | | |
| **3a** | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer lines 3b and 3c below.* **3a** | | |
| **b** | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in* **Part VI** *when and how the organization made the determination.* **3b** | | |
| **c** | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in* **Part VI** *what controls the organization put in place to ensure such use.* **3c** | | |
| **4a** | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes," and if you checked box 12a or 12b in Part I, answer lines 4b and 4c below.* **4a** | | |
| **b** | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in* **Part VI** *how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations.* **4b** | | |
| **c** | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in* **Part VI** *what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes.* **4c** | | |
| **5a** | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer lines 5b and 5c below (if applicable). Also, provide detail in* **Part VI,** *including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document).* **5a** | | |
| **b** | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? **5b** | | |
| **c** | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? **5c** | | |
| **6** | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in* **Part VI.** **6** | | |
| **7** | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (as defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990).* **7** | | |
| **8** | Did the organization make a loan to a disqualified person (as defined in section 4958) not described on line 7? *If "Yes," complete Part I of Schedule L (Form 990).* **8** | | |
| **9a** | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons, as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in* **Part VI.** **9a** | | |
| **b** | Did one or more disqualified persons (as defined on line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in* **Part VI.** **9b** | | |
| **c** | Did a disqualified person (as defined on line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in* **Part VI.** **9c** | | |
| **10a** | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below.* **10a** | | |
| **b** | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings.)* **10b** | | |

132024 01-04-21      **Schedule A (Form 990) 2021**

INTERNATIONAL ASSOCIATION OF EATING
DISORDERS PROFESSIONALS FOUND INC

Schedule A (Form 990) 2021                                             33-0143040   Page 5

**Part IV** **Supporting Organizations** *(continued)*

|   |   | Yes | No |
|---|---|---|---|
| 11 | Has the organization accepted a gift or contribution from any of the following persons? | | |
| a | A person who directly or indirectly controls, either alone or together with persons described on lines 11b and 11c below, the governing body of a supported organization? | | |
| | **11a** | | |
| b | A family member of a person described on line 11a above? **11b** | | |
| c | A 35% controlled entity of a person described on line 11a or 11b above? *If "Yes" to line 11a, 11b, or 11c, provide detail in* **Part VI.** **11c** | | |

**Section B. Type I Supporting Organizations**

|   |   | Yes | No |
|---|---|---|---|
| 1 | Did the governing body, members of the governing body, officers acting in their official capacity, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's officers, directors, or trustees at all times during the tax year? *If "No," describe in* **Part VI** *how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove officers, directors, or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* **1** | | |
| 2 | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in* **Part VI** *how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised, or controlled the supporting organization.* **2** | | |

**Section C. Type II Supporting Organizations**

|   |   | Yes | No |
|---|---|---|---|
| 1 | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in* **Part VI** *how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s).* **1** | | |

**Section D. All Type III Supporting Organizations**

|   |   | Yes | No |
|---|---|---|---|
| 1 | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? **1** | | |
| 2 | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s) or (ii) serving on the governing body of a supported organization? *If "No," explain in* **Part VI** *how the organization maintained a close and continuous working relationship with the supported organization(s).* **2** | | |
| 3 | By reason of the relationship described on line 2, above, did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in* **Part VI** *the role the organization's supported organizations played in this regard.* **3** | | |

**Section E. Type III Functionally Integrated Supporting Organizations**

1   *Check the box next to the method that the organization used to satisfy the Integral Part Test during the year* **(see instructions).**
a   ☐ The organization satisfied the Activities Test. *Complete* **line 2** *below.*
b   ☐ The organization is the parent of each of its supported organizations. *Complete* **line 3** *below.*
c   ☐ The organization supported a governmental entity. *Describe in* **Part VI** *how you supported a governmental entity (see instructions).*

|   |   | Yes | No |
|---|---|---|---|
| 2 | Activities Test. **Answer lines 2a and 2b below.** | | |
| a | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in* **Part VI identify those supported organizations and explain** *how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities.* **2a** | | |
| b | Did the activities described on line 2a, above, constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in* **Part VI** *the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement.* **2b** | | |
| 3 | Parent of Supported Organizations. **Answer lines 3a and 3b below.** | | |
| a | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *If "Yes" or "No" provide details in* **Part VI.** **3a** | | |
| b | Did the organization exercise a substantial degree of direction over the policies, programs, and activities of each of its supported organizations? *If "Yes," describe in* **Part VI** *the role played by the organization in this regard.* **3b** | | |

