E-FILED

Monday, 15 December, 2025  02:33:02 PM

Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

JOY ZELIKOVSKY, PsyD, DEBRA )
MILLER, Individually and on behalf of all )
Others similarly situated, )
                          )
                          )
            Plaintiffs, )
       v. )
                          )         Case No. 1:24-cv-01474-MMM
                          )
INTERNATIONAL ASSOCIATION OF )
EATING DISORDER PROFESSIONALS' )
FOUNDATION, INC., et al., )
                          )
            Defendants. )

## <u>ORDER AND OPINION</u>

On April 13, 2025, Plaintiffs Joy Zelikovsky and Debra Miller (collectively, "Plaintiffs")

filed their Third Amended Class Action Complaint ("the Complaint") against Defendants Bonnie

Harken, International Association of Eating Disorder Professionals Foundation, Inc. ("iaedp"),

Joel Jahraus, Dena Cabrera, Ralph Carson, and John Does 1–10. [1] D. 82. Before the Court are two

Motions to Dismiss. D. 85; D. 86. The first is filed by Defendant Bonnie Harken, D. 85, and the

second is filed by Defendants iaedp, Jahraus, Cabrera, and Carson. D. 86. For the reasons stated

below, the Motions are GRANTED.

---

[1] The Plaintiffs also seek certification of two classes: (1) the "Antitrust Class;" and (2) the "RICO Class." The "Antitrust Class" is defined as "[a]ll individual persons who became board certified through iaedp between January 1, 2017 to present and who paid membership dues to iaedp and attended at least one national symposium during that time period." D. 82 at ¶ 58. The "RICO Class," is defined as "[a]ll individual persons who paid membership dues to iaedp and attended at least one national symposium from February 15, 2019 through December 31, 2023." *Id.* at ¶ 133.

# I.    BACKGROUND[2]

## II.    Antitrust Class Allegations:

Iaedp is a non-profit, professional association for eating disorder specialists. Iaedp specializes in promoting ethical and professional standards, offering education and training in the field of eating disorders, promoting professional awareness of eating disorders and assisting in prevention efforts. D. 82 at ¶ 18. Iaedp also provides the only nationally recognized board certification process for eating disorder specialists and both Plaintiffs have obtained iaedp board certification.

Iaedp exclusively controls its board certification. Certification was contingent upon purchasing and maintaining association membership in iaedp and attending iaedp's annual symposium once every four years. Of iaedp's 2,809 members, 1,375 are iaedp board certified. Of those board certified members, 1,200 only purchased iaedp membership to obtain certification. D. 93 at 7; D. 82 at 19. Iaedp board certification signifies a professional's mastery of basic knowledge and skills within the eating disorder specialty. Though this certification is generally not required to practice, it provides certain advantages to those seeking to develop their practice, such as attracting clients, obtaining employment in private practice, and participating within different insurance networks.

Plaintiffs allege that those seeking certification are forced to pay hundreds of thousands of dollars to iaedp for registration, examination, certification processing fees, membership fees, and expenses associated with attending iaedp's annual symposium. Between 2021 and 2023, iaedp

---

[2] The following factual allegations stem from the Plaintiffs' Third Amended Complaint. *See* D. 82. At this stage in the litigation, the Court accepts all well-pleaded allegations in Plaintiffs' Complaint as true. *See Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012).

"annually received an average of $153,703 in certification fees; $474,109 in association membership fees, and; $641,979 in symposium revenue." *Id*. at ¶ 21.

Plaintiffs assert that these fees far exceeded "the actual operating expenses attendant to the board certification process[,]" and that iaedp received these fees by unlawfully forcing iaedp membership on the plaintiffs under "the threat of invalidating prior board certification." *Id*. at ¶¶ 21–22. Plaintiffs further claim that this arrangement foreclosed competition in the Eating Disorder Association Membership Market ("EDAMM"). A few other eating disorder mental health associations compete with iaedp in the EDAMM for membership of eating disorder specialists. These include the Multi-Service Eating Disorder Association, Inc., ("MEDA"), the National Eating Disorder Association ("NEDA"), and Academy of Eating Disorders ("AED"). *Id*. at ¶ 37. Some of these entities offer certification, however, iaedp offers, oversees, and controls the only "nationally recognized certification credential for eating disorders." *Id*. at ¶ 38.

"In the United States, medical professionals and mental health practitioners who wish to obtain certification in treating eating disorders were first required to obtain and then maintain annual membership in iaedp and to attend its annual symposium once every four years." *Id*. As a result, the Plaintiffs assert that iaedp has a monopoly over eating disorder certification. Though Plaintiffs depend on iaedp for certification, iaedp would cancel or deny their iaedp certification if they did not pay iaedp's annual supervision membership fees. *Id*. Iaedp's annual membership and certification fees are significantly more than the annual dues for membership in other eating disorder associations. Collectively, these annual fees, not including the cost to attend the symposium, are $1,200.00. Comparatively, MEDA's annual dues range from $175 to $250. NEDA's are $100. AEDA's annual dues are on a sliding scale depending on income and country

and range from $19 to $285. The Plaintiffs assert iaedp inflated its membership prices and certification fees without any pro-competitive justification, harming consumer welfare.

Plaintiffs allege that iaedp leveraged its power in the certified eating disorder specialist market ("Certification Market") "by condition eating disorder board certification [the 'tying product'] upon membership in iaedp, an organization in the EDAMM [the 'tied product']." *Id*. at ¶ 41. This arrangement required Plaintiffs to pay annual membership dues and symposium fees to maintain their certification, which they claim constitutes an illegal tying arrangement under § 1 of the Sherman Act. They also claim that this tying arrangement substantially effected interstate commerce because, overtime more than 1,200 board certified eating disorder specialist have been forced to purchase and maintain annual iaedp memberships and pay expenses related to its symposium to maintain their board certification.[3] *Id*. at ¶ 75.

### III. Racketeering Class Allegations and Unjust Enrichment Allegations against Harken:

Harken started with iaedp in 2002. Over the next 22 years, Plaintiffs claim she gained complete control over iaedp and its "independent" corporate chapters. *Id*. at ¶ 90. In this position, Plaintiffs allege that Harken engaged in "acts of mail fraud, wire fraud, forgery, tax evasion and tax fraud, and a grossly negligent lack of oversight." *Id*. This activity resulted in iaedp losing its good standing with the Registry of Charities and Fundraisers in California on February 15, 2019. *Id*. at ¶¶ 5, 90–91. As a result, iaedp was not authorized to conduct any business from February 15, 2019, through 2023. *Id*. at ¶ 93. Despite the suspension, iaedp continued to collect associations

---

[3] Plaintiffs' pleading is not consistent as to the number of board certified individuals who were forced to purchase and maintain iaedp membership. *Compare* D. 82 at ¶ 75 (stating that more than 3,000 board certified eating disorder specialists have been forced to purchase iaedp membership) *with* D. 82 at ¶ 63 (defining the Antitrust Class as comprised of 1200 members) *and* D. 93 at 7 (stating "[t]he tying arrangement forced at least 1,200 iaedp board certified professionals to purchase annual iaedp membership[.]").

dues from its members and annual symposium fees. *Id*. at ¶ 4. During the relevant time, this included "$2,288,376 in association membership fees, $709,678 in certification fees and $2,935,712 in symposium fees." *Id*. As of April 11, 2025, the Illinois Secretary of State also revoked iaedp's authority to conduct business in the State of Illinois. *Id*. at ¶ 94. Plaintiffs seek a return of all monies paid for their annual membership dues, and their costs and expenses to attend iaedp's symposium between 2019 and 2023. *Id*. at ¶ 5.