132025  01-04-22                                                      Schedule A (Form 990) 2021

16371117 781445 56506.000              2021.05000 INTERNATIONAL ASSOCIATION 56506.01

INTERNATIONAL ASSOCIATION OF EATING

Schedule A (Form 990) 2021     DISORDERS PROFESSIONALS FOUND INC     33-0143040   Page 6

**Part V** | **Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations**

1 ☐ Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov. 20, 1970 ( *explain in* **Part VI**). **See instructions.**
All other Type III non-functionally integrated supporting organizations must complete Sections A through E.

| Section A - Adjusted Net Income | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 Net short-term capital gain | 1 | | |
| 2 Recoveries of prior-year distributions | 2 | | |
| 3 Other gross income (see instructions) | 3 | | |
| 4 Add lines 1 through 3. | 4 | | |
| 5 Depreciation and depletion | 5 | | |
| 6 Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | 6 | | |
| 7 Other expenses (see instructions) | 7 | | |
| 8 **Adjusted Net Income** (subtract lines 5, 6, and 7 from line 4) | 8 | | |

| Section B - Minimum Asset Amount | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year): | | | |
| a Average monthly value of securities | 1a | | |
| b Average monthly cash balances | 1b | | |
| c Fair market value of other non-exempt-use assets | 1c | | |
| d **Total** (add lines 1a, 1b, and 1c) | 1d | | |
| e **Discount** claimed for blockage or other factors (*explain in detail in* **Part VI**): | | | |
| 2 Acquisition indebtedness applicable to non-exempt-use assets | 2 | | |
| 3 Subtract line 2 from line 1d. | 3 | | |
| 4 Cash deemed held for exempt use. Enter 0.015 of line 3 (for greater amount, see instructions). | 4 | | |
| 5 Net value of non-exempt-use assets (subtract line 4 from line 3) | 5 | | |
| 6 Multiply line 5 by 0.035. | 6 | | |
| 7 Recoveries of prior-year distributions | 7 | | |
| 8 **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |

| Section C - Distributable Amount | | Current Year |
|---|---|---|
| 1 Adjusted net income for prior year (from Section A, line 8, column A) | 1 | |
| 2 Enter 0.85 of line 1. | 2 | |
| 3 Minimum asset amount for prior year (from Section B, line 8, column A) | 3 | |
| 4 Enter greater of line 2 or line 3. | 4 | |
| 5 Income tax imposed in prior year | 5 | |
| 6 **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions). | 6 | |

7 ☐ Check here if the current year is the organization's first as a non-functionally integrated Type III supporting organization (see instructions).

Schedule A (Form 990) 2021

132026 01-04-22

INTERNATIONAL ASSOCIATION OF EATING
Schedule A (Form 990) 2021    DISORDERS PROFESSIONALS FOUND INC    33-0143040    Page 7

| Part V | Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations  *(continued)* |
|---|---|

| Section D - Distributions | | Current Year |
|---|---|---|
| 1 | Amounts paid to supported organizations to accomplish exempt purposes | **1** | |
| 2 | Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | **2** | |
| 3 | Administrative expenses paid to accomplish exempt purposes of supported organizations | **3** | |
| 4 | Amounts paid to acquire exempt-use assets | **4** | |
| 5 | Qualified set-aside amounts (prior IRS approval required · *provide details in* **Part VI**) | **5** | |
| 6 | Other distributions (*describe in* **Part VI**). See instructions. | **6** | |
| 7 | **Total annual distributions.** Add lines 1 through 6. | **7** | |
| 8 | Distributions to attentive supported organizations to which the organization is responsive (*provide details in* **Part VI**). See instructions. | **8** | |
| 9 | Distributable amount for 2021 from Section C, line 6 | **9** | |
| 10 | Line 8 amount divided by line 9 amount | **10** | |