Plaintiffs further allege that the purpose of Harken's illegal conduct was personal, financial gain. Harken made material misrepresentations on iaedp's tax filings between 2017 and 2023. Specifically, she stated on iaedp's tax forms that she worked 40 hours a week, was listed as an officer, but took no salary. *Id*. at ¶ 96. She also represented that she had dissolved her own management company, Crossroads Programs, Inc., which had a consulting agreement with iaedp and was paid a base salary of $156,000.00. *Id*.

Despite Harken's statements, Plaintiffs allege that she had signatory authority over iaedp's bank accounts and was paying herself $617,000 from 2018 to 2021. Further, Harken's company had been dissolved since June 6, 2016, making iaedp's tax forms and its Annual Registration Renewal Fee Report to the Attorney General of California incorrect. *Id*. at ¶¶ 97-101. Harken's control extended to requiring at least twenty-nine of iaedp's allegedly "independent" corporate chapters to incorporate in the state of Illinois. Her sole control led to negligent oversight of the operations of these chapters including numerous mandatory filing fees not being paid and those chapters being placed on inactive or suspended status. Once Harken's fraud was exposed, several of iaedp's "independent" chapters were dissolved and numerous others are discussing dissolution. As these chapters petitioned for dissolution, Harken demanded that all money in the chapter's bank account be turned over to her. *Id*. at ¶ 103. To cover up her business practices, Plaintiffs allege,

Harken prohibited any auditing firms from conducting an independent audit of iaedp for over 12 years. *Id*. at 104. She also forged the signatures of other iaedp officers on Annual Reports filed with the Illinois Secretary of State. *Id*. at 105.

Plaintiffs allege that Harken's actions violated 18 U.S.C. § 1962(a) and (c), using income from racketeering to control iaedp and engaging in racketeering activities affecting interstate commerce. Plaintiffs also claim that Harken was unjustly enriched through her illicit conduct, demanding compensation for damages caused by her actions.

### IV.     Uniform Declaratory Judgment Act Allegations:

Plaintiffs lastly bring this action under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), against Defendants Carson, Jahraus, Cabrera, and the Doe Defendants, and ask the Court to determine their rights under California Revenue and Tax Code §§ 23301 and 23304.1(a), and California Corporations Code §§ 5008(d), 6810, and 5231. *Id.* at 146. Plaintiffs allege that these Defendants either ignored or rubber stamped iaedp and Harken's violations of RICO and violated their duty to investigate by not placing Harken on administrative leave while an investigation was conducted. *Id*. at 148. As a result, these Defendants "constructively participated in the illegal and wrongful conduct and as such, should be jointly and severally liable for all wrongful acts perpetrated by Defendants iaedp and Harken." *Id*.

### II.     JURISDICTION AND VENUE

Venue is proper in the Central District of Illinois because a substantial part of the events underlying Plaintiffs' claims occurred in this district. *See* D. 82 at 5; *see also* 28 U.S.C.A. § 1391(b)(2). Plaintiffs assert subject matter jurisdiction primarily under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A).[4] D. 82 at 5. Under CAFA, a federal court has

---

[4] Alternatively, Plaintiffs allege the Court has federal question jurisdiction under 28 U.S.C. § 1331. D. 82 at 5. Plaintiffs rely on their claims under the Sherman Act and RICO to create this jurisdiction. As discussed below, the

jurisdiction to hear a class action which satisfies the following requirements: (1) the class is comprised of at least 100 members; (2) the amount in controversy is at least $5,000,000; and (3) there is diversity between at least one defendant and one class member ("minimal diversity"). *See* 28 U.S.C. § 1332(d). The fact that the Court has not yet certified Plaintiffs' class does not preclude CAFA jurisdiction. *See Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806 (7th Cir. 2010) ("[J]urisdiction attaches when a suit is *filed* as a class action, and that invariably precedes certification) (emphasis in original). Here, Defendants do not dispute CAFA jurisdiction. Upon review of the Complaint, the Court finds that Plaintiffs sufficiently allege the CAFA's requirements for purposes of establishing subject matter jurisdiction at this stage of the litigation. *See* D. 82.

### III.    DISCUSSION

The two Motions to Dismiss collectively raise several challenges to Plaintiffs' claims. *See* D. 85; D. 86. Iaedp first moves to dismiss Plaintiff's Sherman Act claim (Counts I and II) and RICO claim (Count III) under Rule 12(b)(1) arguing Plaintiffs lack standing to bring either claim. Even if the Court does find standing, iaedp maintains that dismissal is warranted under Rule 12(b)(6) because Plaintiffs failed to state a claim. Harken also moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' RICO Act claim (Count III) and unjust enrichment claim (Count V). D. 85. Defendants Jahraus, Cabrera, and Carson further contend that the claim for declaratory relief (Count IV) must be dismissed given the absence of a substantive claim. The Court will evaluate these challenges in turn, beginning with iaedp's Motion to Dismiss under 12(b)(1).

### A.  Motion to Dismiss under 12(b)(1)

---

Court finds that Plaintiffs have failed to allege these claims and thus, they cannot be used to establish subject matter jurisdiction.

Under Article III, a federal court's jurisdiction is limited to "Cases" and "Controversies" neither of which exist if a plaintiff lacks standing.[5] U.S. Const. art. III, § 2; *see also Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) ("Standing is an essential component of Article III's case-or-controversy requirement."). A defendant may present either a facial or factual challenge to a plaintiff's standing to sue. *Apex*, 572 F.3d at 443–44. Under the former, a party may argue that the pleadings, even if true, do not properly allege standing. *Second Amend. Found., Inc. v. Walker*, No. 16-CV-2214, 2019 WL 13162728, at *6 (C.D. Ill. Apr. 1, 2019). In contrast, a factual challenge contends that "there is *in fact* no subject matter jurisdiction" even though the allegation of such was facially sufficient. *Apex*, 572 F.3d at 444 (emphasis in original).