| Section E - Distribution Allocations (see instructions) | (i) Excess Distributions | (ii) Underdistributions Pre-2021 | (iii) Distributable Amount for 2021 |
|---|---|---|---|
| 1 | Distributable amount for 2021 from Section C, line 6 | | | |
| 2 | Underdistributions, if any, for years prior to 2021 (reasonable cause required · *explain in* **Part VI**). See instructions. | | | |
| 3 | Excess distributions carryover, if any, to 2021 | | | |
| a | From 2016 | | | |
| b | From 2017 | | | |
| c | From 2018 | | | |
| d | From 2019 | | | |
| e | From 2020 | | | |
| f | **Total** of lines 3a through 3e | | | |
| g | Applied to underdistributions of prior years | | | |
| h | Applied to 2021 distributable amount | | | |
| i | Carryover from 2016 not applied (see instructions) | | | |
| j | Remainder. Subtract lines 3g, 3h, and 3i from line 3f. | | | |
| 4 | Distributions for 2021 from Section D, line 7:                $ | | | |
| a | Applied to underdistributions of prior years | | | |
| b | Applied to 2021 distributable amount | | | |
| c | Remainder. Subtract lines 4a and 4b from line 4. | | | |
| 5 | Remaining underdistributions for years prior to 2021, if any. Subtract lines 3g and 4a from line 2. For result greater than zero, *explain in* **Part VI**. See instructions. | | | |
| 6 | Remaining underdistributions for 2021. Subtract lines 3h and 4b from line 1. For result greater than zero, *explain in* **Part VI**. See instructions. | | | |
| 7 | **Excess distributions carryover to 2022.** Add lines 3j and 4c. | | | |
| 8 | Breakdown of line 7: | | | |
| a | Excess from 2017 | | | |
| b | Excess from 2018 | | | |
| c | Excess from 2019 | | | |
| d | Excess from 2020 | | | |
| e | Excess from 2021 | | | |

**Schedule A (Form 990) 2021**

132027 01-04-22

Schedule A (Form 990) 2021
INTERNATIONAL ASSOCIATION OF EATING
DISORDERS PROFESSIONALS FOUND INC     33-0143040   Page **8**

| Part VI | **Supplemental Information.** Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a, and 3b; Part V, line 1; Part V, Section B, line 1e; Part V, Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions.) |

132028 01-04-22

**Schedule A (Form 990) 2021**

**SCHEDULE D**
(Form 990)

Department of the Treasury
Internal Revenue Service

# Supplemental Financial Statements

▶ Complete if the organization answered "Yes" on Form 990,
Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

# 2021

**Open to Public
Inspection**

| Name of the organization | Employer identification number |
|---|---|
| INTERNATIONAL ASSOCIATION OF EATING DISORDERS PROFESSIONALS FOUND INC | 33-0143040 |

**Part I** | **Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.** Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds
are the organization's property, subject to the organization's exclusive legal control? .................................................. ☐ Yes ☐ No

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only
for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring
impermissible private benefit? .................................................................................................... ☐ Yes ☐ No

**Part II** | **Conservation Easements.** Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1 Purpose(s) of conservation easements held by the organization (check all that apply).
☐ Preservation of land for public use (for example, recreation or education)    ☐ Preservation of a historically important land area
☐ Protection of natural habitat                                                  ☐ Preservation of a certified historic structure
☐ Preservation of open space

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last
day of the tax year.

| | | Held at the End of the Tax Year |
|---|---|---|
| a | Total number of conservation easements | 2a |
| b | Total acreage restricted by conservation easements | 2b |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c |
| d | Number of conservation easements included in (c) acquired after 7/25/06, and not on a historic structure listed in the National Register | 2d |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax
year ▶ _____

4 Number of states where property subject to conservation easement is located ▶ _____

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of
violations, and enforcement of the conservation easements it holds? .......................................................... ☐ Yes ☐ No

6 Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ _____

7 Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ $ _____

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i)
and section 170(h)(4)(B)(ii)? ................................................................................................. ☐ Yes ☐ No

9 In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement and
balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the
organization's accounting for conservation easements.

**Part III** | **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a If the organization elected, as permitted under FASB ASC 958, not to report in its revenue statement and balance sheet works
of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public
service, provide in Part XIII the text of the footnote to its financial statements that describes these items.

b If the organization elected, as permitted under FASB ASC 958, to report in its revenue statement and balance sheet works of
art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service,
provide the following amounts relating to these items:

   (i) Revenue included on Form 990, Part VIII, line 1 ............................................................ ▶ $ _____

   (ii) Assets included in Form 990, Part X .................................................................... ▶ $ _____

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide
the following amounts required to be reported under FASB ASC 958 relating to these items:

a Revenue included on Form 990, Part VIII, line 1 ................................................................ ▶ $ _____

b Assets included in Form 990, Part X ......................................................................... ▶ $ _____