This is not a distinction without difference. The type of challenge to subject matter jurisdiction controls what courts may consider when evaluating a Rule 12(b)(1) motion. *Id.* at 443–44; *see also Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (noting that the Rule 12(b)(1) analysis begins with classifying the challenge as either facial or factual). When confronted with a facial challenge, a court is limited to the pleadings, accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in plaintiff's favor. *Silha*, 807 F.3d at 173. If the

---

[5] Before making this argument, Plaintiffs also request the Court defer the standing issue until after class certification. As indicated at oral argument, the Court will not postpone the standing issue. Plaintiffs rely on a flutter of recent case law coming out of the Northern District of Illinois to support their request. *See Baldwin v. Star Sci., Inc.*, 78 F. Supp. 3d 724 (N.D. Ill. 2015); *see also Rawson v. Aldi, Inc.*, No. 21-CV-2811, 2022 WL 1556395, *6 (N.D. Ill. May 17, 2022) (collecting cases). None of the cited cases are binding on this Court. To the contrary, the United States Supreme Court has indicated that Rule 23 should not be used to expand a court's subject matter jurisdiction unless the class certification issues are dispositive. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997); *see also Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002) ("[U]ntil certification, the jurisdiction of the district court depends upon its having jurisdiction over the claim of the named plaintiffs when the suit is filed and continuously thereafter until certification ...."). This is a narrow exception, under which deferring the standing issue is limited to cases in which "[t]he class certification issues are dispositive, [and] their resolution is logically antecedent to the existence of any Article III issues." *Amchem Prods.*, 521 U.S. at 612 (internal quotations and citations omitted). The present case does not implicate this limited exception; thus, the Court will not defer the standing issue. *See Payton v. Cty. of Kane*, 308 F.3d 673, 678 (7th Cir. 2002) (prohibiting the named plaintiffs from "piggy-back[ing] on injuries of unnamed class members" to establish standing); *see also* 28 U.S.C. § 2072(b) ("[Federal procedural] rules shall not abridge, enlarge, or modify any substantive right.").

defendant challenges standing as a factual matter, however, courts may look to extrinsic evidence outside of the complaint. *Apex*, 572 F.3d at 443.

The plaintiff carries the burden of establishing standing by a preponderance of the evidence. *Reid v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004). To establish standing, a plaintiff must show: (1) an injury in fact; (2) "a fairly traceable connection between plaintiff's injury and the complained-of conduct of the defendant;" and (3) a likelihood that the relief sought will redress the plaintiff's injury. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998).

    *1. Standing under RICO*

RICO standing requires a plaintiff to have been "injured in his business or property by reason of a violation of § 1962 of this chapter." 18 U.S.C.A. § 1964(c); *Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). "[T]he 'business or property' requirement operates with respect to the *kinds* of harm for which the plaintiff can recover, not the *cause* of the harm for which he seeks relief." *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025) (emphasis in original). RICO's causation requirement adopts common-law principles of proximate causation. *Holmes v. Sec. Inv. Prot. Corp.,* 503 U.S. 258, 268 (1992).

To properly address the issue of standing, it is necessary to first briefly summarize Plaintiffs' RICO claim. Plaintiffs claim that Harken and iaedp formed an enterprise through which they engaged in various misconduct. This misconduct included "tax evasion, tax fraud, mail fraud, wire fraud, forgery, fraud, unjust enrichment, operating a certification program which was not legally authorized, and violations of federal and state law." D. 93 at 24. In Harken's alleged scheme

to defraud, Plaintiffs claim she "routinely commingled and transferred and utilized" iaedp's various agents, services, and assets. D. 82 at 30.

Iaedp argues that Plaintiffs do not sufficiently allege a RICO injury and thus, do not have standing. Because this challenge focuses on the sufficiency of the pleadings, the Court construes it as a facial challenge to subject matter jurisdiction and is limited to the contents of the Complaint. *See Silha*, 807 F.3d at 173. In their response, Plaintiffs do not directly address the issue of injury.[6] The closest Plaintiffs come to addressing iaedp's challenge is their reference to the allegation that iaedp continued to issue certifications when it was not listed in good standing and thus, the certifications issued during these periods are "at minimum voidable." D. 93 at 25. But they do not go as far to say that either of their specific certifications were void or even voidable, and there is nothing in the Complaint to suggest that their certifications were issued during these suspension periods.[7]

Plaintiffs' requested relief further does not elucidate a RICO injury. Under their RICO claim, Plaintiffs seek "a return of all monies paid … for their annual membership dues, and their costs and expenses to attend iaedp's symposium between 2019 and 2023." D. 82 at 3. But still, the connection between those payments and Harken's tax evasion, negligent oversight, or mail/wire fraud is unclear. Though an iaedp member might not have paid their fees if they had known of iaedp's status in California and Illinois, that is not alleged here. To the contrary, neither Plaintiff

---

[6] Given Plaintiffs' underwhelming response, Defendant argues that they have waived any counter argument, and such silence alone warrants dismissal of the RICO claim. Defendant is correct to the extent that Plaintiff's response is unimpressive, but it's a stretch to conclude that they do not respond at all. As discussed, Plaintiffs stated that the certifications are at minimum voidable. Though not a persuasive response, it is a response, nonetheless.

[7] Plaintiffs claim that, apart from the period between November 8, 2023, through April 11, 2025, iaedp was not in good standing with the state of Illinois. Dkt. No. 91 at 25. Thus, Plaintiffs claim that "the actual damages to the class members are still ongoing." *Id*. But, again, the Plaintiffs make this allegation without any attempt to define those "actual damages."

lives nor seemingly practices in either of those states.[8] Instead, Plaintiffs imply that iaedp's certifications were somehow invalid but, again, they do not state that their certifications were voided or that their practice was otherwise affected by iaedp's status in California and Illinois.

Given the lack of clear injury, it is unsurprising that Plaintiffs also cannot fail to connect the dots between this misconduct and an alleged harm. Instead of alleging a causal relationship, Plaintiffs resort to the general claim that "[a]ll this misconduct is inextricably intertwined and proximately caused actual damages to Plaintiffs and the class members." *See* D. 91 at 25. This is insufficient to allege the necessary causal connection.

For the above reasons, Count III of Plaintiff's Complaint is DISMISSED.

### 2. *Standing under the Sherman Act*

Plaintiffs seek to hold iaedp liable for tying its board certification to an iaedp membership. Iaedp argues that Plaintiffs do not have standing to assert this claim because they did not fall victim to the alleged tying scheme. In other words, iaedp argues that both Plaintiffs purchased memberships with iaedp independent of certification.