LHA **For Paperwork Reduction Act Notice, see the Instructions for Form 990.**           **Schedule D (Form 990) 2021**

132051 10-28-21

INTERNATIONAL ASSOCIATION OF EATING
Schedule D (Form 990) 2021    DISORDERS PROFESSIONALS FOUND INC    33-0143040  Page **2**

| Part III | Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets *(continued)* |

**3** Using the organization's acquisition, accession, and other records, check any of the following that make significant use of its
collection items (check all that apply):

**a** ☐ Public exhibition                          **d** ☐ Loan or exchange program

**b** ☐ Scholarly research                         **e** ☐ Other _____

**c** ☐ Preservation for future generations

**4** Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

**5** During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets
to be sold to raise funds rather than to be maintained as part of the organization's collection? .................................. ☐ Yes ☐ No

| Part IV | Escrow and Custodial Arrangements. Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21. |

**1a** Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included
on Form 990, Part X? ............................................................................................................................ ☐ Yes ☐ No

**b** If "Yes," explain the arrangement in Part XIII and complete the following table:

|  |  | Amount |
|---|---|---|
| **c** Beginning balance ................................................................ | **1c** | |
| **d** Additions during the year ..................................................... | **1d** | |
| **e** Distributions during the year ............................................... | **1e** | |
| **f** Ending balance ...................................................................... | **1f** | |

**2a** Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? ............... ☐ Yes ☐ No

**b** If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided on Part XIII .................................. ☐

| Part V | Endowment Funds. Complete if the organization answered "Yes" on Form 990, Part IV, line 10. |

|  | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance ............ | | | | | |
| **b** Contributions ................................. | | | | | |
| **c** Net investment earnings, gains, and losses | | | | | |
| **d** Grants or scholarships ................. | | | | | |
| **e** Other expenditures for facilities and programs ............................ | | | | | |
| **f** Administrative expenses ............... | | | | | |
| **g** End of year balance ...................... | | | | | |

**2** Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

**a** Board designated or quasi-endowment ▶ _____ %

**b** Permanent endowment ▶ _____ %

**c** Term endowment ▶ _____ %

The percentages on lines 2a, 2b, and 2c should equal 100%.

**3a** Are there endowment funds not in the possession of the organization that are held and administered for the organization
by:

|  |  | Yes | No |
|---|---|---|---|
| **(i)** Unrelated organizations ........................................................................................... | **3a(i)** | | |
| **(ii)** Related organizations ........................................................................................... | **3a(ii)** | | |
| **b** If "Yes" on line 3a(ii), are the related organizations listed as required on Schedule R? ....................................... | **3b** | | |

**4** Describe in Part XIII the intended uses of the organization's endowment funds.

| Part VI | Land, Buildings, and Equipment. |

Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| **1a** Land ................................................. | | | | |
| **b** Buildings ......................................... | | | | |
| **c** Leasehold improvements .................. | | | | |
| **d** Equipment ....................................... | | 13,042. | 13,042. | 0. |
| **e** Other ............................................... | | 34,545. | 22,177. | 12,368. |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10c.)* ......... ▶ | | | | 12,368. |

Schedule D (Form 990) 2021

132052 10-28-21

INTERNATIONAL ASSOCIATION OF EATING
DISORDERS PROFESSIONALS FOUND INC

Schedule D (Form 990) 2021

33-0143040    Page **3**

## Part VII | Investments - Other Securities.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11b. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) Financial derivatives ............................................ | | |
| (2) Closely held equity interests .............................. | | |
| (3) Other | | |
| (A) _____ | | |
| (B) _____ | | |
| (C) _____ | | |
| (D) _____ | | |
| (E) _____ | | |
| (F) _____ | | |
| (G) _____ | | |
| (H) _____ | | |
| **Total.** (Col. (b) must equal Form 990, Part X, col. (B) line 12.) ▶ | | |

## Part VIII | Investments - Program Related.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |
| (6) | | |
| (7) | | |
| (8) | | |
| (9) | | |
| **Total.** (Col. (b) must equal Form 990, Part X, col. (B) line 13.) ▶ | | |

## Part IX | Other Assets.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |
| (6) | |
| (7) | |
| (8) | |
| (9) | |
| **Total.** (Column (b) must equal Form 990, Part X, col. (B) line 15.) ▶ | |

## Part X | Other Liabilities.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11e or 11f. See Form 990, Part X, line 25.