As a threshold inquiry, the Court must first categorize this jurisdictional challenge as either facial or factual. Because iaedp argues that the Plaintiffs did not suffer from the injury alleged: that they were "forced to purchase and maintain annual memberships in iaedp" to obtain certification, the Court classifies this as a factual challenge to subject matter jurisdiction. *See* D. 22; *see also Apex*, 572 F.3d at 444. As such, it will consider iaedp's extrinsic evidence.[9]

Iaedp's extrinsic evidence shows that Plaintiffs did not purchase their iaedp membership at the same time they sought board certification. Instead, Zelikovsky acquired her iaedp

---

[8] Zelikovsky resides in Connecticut and Miller resides in Alabama. D. 82 at 4.
[9] Plaintiffs assert that the Court may not consider this evidence at the motion to dismiss stage but rather is limited to the contents of the Third Amended Complaint. D. 93 at 6. However, as discussed, the Court rejects this contention given the nature of iaedp's challenge. *See Apex*, 572 F.3d at 444.

membership nine years before applying for board certification and Miller acquired her certification months after becoming a member with iaedp. Given this timeline, iaedp alleges neither can claim that they were forced to purchase a membership to obtain certification.

When faced with evidence calling subject matter jurisdiction into question, "[t]he presumption of correctness that we accord to a complaint's allegations falls away." *Apex*, 572 F.3d at 444 (citing *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998). In response, plaintiff must provide competent proof that standing exists. *Id*. at 444–45.

Plaintiffs seem to concede that they bought their iaedp membership independent of their board certification. Instead, they narrow their claim in response to iaedp's challenge. Plaintiffs claim that they were forced to pay the subsequent membership fees to maintain their certification. In other words, Plaintiffs now claim that only the *maintenance* of their board certification (tying product) was conditioned on the payment of iaedp's annual membership fees and attending the symposium every four years (tied product). In response, iaedp rejects this reconstruction and asserts that an actionable tying relationship requires the seller to impose the tying condition upon the purchaser at the time she purchases the tying product.

In the case of a single transaction, iaedp's theory seems to hold water. It would certainly be difficult for a plaintiff to claim they were forced to purchase product A to obtain product B, when they purchased product A years prior. The purchases here, however, are a bit more complex. Neither iaedp certification nor iaedp membership could be permanently purchased. Rather, iaedp only offered the sale of a year's worth of each product. Thus, neither the membership nor the certification could constitute a single transaction but required recurring payments. None of the

cases iaedp cites to support the contention that the two products must be purchased contemporaneously involve sales of this nature.

The Seventh Circuit has not directly spoken on this issue, but it has twice rejected the notion that maintenance of certification and initial certification are separate products. *See Siva v. Am. Bd. of Radiology*, 38 F.4th 569 (7th Cir. 2022); *Lazarou v. Am. Bd. of Psychiatry & Neurology*, No. 24-1994, 2025 WL 3022661 (7th Cir. Oct. 29, 2025). In both cases, the court refused to find a certifying board could "tie" initial board certification with maintenance of that certification because the two constituted a single product. What the Seventh Circuit did not resolve, however, was whether maintenance of certification can be tied to something other than the initial certification. Nor did the Seventh Circuit indicate how courts should treat such maintenance fees when deciding the time of sale.

However, the Seventh Circuit's decision in *Will v. Comprehensive Accounting Corp.*, provides some guidance on the issue. 776 F.2d 665 (7th Cir. 1985). *Will* involved a franchising agreement between the plaintiffs and defendant, Comprehensive Accounting Corporation ("Comprehensive"). *Id*. at 668. When signing the agreement, the plaintiffs agreed to a tying arrangement in which the purchase of the Comprehensive franchise (tying product) was tied to Comprehensive's data processing services (tied product).[10] *Id*. Later, when cheaper data processing services became available, the franchisees no longer wanted to abide by the initial contract. *Id*. Comprehensive threatened to (and, at times, did) terminate franchisees who used other data processing services. *Id*.

---

[10] Technically, this contract allowed the franchisees to have data processed as long as "the Comprehensive E.D.P. [electronic data processing] is not competitive for like services of the same quality, with the same turnabout time." *Will*, 776 F.2d at 668. However, in practice, Comprehensive's requirements for other permissible data processing services led "some franchisees to conclude that Comprehensive would never be satisfied." *Id*. Further, the United States Supreme Court has found that even a plaintiff who explicitly agreed to the tying agreement may still bring a Sherman Act claim. *See generally, Perma Life Mufflers, Inc.*, 392 U.S. 134.

Despite that the sale of the data processing services occurred after the initial agreement, the Seventh Circuit proceeded to evaluate the tying arrangement claim on its merits. The court indicated that a tying arrangement can exist where the purchaser's acceptance of the forced restraints was due to "the communicated danger of termination" of the tying product, there the franchise agreements. Thus, even though the franchisees seemingly acquiesced to the terms of the franchise agreement initially, their later "unwilling compliance" satisfied a requirement of the Sherman Act.

Similarly, in *Perma Life Mufflers, Inc. v. International Parts Corp.*, the Supreme Court found that the franchisees were able to bring a tying arrangement claim. 392 U.S. 134 (1981). There, the defendant and plaintiffs entered into a franchise agreement which explicitly contained various tying arrangements. Defendant argued that the plaintiff was barred from bringing a Sherman Act claim, given that it had voluntarily entered into these agreements while fully aware of the tying arrangements. The Court rejected this argument noting that courts may not "undermine the antitrust acts by denying recovery to injured parties merely because they have participated to the extent of utilizing illegal [arrangements] formulated and carried out by others." *Id*. at 140.

Like here, the franchisees in *Will* and *Perma* also seemingly acquiesced to the tying arrangement originally but presented a tying arrangement claim on a forced subsequent sale. Still, these cases do not perfectly rebut all iaedp's arguments. Plaintiffs here bought the tied, and allegedly unwanted product, before the tying product. In contrast, the *Will* franchisees bought the tying product prior to the tied, unwanted data processing service. Still, *Will* reiterates the general principle that the Sherman Act targets the coercive nature of tying arrangements. It implies that the presence of such coercion at future transactions related to the original tying arrangement is

14

sufficient to state a tying arrangement claim, even where the initial tying arrangement was not forced.

Further, *Will and Perma Life* involved plaintiffs who were allegedly complicit in the arrangement underlying the claim. Here, iaedp makes a different though slightly related argument that Plaintiffs didn't just agree initially to the arrangement but that they had already purchased the item allegedly "forced" on them prior to entering it. Still, both *Will and Perma Life* provide that, even when the forcing was absent at the time of the initial agreement, the "coercive effect" targeted under the Sherman Act can later come into being.