| 1. | (a) Description of liability | (b) Book value |
|---|---|---|
| | (1) Federal income taxes | |
| | (2) | |
| | (3) | |
| | (4) | |
| | (5) | |
| | (6) | |
| | (7) | |
| | (8) | |
| | (9) | |
| **Total.** (Column (b) must equal Form 990, Part X, col. (B) line 25.) ▶ | | |

2. Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the
organization's liability for uncertain tax positions under FASB ASC 740. Check here if the text of the footnote has been provided in Part XIII ... ☐

**Schedule D (Form 990) 2021**

132053 10-28-21

INTERNATIONAL ASSOCIATION OF EATING
Schedule D (Form 990) 2021    DISORDERS PROFESSIONALS FOUND INC        33-0143040   Page **4**

**Part XI** | **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.**

Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | |
|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements | | **1** |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | |
| a | Net unrealized gains (losses) on investments | **2a** | |
| b | Donated services and use of facilities | **2b** | |
| c | Recoveries of prior year grants | **2c** | |
| d | Other (Describe in Part XIII.) | **2d** | |
| e | Add lines **2a** through **2d** | | **2e** |
| 3 | Subtract line **2e** from line **1** | | **3** |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | **4a** | |
| b | Other (Describe in Part XIII.) | **4b** | |
| c | Add lines **4a** and **4b** | | **4c** |
| 5 | Total revenue. Add lines **3** and **4c.** *(This must equal Form 990, Part I, line 12.)* | | **5** |

**Part XII** | **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.**

Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | |
|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements | | **1** |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | |
| a | Donated services and use of facilities | **2a** | |
| b | Prior year adjustments | **2b** | |
| c | Other losses | **2c** | |
| d | Other (Describe in Part XIII.) | **2d** | |
| e | Add lines **2a** through **2d** | | **2e** |
| 3 | Subtract line **2e** from line **1** | | **3** |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | **4a** | |
| b | Other (Describe in Part XIII.) | **4b** | |
| c | Add lines **4a** and **4b** | | **4c** |
| 5 | Total expenses. Add lines **3** and **4c.** *(This must equal Form 990, Part I, line 18.)* | | **5** |

**Part XIII** | **Supplemental Information.**

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

132054 10-28-21                                                    Schedule D (Form 990) 2021

16371117 781445 56506.000        2021.05000 INTERNATIONAL ASSOCIATION 56506.01

**SCHEDULE L**
(Form 990)

Department of the Treasury
Internal Revenue Service

# Transactions With Interested Persons

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 25a, 25b, 26, 27, 28a, 28b, or 28c, or Form 990-EZ, Part V, line 38a or 40b.
▶ **Attach to Form 990 or Form 990-EZ.**
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

# 2021

Open To Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| INTERNATIONAL ASSOCIATION OF EATING DISORDERS PROFESSIONALS FOUND INC | 33-0143040 |

**Part I**   **Excess Benefit Transactions** (section 501(c)(3), section 501(c)(4), and section 501(c)(29) organizations only).
Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? Yes | No |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

2  Enter the amount of tax incurred by the organization managers or disqualified persons during the year under
section 4958 ................................................................................................................................ ▶ $ _____

3  Enter the amount of tax, if any, on line 2, above, reimbursed by the organization ................................. ▶ $ _____

**Part II**   **Loans to and/or From Interested Persons.**
Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a or Form 990, Part IV, line 26; or if the organization
reported an amount on Form 990, Part X, line 5, 6, or 22.

| (a) Name of interested person | (b) Relationship with organization | (c) Purpose of loan | (d) Loan to or from the organization? To | From | (e) Original principal amount | (f) Balance due | (g) In default? Yes | No | (h) Approved by board or committee? Yes | No | (i) Written agreement? Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Total .................................................................................................................. ▶ $

**Part III**   **Grants or Assistance Benefiting Interested Persons.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of assistance | (d) Type of assistance | (e) Purpose of assistance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LHA  **For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**                    **Schedule L (Form 990) 2021**

132131 11-02-21

16371117 781445 56506.000              2021.05000 INTERNATIONAL ASSOCIATION 56506.01

Schedule L (Form 990) 2021

INTERNATIONAL ASSOCIATION OF EATING
DISORDERS PROFESSIONALS FOUND INC            33-0143040  Page **2**

**Part IV** | Business Transactions Involving Interested Persons.

Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? Yes | No |
|---|---|---|---|---|---|
| BONNIE HARKEN | MANAGING DIRECTOR O | 156,000. | THE ORGANIZ | | X |
| MATT HARKEN | SON OF MANAGING DIR | 76,798. | THE ORGANIZ | | X |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part V** | Supplemental Information.