Plaintiffs allege that this is what happened here. When Plaintiffs first purchased their certifications, they seemingly voluntarily agreed to obtain an iaedp membership, albeit one they already possessed. Yet, that was not the end of the transaction. As explained above, Plaintiffs were required to continue to pay annual dues, and purchase symposium attendance in order to maintain their certification. Thus, iaedp's tying arrangement is not based on one sale at a single point in time rather both of its products can only be purchased for one year. At the conclusion of each year, Plaintiffs face another point of sale in which they must again purchase iaedp membership. If they do not, they lose their certification. In other words, certification is not just tied to the initial year of membership but to every subsequent yearly purchase. At each annual point of sale, Plaintiffs, may no longer want the tied product for the upcoming year yet, they may unwillingly comply with the agreement for the sake of maintaining their certification. Plaintiffs allege that there was a point in time that they felt this coercion in the years following their initial certification. Under *Will*, the moment Plaintiffs paid for their membership only to maintain certification amounts to a tying claim. *See Will*, 776 F.2d at 669 ("[T]he substantive theory of tying law depends on coercion to take two products as a package.").

At oral argument, iaedp argued that the above interpretation raises public policy concerns. Namely, that it would enable a consumer to squirm out of a prior agreement. True, the Sherman Act does not seek to redress buyer's remorse, however, that is not what Plaintiffs are alleging here. The question before the Court is whether the Plaintiffs here were injured by the tying arrangement – i.e. were they forced to pay for an unwanted product (iaedp membership) to obtain a separate product (iaedp certification). To find that the subsequent payments are not a part of the initial purchase, as iaedp argues here, would have far more troubling policy implications than the alternative. It is common for certain products and services to have maintenance or subscription fees. These fees can continue long after the initial purchase and, in that time, things may change. Other sellers of the same product, for example, may have dwindled causing the seller in question to have generated more market power than at the time of the initial purchase. Alternatively, the consumer's needs may have shifted, and they may no longer want to renew the tied product. Here, Plaintiffs argue that at a certain point after their iaedp certification, they no longer wanted their iaedp membership, but the tying arrangement forced them to renew it. Though iaedp is free to challenge the credibility of that statement in later stages of this litigation, at this point the Court is forced to accept this allegation as true. In doing so, it finds that the subsequent forced purchase of additional years of iaedp membership constitutes an injury under the Sherman Act.

For the above reasons, the Court finds that Plaintiffs have standing to assert a Sherman Act claim.

**B. Motion to Dismiss under 12(b)(6)**

The two Motions to Dismiss collectively argue that Plaintiffs' Sherman Act claim, unjust enrichment claim, and declaratory relief claim should be dismissed under Rule 12(b)(6) for failure to state a claim.

The purpose of a motion to dismiss is not to resolve the merits of a claim but instead tests the sufficiency of the allegations in a complaint. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a Rule 12(b)(6) motion a court will treat all allegations in the complaint as true and draw factual inferences in the plaintiff's favor. *Kahn v. Walmart Inc.*, 107 F.4th 585, 593–94 (7th Cir. 2024). To survive a motion to dismiss, the factual allegations of the complaint must state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard is met when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586–87 (7th Cir. 2021).

### 1. Sherman Act Claim

Count I of Plaintiffs' Complaint alleges that iaedp violated the Sherman Act because its tying arrangement was per se illegal. Count II of Plaintiffs' Complaint alleges that iaedp's tying arrangement violates the Sherman Act under the rule of reason. Because the Plaintiffs must satisfy similar elements for both claims, the Court considers them together. *Lazarou v. Am. Bd. of Psychiatry & Neurology*, No. 19 CV 01614, 2023 WL 6461255, *4 (N.D. Ill. Oct. 4, 2023) (citing *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020)).

### i.  Legal Standard

The Sherman Act was enacted "to protect the benefits of competition" and prevent the harms that stem from a diminished market. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). As discussed above, a tying arrangement exists where a seller agrees to sell its product

17

(tying product) to a consumer on the condition that the consumer also purchases a different product (tied product) or, at minimum, agrees to not purchase that product from another supplier. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992).

Not all tying arrangements violate the Sherman Act. Courts only intervene where "the seller has some special ability – usually called 'market power' – to force a purchaser to do something that he would not do in a competitive market." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984), abrogated on other grounds by *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all or might have preferred to purchase elsewhere on different terms." *Jefferson*, 466 U.S. at 12.

To state a plausible tying claim, a plaintiff must allege (1) two separate products, (2) that defendant possesses sufficient economic power in the tying product market to restrain free competition in the tied product market; (3) the alleged tie affects a substantial amount of interstate commerce; and (4) the defendant's economic interest in the sales of the tied product. *Shiva v. American Board of Radiology*, 38 F.4th 569, 574 (7th Cir. 2022).

### ii. Discussion

Iaedp seems to concede the first element of the claim but argues the following grounds for dismissal: (1) Plaintiffs have not established a tying market, (2) Plaintiffs have not alleged iaedp has market power in either the certification market or the membership market, and (3) Plaintiffs have not alleged antitrust injury necessary to bring a tying claim.

In response, Plaintiffs argue that their *per se* theory does not require them to allege the specific economic impact of the tying arrangement. To some extent, Plaintiffs are correct that a

*per se* tying arrangement claim is subject to less onerous pleading requirements than a rule of reason claim. Namely, under a per se theory, a plaintiff is not required to show an anti-competitive effect in the tied product market. *See Agnew*, 683 F.3d at 336 ("[U]nder a *per se* framework, a restraint is deemed unreasonable without any inquiry into the market context in which the restraint operates.").

However, courts have recognized that the "per se" label is somewhat of a misnomer. This "most peculiar per se rule" does not excuse a plaintiff's failure to plausibly allege a market and the seller's market power. *Viamedia*, 951 F.3d at 468; *see also Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 594-95 (7th Cir. 2008) (defining the relevant market at the motion to dismiss stage prior to dismissing the *per se* claim for failure to allege defendant's power in that market). To the contrary, the per se claim is only available where the existence of forcing is probable. *Jefferson Parish.*, 466 U.S. at 17. Courts typically evaluate the risk of such forcing by evaluating the seller's market power in the tying product market. *Id*.; *see also Viamedia*, 951 F.3d at 468 (noting that a per se claim involves "some assessment of market power, rough predications of anticompetitive harm, and consideration of procompetitive justifications."). Thus, Plaintiffs here may not state a per se tying arrangement claim absent some allegation of iaedp's market power in the certification market.

Plaintiffs allege that iaedp has market power in the "Eating Disorder Board Certification Market" ("Certification Market").[11] Plaintiffs allege that the Certification Market is a nationwide

---

[11] Iaedp also argues that Plaintiffs have failed to sufficiently define this market. Typically, market definition is only scrutinized in rule of reason claim. *See Agnew*, 683 F.3d at 337; *Ass'n of Am. Physicians & Surgeons, Inc.*, 2020 WL 5642941 at *6 (noting that the rule of reason requires plaintiff to show a precise market definition whereas a per se claim does not require inquiry into the relevant market). In contrast, plaintiffs must allege the seller's market power in the tying product market under either a per se or rule of reason claim. *See Jefferson Parish*, 466 U.S. at 17; *see also Viamedia*, 951 F.3d at 468. Because the Court finds that Plaintiffs have not alleged this shared element, it will not address the issue of market definition.

market containing at least three other actors who provide certifications to professionals in the eating disorder field.[12] Plaintiffs allege that the Certification Market has at least three other certifying entities but none of these certifications "are recognized as authoritative and comprehensive" as iaedp's. D. 82 at 9. As a result, iaedp faces no meaningful competition and has exclusive market power in the Certification Market. D. 82 at 8, 9.