Provide additional information for responses to questions on Schedule L (see instructions).

SCH L, PART IV, BUSINESS TRANSACTIONS INVOLVING INTERESTED PERSONS:

(A) NAME OF PERSON: BONNIE HARKEN

(B) RELATIONSHIP BETWEEN INTERESTED PERSON AND ORGANIZATION:

MANAGING DIRECTOR OF THE ORGANIZATION

(D) DESCRIPTION OF TRANSACTION: THE ORGANIZATION PAYS MANAGEMENT FEES TO

CROSSROADS PROGRAMS, INC, A MANAGEMENT COMPANY OWNED BY BONNIE HARKEN.

(A) NAME OF PERSON: MATT HARKEN

(B) RELATIONSHIP BETWEEN INTERESTED PERSON AND ORGANIZATION:

SON OF MANAGING DIRECTOR

(D) DESCRIPTION OF TRANSACTION: THE ORGANIZATION PAYS MATT FOR WEBMASTER

SERVICES, ACCOUNTS PAYABLE MANAGEMENT, AND WEBINAR PRODUCTION AND

MAINTENANCE.

Schedule L (Form 990) 2021

132132 11-02-21

16371117 781445 56506.000        2021.05000 INTERNATIONAL ASSOCIATION 56506.01

| SCHEDULE O | Supplemental Information to Form 990 or 990-EZ | OMB No. 1545-0047 |
|---|---|---|
| **(Form 990)** | Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information. | **2021** |
| Department of the Treasury Internal Revenue Service | ▶ Attach to Form 990 or Form 990-EZ.<br>▶ Go to www.irs.gov/Form990 for the latest information. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| INTERNATIONAL ASSOCIATION OF EATING DISORDERS PROFESSIONALS FOUND INC | 33-0143040 |

FORM 990, PART III, LINE 4A, PROGRAM SERVICE ACCOMPLISHMENTS:

MEDIA, SCHOOLS, GENERAL PUBLIC AND PROFESSIONALS REGARDING EATING

DISORDERS PREVENTION, AWARENESS AND TREATMENT.


FORM 990, PART VI, SECTION A, LINE 3:

CROSSROADS PROGRAMS, INC, A MANAGEMENT COMPANY OWNED BY DIRECTOR BONNIE J.

HARKEN, MANAGES OPERATIONS.   PAYMENT FOR THESE SERVICES IS DISCLOSED ON

PART VII, SECTION B AS REPORTABLE INDEPENDENT CONTRACTOR COMPENSATION.


FORM 990, PART VI, SECTION B, LINE 11B:

THE RETURN IS REVIEWED BY THE MANAGING DIRECTOR AND PROVIDED TO THE

EXECUTIVE COMMITTEE.


FORM 990, PART VI, SECTION B, LINE 12C:

THE BOARD OF DIRECTORS SIGN CONFLICT OF INTEREST STATEMENTS ANNUALLY, AND

ALL CONFERENCE SPEAKERS IDENTIFY ANY COMMERCIAL INTERESTS.


FORM 990, PART VI, SECTION B, LINE 15A:

MANAGING DIRECTOR FEES ARE APPROVED BY THE BOARD OF DIRECTORS.


FORM 990, PART VI, SECTION C, LINE 19:

AVAILABLE UPON REQUEST FROM THE CORPORATE OFFICE.


FORM 990, PART IX, LINE 11G, OTHER FEES:

OTHER MEMBER & CHAPTER:

PROGRAM SERVICE EXPENSES                                        317,495.

LHA  For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.        Schedule O (Form 990) 2021

132211 11-11-21

| Schedule O (Form 990) 2021 | | Page 2 |
|---|---|---|
| Name of the organization | INTERNATIONAL ASSOCIATION OF EATING DISORDERS PROFESSIONALS FOUND INC | **Employer identification number** 33-0143040 |

MANGEMENT AND GENERAL EXPENSES ........................................ 136,069.

FUNDRAISING EXPENSES ........................................................ 0.

TOTAL EXPENSES ............................................................... 453,564.

TOTAL OTHER FEES ON FORM 990, PART IX, LINE 11G, COL A ........ 453,564.