Among iaedp's many arguments for dismissal, it claims that Plaintiffs have failed to allege that it possesses the necessary market power in the Certification Market. For a tying arrangement to violate the Sherman Act, the seller must have "appreciable economic power in the tying product market." *Eastman Kodak Co.*, 504 U.S. at 462 (internal quotations omitted); *see also Sheridan*, 530 F.3d at 594 (explaining that "market power is key" when evaluating a tying arrangements). "Market power is the ability to raise prices profitably by restricting output." *Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018). A plaintiff may show market power through uniqueness of the product. *Will*, 776 F.2d at 672. However, uniqueness alone is not enough. *U. S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 621 (1977). Rather, if rivals may replicate the uniqueness or "offer a similar package for a similar cost, there is no barrier, and without a barrier there is no market power." *Will*, 776 F.2d at 672. Though there is no bright line as to what constitutes market power, courts have found that the seller must have more than a thirty percent share of the market. *See Jefferson Parish*, 466 U.S. at 8–9.

Plaintiffs' general allegation that iaedp has a monopoly in the Certification Market is insufficient. *See Sheridan*, 530 F.3d at 595 ("[T]he plaintiff's naked assertion of Marathon's "appreciable economic power"—an empty phrase—cannot save the complaint" from a motion to

---

[12] Plaintiffs name the following three entities as sellers in the Certification Market: the Commission on Dietetic Registration, the Training Institute for Child and Adolescent Eating Disorders, and Inclusive Eating Disorder Education, PLLC. D. 82 at 9.

dismiss). Plaintiffs' attempt to couch this allegation in the fact that iaedp is the only nationally viable certification program is also uncompelling. Though its national recognition may make iaedp's certification unique, such uniqueness does not equate to market power absent an allegation that the other certification companies in the market could not achieve the same recognition. *See U. S. Steel Corp.*, 429 U.S. at 621 ("Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves.") (internal citation and quotation omitted). Plaintiffs do not allege that any of the other actors in this market are barred from creating a comprehensive certification program. Rather, Plaintiffs allege that these actors intentionally choose not to. D. 82 at 9 (noting that one of the other entities in the market primarily aims "to support[] and uplift[] Native people.").

In an attempt to allege market power, Plaintiffs provide some statistics as to iaedp's certification and membership programs. According to Plaintiffs, iaedp currently has over 2,809 members of which 1,375 are iaedp board certified. They state that 1,200 of these 1,375 certified professionals were forced to purchase a corresponding membership. D. 93 at 7; D. 82 at 19. Further, they allege that from 2017 to 2021, iaedp generated $516,003 in certification fees. Not only are these numbers significantly less than those in Plaintiffs' supporting legal authority, but they are also meaningless without further information as to the Certification Market. For example, Plaintiffs do not allege how many eating disorder professionals compromise this market or how much revenue the general Certification Market generates annually. Without establishing this baseline, the Court cannot determine that these statistics represent a large share of the Certification Market.

Plaintiffs heavily rely on *Talone v. American Osteopathic Association* in their rebuttal to iaedp's arguments. No. 1:16-CV-04644-NLH-JS, 2017 WL 2539394 (D.N.J. June 12, 2017). In

*Talone*, plaintiffs brought a tying arrangement claim against the defendant, a medical association which also issued professional certifications. *Id*. at *1. Like here, the defendant was forcing doctors to become members of the association in order to receive and/or maintain their certification. *Id*. at *1–2. Defendant imposed this membership requirement retroactively, so that the 32,000 doctors who previously had received certification were required to become members to maintain this certification. *Id*. at *1.

The *Talone* court denied defendant's motion to dismiss, noting that the arrangement allegedly forced 32,000 board certified doctors to purchase memberships, and those memberships cost significantly more than similar memberships. *Id*. at *5–6. Not only did that arrangement prevent the other membership associations from competing for those 32,000 potential members, it also generated nine million dollars in revenue for the defendant. *Id*. at *6. Further, Plaintiffs pled that they would have chosen a different membership association absent the tying arrangement. *Id*.

*Talone* is not as helpful as Plaintiffs would like. The plaintiffs in *Talone* were limited to purchasing certification from one of two entities. *Id*. at *5. The other certifying entity was only available to doctors who had completed their residency at a specific institution. *Id*. at *3. Thus, in order to switch to this alternative certification, the doctors would have to repeat the timely and costly process of medical residency. *Id*. at *6. The *Talone* court implied that this was a sufficient barrier and gave the defendant sufficient power in the certification market. *Id*. Here, in contrast, Plaintiffs do not sufficiently allege any similar barrier facing the other certification entities.

*Talone* is more relevant to the issue of Defendants' latter argument: that Plaintiffs have not alleged the tying arrangement has stifled business in tied market: Eating Disorder Association Membership Market ("EDAMM"). Even still, it is unhelpful to Plaintiff's case. If anything, it illustrates the weaknesses in the few allegations Plaintiffs do make regarding this element. For

example, iaedp's 1,200 members and $516,002 in revenue pales in comparison to *Talone*'s 32,000 members and 9 million in revenue. Further, *Talone* argued that 32,000 doctors were forced into purchasing the membership to maintain their pre-existing certification. Here, Plaintiffs allege that 1,200 of the 1,375 iaedp board certified members fell victim to the tying arrangement. D. 93 at 7; D. 82 at 19. Even when accepting this as true, absent facts as to the size of the EDAMM, the Court cannot find that this shows substantial foreclosure of competition in the membership market.

Plaintiffs also argue that the fact that iaedp's membership price is higher than the other entities is indicative of its market power. Again, without knowing the total amount of professionals within this market, the Court cannot conclude that the iaedp has market power simply because its 3,000 members have agreed to pay a higher membership fee. To the contrary, Plaintiffs allege that there are approximately 1,400 iaedp members who pay these higher fees, despite not having iaedp certification. *See* D. 82 at 6 (stating that of the 2,809 iaedp members only 1,375 are iaedp board certified and even a smaller amount (1,200) felt forced into purchasing a membership).

Because the Plaintiffs have not alleged that iaedp has significant market power in the Certification Market, they cannot state a claim under either a per se theory or under the rule of reason.

For these reasons, Counts I and II are DISMISSED.

### 2. *Declaratory Judgment Act*

Plaintiffs bring a claim for Declaratory Judgment against Jahraus, Cabrera, Carson, and John Does 1–10 (collectively, "iaedp's board members"). Plaintiffs request the Court to determine their rights under various statutes provided in both California's Corporations Code and Tax Code. Specifically, they seek this Court to declare that iaedp's board members "breached their duty of care, and willfully neglected their duties as board members … either ignored or rubber stampd

(*sic*) Defendant iaedp's unlawful tying arrangement and Defendant iaedp and Harken's violations of the Racketeering statutes … violated their duty to investigate by not placing Defendant Harken on administrative leave while an investigation was conducted [and] constructively participated in the illegal and wrongful conduct." D. 82 at 42-43. Plaintiffs further seek the Court declare that iaedp "was not authorized to conduct any business during the time i[t] had been suspended by the California Attorney General[.]" D. 93 at 22. Under this statute, Plaintiffs seek to hold the iaedp board members jointly and severally liable for iaedp and Harken's alleged misconduct. D. 82 at 43.

### i.    Legal Standards

A federal court has the authority to issue declaratory judgment under the Declaratory Judgment Act (DJA). 28 U.S.C. § 2201(a). The DJA's purpose is to assist parties who are not certain of their rights by declaring the rights and legal relations of the interested parties. *See id.*; *see also NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 577 (7th Cir. 1994). In doing so, the uncertain party may "avoid accrual of avoidable damages … without waiting until his adversary should see fit to begin suit." *NUCOR Corp.*, 28 F.3d at 577.

The DJA is a procedural remedy and does not create substantive rights. *See Powers v. United States*, 218 F.2d 828, 829 (7th Cir. 1954). Thus, relief under the DJA is limited to cases of actual controversies. *Trippe Mfg. Co. v. Am. Power Conversion Corp.*, 46 F.3d 624, 627 (7th Cir. 1995). The controversy requirement is satisfied where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *see also Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377 (7th Cir. 2019) ("The phrase 'case of actual controversy' in the Declaratory Judgment Act refers to the type of 'Cases' and

'Controversies' that are justiciable under Article III.") (internal quotations omitted). The party seeking declaratory relief bears the burden of showing a controversy exists. *Cardinal Chem. Co. v. Morton Int'l. Inc.*, 508 U.S. 83, 95 (1993).

Even where a substantial controversy exists, a court reserves wide discretion when determining whether to issue declaratory relief. *See id.* (citing *Wilton v. Seven Falls Co.*, 115 S.Ct. 2137, 214 (1995)). "If a district court, in the sound exercise of its judgment, determines after a complaint is filed that a declaratory judgment will serve no useful purpose, it cannot be incumbent upon that court to proceed to the merits before staying or dismissing the action." *Wilton*, 115 S.Ct. at 2143.

### ii.    Discussion

Iaedp's board members raise a host of issues with Plaintiffs' request for declaratory relief. However, because the Plaintiffs have failed to state a plausible claim, they do not present a justiciable controversy as required under the DJA. This alone warrants dismissal of their DJA claim. *See Nieto v. Perdue Farms, Inc.*, No. 08-07399, 2010 WL 1031691, at *5 (N.D. Ill. Mar. 17, 2010) (dismissing the DJA claim where the plaintiff had otherwise failed to allege a cause of action); *see also Sieving v. Cont'l Cas. Co.*, 535 F. Supp. 3d 762, 774 (N.D. Ill. 2021) (noting that the DJA provides a form of relief, not an independent cause of action).

Even if Plaintiffs had stated an independent cause of action, their request for declaratory relief suffers from additional deficiencies. First, as iaedp board members note, Plaintiffs seem to be seeking declaratory relief for harms that have already occurred. Yet, relief under the DJA is primarily concerned with addressing ongoing or impending harm. *Maryland Cas. Co.*, 312 U.S. at 273 (noting the DJA is only proper where the interests are of sufficient immediacy); *see also*

25

*Generations at Rock Island*, 712 F. Supp. 3d 1071, 1077 (N.D. Ill. 2024) (stating that DJA relief is reserved to address an ongoing or impending harm). Plaintiffs do not explain how any of iaedp's violation of the various state statutes create a harm so urgent in nature that the DJA is implicated.

On a similar note, Plaintiffs seek to use the DJA to have the Court determine the rights and liabilities of iaedp's board members, not their own. This runs contrary to the Act's purpose which seeks to define the liabilities of the moving party so that they can adjust their conduct as needed to avoid the accrual of damages. Plaintiffs do not explain how this Court's determination regarding the cited statutes would assist them in making an informed decision regarding their own behavior. *See Int'l Paper Co. v. Androscoggin Energy LLC*, No. 00 C 6215, 2003 WL 21468623, at *3 (N.D. Ill. June 20, 2003) (dismissing a declaratory judgment claim where the plaintiff was using it to clarify the rights of the opposing party). Given these two additional deficiencies, the Court cannot find that issuing declaratory relief – even if confronted with the necessary controversy – would "serve [a] useful purpose." *Wilton*, 115 S.Ct. at 2143.

For the above reasons, Plaintiffs' Count IV is DISMISSED.

### 3. Unjust Enrichment

Plaintiffs also assert an unjust enrichment claim against Harken. Specifically, they argue that Harken was unjustly enriched with their annual membership fees because she solicited these payments through fraudulent means.

### i. Legal Standard

Under Illinois law, an unjust enrichment claim must allege that the defendant unjustly retained a benefit to the plaintiff's detriment and the defendant's continued retention "violates fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). Typically, an unjust enrichment claim arises in cases where "the

benefit the plaintiff is seeking to recover proceeded directly from him to the defendant." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 161 (1989) (citing 4 G. Palmer, The Law of Restitution § 21.1, at 291 (1978)). However, an unjust enrichment claim may also proceed where the plaintiff seeks to recover a benefit that was provided to the defendant by a third party. *Id*. In this circumstance, an unjust enrichment claim is limited to the following three scenarios: "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Id*. at 161–62.

Unjust enrichment is an independent cause of action that may proceed without a separate, underlying claim. *Id*. However, typically the conduct that renders the retention of the benefit unjust forms the basis of a separate claim against the defendant. *Id*.; *see also Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.,* 493 F.3d 841 (7th Cir. 2007). In this instance, the "unjust enrichment will stand or fall with the related claim." *Cleary*, 656 F.3d at 517; *see also Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436 (7th Cir. 1996) (dismissing the unjust enrichment claim where the related fraud claim failed).

### ii.   Whether Plaintiffs have sufficiently alleged fraud.

Here, Plaintiffs allege that Harken's retention of their membership fees is unjust because she procured them through fraudulent means.[13] Because their unjust enrichment claim is predicated on the mail/wire fraud, "resolution of the fraud claim is dispositive of the unjust

---

[13] Plaintiffs do not allege a separate common law count of fraud but instead allege mail and wire fraud as predicate acts under RICO. Because Plaintiffs did not have standing to bring this claim, the Court did not previously have the opportunity to evaluate the claim's sufficiency.

enrichment claim as well." *Caremark RX, Inc.,* 493 F.3d at 855. Harken argues that Plaintiffs have failed to do so.

To state a wire fraud claim, the plaintiff must show: (1) the defendant participated in a scheme to defraud; (2) defendant had the intent to defraud; and (3) defendant used wires in furtherance of that scheme. *United States v. Fard*, 775 F.3d 939, 944 (7th Cir. 2015). Mail fraud requires nearly identical elements, except it requires a showing that the defendant used the mail, not wires, for the purpose of executing such scheme. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). Further, under both mail and wire fraud, a plaintiff must prove materiality of falsehood. *Neder v. United States*, 527 U.S. 1, 25, 119 S. Ct. 1827, 1841 (1999).

Federal Rule of Civil Procedure 9(b) also imposes a heightened pleading standard to mail and wire fraud claims. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992) (stating that Rule 9(b) applies to plaintiffs alleging civil fraud in a RICO complaint). To meet this particularity requirement, a plaintiff must plead: "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 738 (7th Cir. 2024) (internal quotations omitted).

Here, Plaintiffs allege that the California Secretary of State suspended iaedp from 2019 to 2023. During this time, Plaintiffs claim that Harken "sent hundreds of emails to iaedp members" requiring them to update their membership and certification status "including but not limited to" the following dates: 12/17/24; 12/2/24; 11/26/24; 10/28/24; 9/18/24; 10/26/23. D. 82 at 33. Though Plaintiffs state when the emails were sent, how they were sent and who they were sent to and from, they fatally omit the contents of these communications. Plaintiffs merely state that the emails "require[ed] them to update their memberships and certification status[.]" D. 82 at 33. Without this

information, the Court cannot find that Plaintiffs have satisfied Rule 9(b)'s particularity requirement.

### iii.  Whether Plaintiffs have stated a claim under Illinois Law

Harken also argues that Plaintiffs have failed to plead an unjust enrichment claim because they do not allege the benefit was directly conferred on to Harken but through a third party, iaedp. Even though the benefit was provided by a third party, Harken contends Plaintiffs have failed to allege one of the three required fact patterns. In their response, Plaintiffs refute iaedp's role in the transaction, arguing that there is a direct link between the payments of their membership fees and Harken's salary.

Based on the facts alleged, Plaintiffs paid membership dues to iaedp and iaedp paid Harken an annual salary.[14] Plaintiffs seek the return of their membership dues but, confusingly, not from iaedp. Instead, they make a more strained claim that their dues were given to Harken in the form of her salary. Specifically, Plaintiffs allege that Harken had complete control over iaedp and that she "paid herself" $617,000 in salary from 2018 through 2021. D. 82 at 27. Even taking this allegation as true, Plaintiffs do not allege a connection to support the inference that Harken's salary came from the revenue generated from the membership fees. Though Plaintiffs allege "[t]here is a direct, transactional relationship between Defendant Harken's unjust retention of funds and Plaintiffs paying for a service, i.e., board certification," they do not further elaborate on this statement. D. 91 at 15. To the contrary, the facts they do allege indicate the opposite. According to the Complaint, Harken consistently received a base salary of $156,000 during the twenty-two

---

[14] When attempting to state their unjust enrichment claim, Plaintiffs do not specify how Harken received this benefit or the exact amount of this enrichment. See D. 82 at 43. In their response to Harken's Motion to Dismiss, however, Plaintiffs state "Harken was financially enriching herself in excess of $156,000 annually." D. 82 at 26. Thus, the Court assumes that the "benefit" Plaintiffs seek to recover is Harken's salary.

years she worked at iaedp. There is no allegation that this salary fluctuated with membership fees. *See* D. 82 at 26. Nor is there any other apparent correlation between iaedp's average annual revenue and Harken's salary. *Compare* D. 82 at 6 (alleging that iaedp's average annual revenue from 2021-2023 was 1.2 million dollars) *with* D. 82 at 26 (alleging Harken's annual base salary was $156,000).

Absent a viable theory that Plaintiffs' dues were paid directly to Harken, they must fit their claim into one of the three scenarios mentioned above. Plaintiffs do not attempt to do so, and any potential argument would be difficult to make. Clearly, iaedp did not mistakenly pay Harken a salary – Plaintiffs allege that she was its managing director, and the salary was provided for in Harken's consulting agreement with iaedp. D. 82 at 26. Plaintiffs do not allege that Harken did not otherwise complete her duties for which she was being compensated. In fact, Plaintiffs cite to a letter from iaedp's board supporting Harken as director even despite the allegations of fraud and misconduct. D. 82 at 29-30. Further, after an internal investigation, Plaintiffs allege that iaedp's board members "concluded Defendant Harken had done no wrong." *Id.* at 30. For similar reasons, it is not clear from Plaintiffs' Complaint why they have a better claim to the funds than Harken. Absent any argument from the Plaintiffs on this point, the Court cannot conclude that they are entitled to Harken's salary.

For the above reasons, Plaintiffs' Count V is DISMISSED.

## IV.    LEAVE TO AMEND

A court's granting of a motion to dismiss operates as an adjudication on the merits and so, the dismissal is typically with prejudice unless otherwise specified. *Ryder v. Hyles*, 27 F.4th 1253, 1257-58 (7th Cir. 2022). The Seventh Circuit Court of Appeals has repeatedly held that a plaintiff shall be given at least one opportunity to amend her Complaint before the entire action is

dismissed. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) (collecting cases); *see also* Fed. R. Civ. P 15(a) ("The Court should freely give leave [to amend] when justice so requires.").

Plaintiffs have previously amended their Complaint thrice. *See* D. 11; D. 31. Given the nature of the flaws in Plaintiffs' unjust enrichment claim and request for declaratory relief, the Court finds that any further amendment would be futile. Thus, the Court will not grant Plaintiffs leave to amend these claims. In contrast, at oral argument, Plaintiffs indicated they could remedy the deficiencies regarding their Sherman Act and RICO claims. Thus, the Court affords Plaintiffs one final attempt to amend their tying arrangement claim under the Sherman Act and their RICO claim. Plaintiffs must file their amended complaint by no later than January 20, 2026. If Plaintiffs fail to do so the Court will also dismiss the RICO and Sherman Act claims with prejudice.

## V.    CONCLUSION

For the above reasons, Harken's [85] Motion to Dismiss and the remaining Defendant's [86] Motion to Dismiss are GRANTED. Counts V and IV are DISMISSED WITH PREJUDICE. Counts I, II, and III are DISMISSED WITHOUT PREJUDICE. Plaintiffs have until January 20, 2026, to file their amended RICO and Sherman Act claims.

Entered on December 15, 2025.

s/Michael M. Mihm
Michael M. Mihm
United States District Judge