E-FILED
Monday, 27 July, 2026  09:50:29 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| JOY ZELIKOVSKY, PsyD, DEBRA MILLER, Individually and on behalf of all Others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | Case No. 1:24-cv-01474-MMM |
| INTERNATIONAL ASSOCIATION OF EATING DISORDER PROFESSIONALS' FOUNDATION, INC., et al., | ) ) ) ) ) | |
| Defendants. | ) | |

<u>**ORDER AND OPINION**</u>

Plaintiffs Joy Zelikovsky and Debra Miller have filed their Fourth Amended Class Action Complaint ("Complaint") against Defendant International Association of Eating Disorder Professionals' Foundation, Inc. ("iaedp"). D. 110. Now before the Court are: (1) iaedp's Motion to Dismiss the Complaint (D. 114); (2) Plaintiffs' Motion for Class Certification (D. 120); (3); iaedp's Motion to Defer Class Certification (D. 128); and (4) Plaintiffs' Motion to File First Supplemental Complaint (D. 135).

For the reasons stated below, Plaintiffs' [135] Motion to File First Supplemental Complaint is DENIED; [128] iaedp's Motion to Defer is GRANTED in part and DISMISSED in part as MOOT; [114] iaedp's Motion to Dismiss is GRANTED; [120] Plaintiffs' Motion for Class Certification is DISMISSED as MOOT.

## I.    BACKGROUND[1]

---

[1] The following factual allegations stem from the Plaintiffs' Fourth Amended Complaint. *See* D. 110. At this stage in the litigation, the Court accepts all well-pleaded allegations in Plaintiffs' Complaint as true. *See Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012).

Plaintiffs have brought this anti-trust class action against iaedp who they allege instituted an illegal tying arrangement. Plaintiffs are board certified eating disorder professionals, and they seek to represent an anti-trust class defined as follows: "[a]ll individuals in the United States who held iaedp eating-disorder board certification and, during the class period, 2017 to present, were required to purchase iaedp membership or attend iaedp-mandated symposiums as a condition of maintaining certification." D. 110 at 14.

"[I]aedp is the only nationally recognized credentialing body for eating disorder board certification relied upon by employers, insurers, and treatment centers throughout the United States." *Id.* at 3. As such, this certification "is widely recognized by insurers, employers, and treatment facilities as evidence of competency in eating-disorder care." *Id.* The certification is exclusively controlled by iaedp and was contingent upon purchasing and maintaining association membership in iaedp and attending symposiums hosted by iaedp. *Id.* at 1, 3. Based on iaedp's records, it has 2,809 members, 1,375 of which are iaedp board certified. *Id.* at 3.

Following certification, "clinicians incur significant sunk costs, including examination fees, supervision expenses, continuing education requirements, and reputational investment." *Id.* at 4. Moreover, in order to maintain their certification, Plaintiffs and the proposed class collectively paid hundreds of thousands of dollars to iaedp for registration, examination, certification, and processing fees. *Id.* They also were required to collectively pay hundreds of thousands of dollars in costs and expenses to attend an annual symposium hosted by iaedp. *Id.* According to iaedp's Form 990s filed between 2021 and 2023, "it annually received an average of $153,703 in certification fees; $474,109 in association membership fees, and; $641,979 in symposium revenue." *Id.* Plaintiffs maintain that this revenue far exceeds the costs associated with the

certification process's actual operating costs, and that no other procompetitive justification, medical reasoning, or other basis exists for these fees. *Id.*

Plaintiffs allege that they were forced to pay these fees under the threat of cancelling their board certification. *Id.* Plaintiffs allege that failing to maintain certification would lead to

> diminished employment opportunities, reduced professional mobility, and loss of income, because employers, treatment centers and insurers treat iaedp certification as a gatekeeping credential. Eating disorder treatment centers and national treatment systems require or strongly expect clinicians to obtain and maintain iaedp's Certified Eating Disorder Specialist credential as a condition of employment, advancement, or clinical supervision. Employers publicly identify iaedp certification in job postings, supervision programs, and leadership credentials, including Eating Disorder Center of Montana, Dallas Nutritional Counseling, Hidden River Healing, Rogers Behavioral Health, Monte Nido & Affiliates, and Alsana. Switching to alternative certifications is not economically feasible due to lack of insurer and employer recognition and the need for multi-year requalification.

*Id.* at 4–5.

Based on the above conduct, Plaintiffs claim iaedp violated § 1 the Sherman Act alleging it impermissibly tied iaedp certification to iaedp membership and symposium attendance. In doing so, Plaintiffs contend that iaedp forced clinicians to purchase an iaedp membership – a product that they would not otherwise want – to obtain the highly beneficial iaedp certification. Plaintiffs also bring a claim for prospective injunctive relief under § 16 of the Clayton Act to structurally separate, or if needed divest, the iaedp-controlled certification program from iaedp's membership, education, and revenue activities, with independent governance and compliance measures, despite the voluntary policy change because iaedp retains unified control which poses a continuing threat of similar anti-competitive restraints.

## II.    JURISDICTION AND VENUE

Venue is proper in the Central District of Illinois because a substantial part of the events underlying Plaintiffs' claims occurred in this District. *See* D. 110 at 3; *see also* 28 U.S.C.A. § 1391(b)(2). The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 given that Plaintiffs allege federal claims under § 1 of the Sherman Act, 5 U.S.C. § 1, and § 16 of the Clayton Act, 15 U.S.C. § 26. D. 110 at 17, 19.

### III.  DISCUSSION

Prior to reaching the underlying Motion to Dismiss, the Court will address Plaintiff's Motion to Certify Class and Plaintiffs' Motion to Supplement. For the reasons stated below, neither of these Motions postpone the Court's ability to decide the Motion to Dismiss.

**A. Defendant's Motion to Defer Class Certification:**

As a threshold issue, the Court must determine whether it can resolve the pending Motion to Dismiss, D. 114, prior to resolving the pending Motion to Certify a Class, D. 120. Defendant's Motion to Defer Class Certification urges the Court to take this very action and defer class certification, until after deciding the Motion to Dismiss and, if necessary, until the close of discovery. D. 128.

1. <u>Legal Standards</u>

Rule 23 of the Federal Rules of Civil Procedure require courts to certify a class action "[a]t an early practicable time." Fed. R. Civ. P. 23(c)(1)(A). Generally, this standard leads many courts to resolve the issue of class certification prior to dispositive motions. However, this rule is not absolute and the term "'practicable' allows for wiggle room." *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995).

Consistent with this flexible standard, the Seventh Circuit has repeatedly noted that a motion to certify may be properly postponed in certain instances. *See McReynolds v. Merrill Lynch*

*& Co.*, 694 F.3d 873, 879 n. 4 (7th Cir. 2012) ("[T]here is no fixed requirement that the court must always defer a decision on a Rule 12(b)(6) motion until after the court address class certification."); *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392 (7th Cir. 2011) (granting summary judgment before addressing pending motion to certify); *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 910 n. 3 (7th Cir. 2013) (noting the district court properly addressed the dispositive motion before the motion to certify).

For example, a dispositive motion may be prioritized over the class certification where it was "defendant's opening move" and the court finds the pleadings "facially suspect in more than one respect that appeared incurable[.]" *Caraluzzi v. Prudential Sec., Inc.*, 824 F. Supp. 1206, 1211 (N.D. Ill. May 26,1993) (quoting *Illinois State Rifle Ass'n v. State of Ill.*, 717 F.Supp. 634, 639 n.12 (N.D. Ill. Aug. 16,1989)).

   2.   Discussion

The Court finds deferring class certification is appropriate here for several reasons. First, consistent with precedent from this District, iaedp filed a motion to dismiss as its "opening move." *See Shaver v. Trauner,* No. 97-1309, 1998 WL 35333712, at n. 1 (C.D. Ill. May 29, 1998), *report and recommendation adopted*, No. CIV. 97-1309, 1998 WL 35333713 (C.D. Ill. July 31, 1998). Further, the Complaint is Plaintiffs' fifth attempt to state a claim. *See* D. 1; D. 11; D. 31; D. 82; D. 110. When the Court previously granted dismissal of the prior complaint, Plaintiffs' pleadings changed substantially both regarding the named defendants and the alleged claims. *Compare* D. 82 *with* D. 110. The changes were so substantial that the Court determined Plaintiffs' earlier motion to certify a class was moot. *Text Order* on 02/02/2026. Consistent with their shifting claims, Plaintiffs' Motion to Supplement the present Complaint is currently pending. D. 135. Given the fluctuating nature of Plaintiffs' claims, the Court finds it is in the interest of judicial

5

efficiency to postpone class certification until after the pleading stages. *See Wilcosky v. Amazon.com, Inc.*, No. 19-CV-05061, 2023 WL 11824850, at \*2 (N.D. Ill. July 21, 2023) (staying the class action proceedings for efficiency noting that the pending motion to dismiss and motion to amend may alter those proceedings by changing the underlying allegations).

The allegations, or lack thereof, further raise serious doubt as to whether the Complaint may survive the pending Motion to Dismiss. *See Illinois State Rifle Ass'n*, 717 F.Supp. at 639 n. 12. The Motion attacks not only the sufficiency of the pleadings but also raises jurisdictional issues. D. 121 at 15. The Supreme Court has indicated that Rule 23 should not be used to expand a court's subject matter jurisdiction unless the class certification issues are dispositive. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997); *see also Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002) ("[U]ntil certification, the jurisdiction of the district court depends upon its having jurisdiction over the claim of the named plaintiffs when the suit is filed and continuously thereafter until certification ...."); *see also* 28 U.S.C. § 2072(b) ("[Federal procedural] rules shall not abridge, enlarge, or modify any substantive right."). There is no indication that the class certification issues are dispositive and thus, the Court finds the Motion to Dismiss should be addressed first.

For these reasons, the Court GRANTS iaedp's [128] Motion to Defer Class Certification in part, deferring the issue of class certification until after the resolution of the Motion to Dismiss. As discussed below, because the Court finds dismissal is warranted, iaedp's request to defer class certification until after the completion of discovery is MOOT.

**B. Plaintiffs' Motion to Supplement:**

Turning next to Plaintiffs' First Motion to File a Supplement Complaint brought pursuant to Federal Rule of Civil Procedure 15(d). D. 135. Plaintiff's Motion, filed on the eve of oral

6

argument for iaedp's Motion to Dismiss, seeks to supplement the Complaint by adding claims based on post-filing events. *Id.* The Court will first summarize these new allegations prior to discussing the merits of such request.

Plaintiffs allege that, on May 28, 2026, iaedp improperly rejected Plaintiff Debra Miller's "continuing education credits" for recertification (hereinafter, "CEs"). Iaedp rejected these CEs finding they "were not sufficiently eating disorder specific" because the term "eating disorders" did not appear in the title of the materials. D. 135 at 3, 12. Plaintiffs allege the rejected CEs addressed "clinical subjects directly relevant to eating disorder treatment, including comorbidity and treatment resistant depression in adolescents" and the courses were presented by a preeminent eating disorder treatment center. *Id.* at 3. Plaintiffs allege that iaedp also used substantially similar reasoning when rejecting the CEs of Miller's employee. *Id.* When the issue was raised to iaedp, iaedp reversed its denial and granted recertification as to Miller's employee.

Plaintiffs allege that the reversal is material because it shows that "iaedp's stated rationale is discretionary, inconsistently applied and capable of selective use against Miller while this case is pending." *Id.* Plaintiffs contend that this post-filing conduct confirms an ongoing risk of selective enforcement and anticompetitive restraints previously alleged.  Because the rejection risks the loss of her certification, Plaintiffs allege harm to Miller's professional standing, marketability, and her economic opportunities.

Plaintiffs argue a contractual or quasi-contractual relationship arose from iaedp's certification program and that iaedp was required to review renewal submissions in good faith and to avoid arbitrary and retaliatory enforcement. They assert that its rejection of Miller's CEs and the inconsistent reversal for her employee's similar rejection shows iaedp's arbitrary or retaliatory

discretion. Plaintiffs seek damages and equitable relief for threatened loss of certification and related injuries.

Specifically, the proposed supplemental complaint seeks to add the following claims: (1) Retaliatory and Selective Enforcement Supporting Supplemental Injunctive Relief Section 16 of the Clayton Act, 15 U.S.C. § 26 (Count I); (2) Protection of Named Plaintiffs, Putative Class Members, Witnesses, and Class Proceedings Fed. R. Civ. P. 23(d) and the Court's Inherent Authority (Count II); and (3) Breach of Certification Agreement and Bad Faith Exercise of Certification Discretion (Count III).[2]

1. <u>Legal Standards</u>:

Rule 15 of the Federal Rules of Civil Procedure governs supplemental pleadings. It provides:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense

Fed. R. Civ. P. 15(d).

"Rule 15(d)…plainly permits supplemental amendments to cover events happening after suit" and these "amendments are well within the basic aim of the rules to make pleadings a means to achieve an orderly and fair administration of justice." *Griffin v. County Sch. Bd. of Prince Edward Cnty*, 377 U.S. 218, 227, 84 S. Ct. 1226, 1231 (1964). A party, however, has no absolute

---

[2] Under Count I, Plaintiffs seek to supplemental their request for injunctive relief under § 16 of the Clayton Act to address iaedp's continued discretionary control, which was used to reject Miller and her employee's CEs. Under Count II, Plaintiffs also seek an Order under Rule 23(d) prohibiting retaliation and misuse of certification functions to chill participation and require preservation of records.

right to supplement and court has substantial discretion when resolving such a motion. *Chicago Reg'l Council of Carpenters v. Vill. of Schaumburg*, 644 F.3d 353, 356 (7th Cir. 2011).

"When considering a motion to supplemental under Rule 15(d) the court may look to several factors including, but not limited to: the extent to which the original and supplemental complaints are related; whether there is evidence of delay, bad faith or dilatory motive on the part of the movant; whether the supplement would impose undue prejudice upon an opposing party; and whether allowing supplementation would serve the interests of judicial economy." *Boyd v. Protestant Mem'l Med. Ctr., Inc.,* Bo. 3:23-cv-3961-NJR, 2026 WL 177621, at *2 (S.D. Ill. Jan. 22, 2026).

2. <u>Discussion</u>

Plaintiffs argue that supplementation is appropriate because the events are related to the existing claims. According to Plaintiffs, the Complaint is based on iaedp's unilateral control over certification renewal and the supplemental claims provide another example of its abuse of that control. Lastly, Plaintiffs assert that such supplementation would not cause prejudice to iaedp nor delay the litigation.

Iaedp opposes the Motion to Supplement arguing that the supplemental claims are futile. First, iaedp contends that the Court does not have Article III jurisdiction because the supplemental claims are not ripe. Under Article III, courts only have jurisdiction over justiciable cases and controversies. U.S. Const. art. III, § 2. Embedded in the cases and controversies requirement is the condition that the claims are ripe for adjudication. *Sweeney v. Raoul*, 990 F.3d 555, 559–560 (7th Cir. 2021). "Plain and simple, ripeness is 'peculiarly a question of timing.'" *Id*. at 560 (quoting *Blanchette v. Conn. Gen. Ins. Corps*, 419 U.S. 102, 140 (1974)). The ripeness doctrine seeks to prevent courts from engaging in premature adjudication of "claims that are premised on uncertain

or contingent events[.]" *Church of Our Lord & Savior Jesus Christ v. City of Markham, Illinois*, 913 F.3d 670, 676 (7th Cir. 2019). This ripeness determination is to be made at the date of the court's decision, not the date of filing. *Id*. at 677.

Iaedp argues that Plaintiffs' claims are not ripe because it never formally rejected her CEs but merely requested additional information from Miller. Upon receiving that information, it accepted enough of her CEs to allow her to successfully renew her certification. Coincidentally, this acceptance occurred after Plaintiffs filed the present Motion to Supplement. Iaedp argues this issue never became ripe for adjudication because the anticipated rejection of Miller's CEs never came to fruition.

The Court is not convinced that iaedp never rejected Miller's CEs. First, in both its briefing and at oral argument, iaedp admits it rejected one of Miller's CEs as untimely. *See* D. 137 at 6. As to the remaining credits, iaedp claims that it had not rejected those CEs but only requested more information. But, again, iaedp also states in its briefing that it initially rejected some of these other credits. *See id*. at 5 ("On May 5, 2026, some of those [credits] were rejected."). Further, iaedp's exhibits indicate that such rejection occurred. For example, it provides an email from iaedp to Miller with the subject line "Submission Rejected[.]" *Id*. at 34. In that correspondence it informs Miller that she could either provide more information regarding these CEs or she could "appeal the *rejection* of these [CEs.]" *Id*. at 35 (emphasis added). Though iaedp states that there was a valid justification for this denial, that factual argument cannot be resolved at this stage of the proceeding. Based on the pleadings it appears that iaedp rejected at least one, if not more, of Miller's CEs. Thus, Plaintiffs' claims present a ripe controversy.

For these reasons, the Court finds the supplemental claims present a justiciable controversy sufficient for Article III jurisdiction.

10

Iaedp also challenges Plaintiffs' standing to bring the proposed supplemental "Breach of Certification Agreement" claim. Like ripeness, standing also stems from Article III's case and controversy requirement. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Thus, Plaintiffs must show, by a preponderance of the evidence "(1) that [they have] suffered an injury in fact (2) that is fairly traceable to the action of the defendant and (3) that will likely be redressed with a favorable decision." *Kathrein v. City of Evanston*, 636 F.3d 906, 914 (7th Cir. 2011) (quoting *Books v. City of Elkhart, Ind.*, 235 F.3d 292, 299 (7th Cir. 2000)).

An injury is sufficient to establish standing where it is "concrete and particularized as well as actual or imminent, not conjectural or hypothetical[.]" *Sweeney*, 990 F.3d at 559 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotations omitted). The "particularized" component requires the injury to "affect the plaintiff in a personal and individual way." *Id*. (quoting *Lujan*, 504 U.S. at 560 n. 1) (internal quotations omitted). Further, a concrete injury is one that is "real, not abstract" regardless of whether it is tangible or intangible, though the former may be easier to identify. *Spokeo*, 578 U.S. at 340. A threatened, future injury may satisfy Article III where that "injury is certainly impending or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

Iaedp claims Plaintiffs do not have standing because they cannot show any injury based on the supplemental facts. In this regard, Plaintiffs plead the following: "threatened loss of certification, professional injury, reputational injury, lost time, renewal expense, loss of professional opportunities, and other consequential damages." D. 135-1 at 19. Iaedp argues that there is no injury because it has renewed Miller's certification, eliminating any of the alleged "threatened" injuries that the underlying rejection posed. At oral argument, Plaintiffs maintained

11

they were injured, despite Miller's certification renewal, because they were subjected to an accreditation entity which had the power to unfairly withhold certification.

But Plaintiffs admitted that this is essentially what they signed up for: to receive certification through iaedp's accreditation process. Miller received her certification and suffered none of the hypothetical consequences Plaintiffs alleged. The fact that iaedp could possibly exercise its power to improperly deny certification at Plaintiffs' next yearly renewal is too hypothetical to satisfy Article III requirements. *See Susan B. Anthony*, 573 U.S. at 158 (noting a threatened injury must be "certainly impending" to establish standing). Because there is no injury, Plaintiffs do not have standing and the Court does not have subject matter jurisdiction over the proposed supplement. It follows then that any supplementation would be futile and unwarranted.[3] On a related note, the Court finds that the relief requested based on this conduct (Count I and II) is similarly futile.

For these reasons, Plaintiffs' Motion to Supplement is DENIED.

**C. Defendant's Motion to Dismiss under 12(b)(6):**

With these two issues resolved, we may now address iaedp's Motion to Dismiss.

1. <u>Legal Standards</u>

The purpose of a motion to dismiss is not to resolve the merits of a claim but instead tests the sufficiency of the allegations in a complaint. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a Rule 12(b)(6) motion a court will treat all allegations in the complaint as true and draw factual inferences in the plaintiff's favor. *Kahn v. Walmart Inc.*, 107 F.4th 585, 593–94 (7th

---

[3] Even if the breach of contract was not futile the Court would decline to exercise supplemental over the state claim. *See Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015).

Cir. 2024). To survive a motion to dismiss, the factual allegations of the complaint must state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard is met when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Bilek v. Fed. Ins. Co*., 8 F.4th 581, 586–87 (7th Cir. 2021).

2.   Count 1 - § 1 of the Sherman Act:

"A tying arrangement is an agreement by a party to sell one product [tying product] but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992) (internal quotations omitted). Supreme Court cases "have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Illinois Tool Works Inc. v. Indep. Ink. Inc.*, 547 U.S. 28 (2006). Accordingly, the Supreme Court has "condemned tying arrangements when the seller has some special ability – usually called 'market power' – to force a purchaser to do something that he would not do in a competitive market." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984), abrogated on other grounds by *Illinois Tool Works Inc.*, 547 U.S. 28.

To state a plausible tying claim, a plaintiff must allege (1) two separate products or services, (1) the defendant "has sufficient economic power in the tying product market to restrain free competition in the tied product market;" (2) "that the tie affects a not-insubstantial amount of interstate commerce in the tied product;" and (3) "that the defendant has some economic interest

13

in the sales of the tied product." *Shiva v. American Board of Radiology*, 38 F.4th 569, 574 (7th Cir. 2022) (internal citation and quotations omitted).

Here, Plaintiffs allege iaedp's tying arrangement violated § 1 of the Sherman Act under the Rule of Reason and per se frameworks.[4] *See* 15 U.S.C. § 1. This alleged tying arrangement conditioned purchase and renewal of iaedp certification (tying product) on the purchase of two separate iaedp products: (1) iaedp membership, and (2) attendance at iaedp symposiums (tied products). Iaedp imposed this tying arrangement at each certification renewal cycle, requiring Plaintiffs to maintain yearly iaedp membership and attend its symposium under the threat of losing their certification.

Plaintiffs further allege that iaedp possesses market power and that it exploited this market power to coerce clinicians into purchasing unwanted membership and symposium attendance at supra-competitive prices. Plaintiffs also allege that the tying arrangement lacks any legitimate procompetitive justification. Plaintiffs highlight that iaedp stopped enforcing this arrangement after this lawsuit was filed, which they contend further demonstrates their unnecessary and anticompetitive nature.

---

[4] A plaintiff may pursue an antitrust claim under the Rule of Reason or the per se framework. A Rule of Reason analysis is the "standard framework" for an antitrust claim, under which the plaintiff carries the burden of showing that the arrangement "had an anticompetitive effect on a given market within a given geographic area." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). In contrast, the per se framework applies to a restraint on trade that "facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Id*. at 336 (internal quotations and citations omitted). As the Court noted in its previous Order, the "per se" label is somewhat of a misnomer, and it does not excuse a plaintiff's failure to plausibly allege a market and the seller's market power. *See* D. 109 at 19 (citing *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020); *see also Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 594-95 (7th Cir. 2008) (defining the relevant market at the motion to dismiss stage prior to dismissing the per se claim for failure to allege defendant's power in that market). Put differently, because market power is an essential allegation under both frameworks, dismissal is warranted regardless of the framework applied.

Iaedp argues dismissal of Count I is warranted because Plaintiffs have not properly defined the tying product market, its power within that market, or any restraint in the tied product market. The Court will address each in turn.

### a. Tying Product Market

To bring an antitrust claim, plaintiffs must define a relevant market. "The relevant market is defined as the area of effective competition, which is typically the arena within which significant substitution in consumption or production occurs." *Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 869 (7th Cir. 2025) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)). Put differently, a market consists of the "products that have reasonable interchangeability for the purposes for which they are produced." *In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 933 (7th Cir. 2025) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). A plaintiff may also allege a submarket within the broader market. *See id*. (citing *Brown Shoe Co. v. United States*, 370 U.S. 291, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)).

The United States Supreme Court has detailed several guiding factors for courts to use when defining the relevant tying market. *Brown Shoe Co.*, 370 U.S. at 325. These "practical indicia" include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, and specialized vendors." *Id*.

Market definition is a factual issue, generally not ripe for resolution on a motion to dismiss. *Fourqurean*, 143 F.4th at 869. But where the plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss

15

may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *see also Marion Healthcare LLC v. S. Illinois Healthcare*, No. 12-CV-00871-DRH-PMF, 2013 WL 4510168, at *12 (S.D. Ill. Aug. 26, 2013) (noting that "market power in the relevant market cannot be analyzed until the relevant market is defined.").

### i.  Certification Maintenance Market

Plaintiffs first allege that the iaedp certification lives within the "Certification Maintenance Market" which it describes as a national market "aftermarket" of the initial certification. D. 110 at 6. Plaintiffs explicitly exclude initial certification from this market and limit it solely to "the continued validity and maintenance of that certification, which must be renewed on an annual basis in order for certified specialists to continue holding themselves out as board-certified eating-disorder professionals." *Id*. In support of this distinction, Plaintiffs claim that certified clinicians face unique consequences if they failed to renew certification after initial purchase such as "forfeiting the professional, reputational, and economic benefits associated with maintaining their existing certification, including employer recognition, insurer credentialing, and patient referrals." *Id*. at 6–7.

At the outset, the Court notes that this definition is in direct contradiction with its prior Order which held that initial certification and certification maintenance constitute one product. As discussed, an antitrust market must include all reasonably interchangeable products. *See In re Harley-Davidson*, 151 F.4th at 933. Consistent with the Court's prior Order, other courts have noted that the maintenance of certification and the initial certification are the same product. *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 274 (N.D. Ill. 2019) (noting that selling certification with future maintenance requirements does not constitute the sale of two separate products); *Lazarou v. Am. Bd. of Psychiatry & Neurology*, No. 19-CV-01614, 2020 WL 5518476, at *5 (N.D.

16

Ill. Sept. 11, 2020) (noting there was no consumer demand for maintenance of certification separate from demand for initial certification). *Kenney v. Am. Bd. of Internal Med.*, 412 F. Supp. 3d 530, 545 (E.D. Pa. 2019), *aff'd*, 847 F. App'x 137 (3d Cir. 2021) ("[I]nitial certification and [maintenance of certification] are part of a single product and do not occupy distinct markets."). Given that initial certification and maintenance of that certification constitute one product, it follows that they are interchangeable and should be included in the same market.

Plaintiffs attempt to distinguish the two is not persuasive. Plaintiffs first argue "once a professional has obtained certification, the decision to maintain it is governed by materially distinct economic considerations, switching costs, and competitive restraints." D. 110 at 6. Though the practical realities of obtaining a different certification elsewhere may vary at the initial certification versus maintenance, that does not inform the critical factor in defining a market: whether the two products are reasonably interchangeable. *See In re Harley-Davidson*, 151 F.4th at 933; *Brown Shoe Co.*, 370 U.S. at 325; *see also Kodak*, 504 U.S. at 472 (considering whether consumers were able to switch to an alternative product when assessing market power). The facts alleged do not allow this Court to infer that a freshly obtained certification is somehow different from certification that the clinician later renews and Plaintiffs allege no difference in the features of certification on this basis. Thus, because initial certification is not a different product than maintenance, the Court cannot find a market that explicitly divorces the two is sufficient as a matter of law. *See Queen City Pizza*, 124 F.3d at 438–39 (affirming dismissal where plaintiffs alleged a market that excluded reasonably interchangeable products).

Plaintiffs next argue that Certification Maintenance Market is supported by the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451 (1992).

Plaintiffs rely extensively on *Kodak* throughout their briefing. Given its relevance, the Court takes a moment to briefly summarize *Kodak* prior to reaching the substance of Plaintiffs' contentions.

In *Kodak*, Eastman Kodak Co. ("Kodak") sold photocopiers as well as service and replacement parts for its copiers. *Id.* at 457. Independent service organizations ("ISOs"), also sold parts and offered repair services that were cheaper and at times better quality than Kodak's. *Id.* at 457–58. Along with ISOs, original equipment manufacturers ("OEMs") also manufactured parts that could be used to repair Kodak copiers. *Id.* at 457. Kodak later changed its policies to prevent ISOs from obtaining the replacement parts necessary to provide repair services. *Id.* at 458. Because Kodak's replacement parts were the only ones compatible with its copiers, ISOs were unable to sell repair services leaving Kodak the only entity which could sell repair services for its product. *Id.* at 457–58.

The ISOs brought a tying arrangement claim against Kodak alleging that it had unlawfully tied the sale of repair services to the sale of Kodak's replacement parts. *Id.* at 459. The Supreme Court considered whether Kodak had sufficient market power in the tying market, replacement parts, to force unwanted purchases within the tied market, repair services. *Id.* at 464. Kodak argued that competition in the primary copier market precluded market power in the aftermarket of replacement parts. *Id.* at 470. Specifically, it contended that "any increase in profits from a higher price in the aftermarkets at least would be offset by a corresponding loss in profits from lower equipment sales as consumers began purchasing equipment with more attractive service costs." *Id*. at 466.

The Supreme Court rejected this argument. First, the Court defined the relevant market as Kodak replacement parts, as opposed to photocopier parts generally, because other parts on the market were not compatible with Kodak's photocopiers. *See id.* at 473–83. The Court also noted

18

that the Kodak customers who had already purchased their copier prior to the policy change may choose not to change products due to the associated costs of doing so. *Id*. at 476–77. Put differently, "[t]hese customers had purchased their copiers before they knew they would be locked into Kodak service, and the copiers were too expensive to easily replace in response to higher-than-expected prices in the aftermarket. *In re Harley*, 151 F.4th at 936 (interpreting *Kodak*). Thus, *Kodak* could have market power in the derivative market without necessarily having market power in the primary market. *See Kodak*, 504 U.S. at 473–83.

Turning back to the present case, Plaintiffs attempt to analogize their Certification Maintenance Market to the market in *Kodak*. Though the claim in *Kodak* was based on an aftermarket limited to one brand (Kodak's repair parts), Plaintiffs cannot leverage this finding. *Kodak* involved "primary and derivative markets for complex durable goods" not an intangible certification whose "maintenance" consists of clinicians paying a recurring fee. *Id*. at 473. In *Kodak*, "maintenance" of the photocopier alluded to physical repair services which could be provided by Kodak, ISOs, or other entities in the market. Here, "maintenance" of certification can only be provided by iaedp and does not represent a new product from that initially purchased. *See Siva*, 418 F. Supp. 3d at 274 (noting that initial certification and maintenance of certification are not two separate products). Thus, these renewal payments are not synonymous with the "maintenance" services at issue in *Kodak* and they cannot alone constitute a market for antitrust purposes.

### ii.  Recognized Certification Market

Plaintiffs also allege an alternative "Recognized Certification Market." D. 110 at 7. Specifically, this market consists only of certifications "that are recognized by insurers, employer credentialing committees, and national treatment facilities as qualifying clinicians for

reimbursement, hiring, network participation, or referral eligibility." *Id*. According to Plaintiffs, this market is "defined by" entities that require "possession of recognized credentials" for reimbursement, employment, or other in network benefits. *Id*. Plaintiffs allege that the "Recognized Certification Market" is a national market. Iaedp claims this market is insufficient because it fails to allege actors in the market but instead describes a "single brand market" comprised solely of iaedp's brand. Plaintiffs counter, arguing that the Recognized Certification Market is not limited solely to iaedp but rather defined by the above referenced entities. They further rest their opposition on the factual nature of the market definition inquiry.

As discussed, a market is defined by the interchangeability of products. Plaintiffs allege that its alternative market, limited to certifications approved of by certain third parties, is sufficient because such approval renders these certifications non-interchangeable with others on the market. Specifically, Plaintiffs allege that such recognized certification qualifies clinicians for reimbursement, hiring, network participation, or referral eligibility that non-recognized certification does not. Further, insurance companies and employers in the field afford this certification a unique value that other certifications do not share. *See In re Harley-Davidson*, 151 F.4th at 933 (noting "industry or public recognition of the submarket as a separate economic entity" relevant to market definition). Given these unique benefits, clinicians do not view iaedp certification as interchangeable with other certifications.

Iaedp does not challenge Plaintiffs' claim that certification with this recognition is not interchangeable with those that lack it. It instead attempts to dismiss this market definition based on the fact that Plaintiffs are alleging a market that, in effect, only consists of iaedp. Plaintiffs' pleadings on this point are difficult to decipher. Though they reference other certifying bodies, they imply those entities are not within this market and allege that "iaedp is the only national

recognized credentialing body…relied upon by employers, insurers, and treatment centers throughout the United States." D. 110 at 3. However, in their response, Plaintiffs clarify that they are not alleging a market based solely on iaedp and state that discovery is necessary to determine other competitors. D. 145 at 16. The Court shares iaedp's concern. However, iaedp provides no case law requiring an antitrust plaintiff to explicitly identify other actors in the market to state a claim. [5] To the contrary, courts commonly hold that market definition is inherently a question of fact, ill-fitted for motion to dismiss challenges. *See Fourqurean*, 143 F.4th at 869. All precedent points to market definition based on the nature and interchangeability of product. *Brown Shoe Co.*, 370 U.S. at 325; *In re Harley-Davidson*, 151 F.4th at 933. Because Plaintiffs have sufficiently alleged element, coupled with the inherently factual nature of this inquiry, the Court will not dismiss on this ground.

For the above reasons, the Recognized Certification Market is sufficiently defined and does not warrant dismissal.

### b.  Market Power

For a tying arrangement to violate the Sherman Act, the seller must have "appreciable economic power in the tying product market." *Kodak*, 504 U.S. at 462 (internal quotations omitted); *see also Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 594 (7th Cir. 2008)

---

[5] Iaedp's supporting cases involve tying product markets that were explicitly limited to a single brand, in which the plaintiff failed to show was not reasonably interchangeable with other products outside that narrow market. *See House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 64657, at *7 (N.D. Ill. Jan. 8, 2014) (rejecting the single product market where plaintiff failed to "allege that consumers are for any reason unable to choose [products] produced by competitors to the [defendant's] brand"); *see also  In re Harley-Davidson.*, 151 F.4th at 934-35 (rejecting a one product market where plaintiffs did not allege any facts to suggest defendant's motorcycles were different than others on the general market); *Sheridan*, 530 F.3d at 594 (finding that the gas station franchise was a trademark, not its own market, that only prevented competitor gas stations from using the name with their product). Iaedp also cites to *Grappone, Inc. v. Subaru of New Eng., Inc.*, in which the First Circuit suggested that the relevant market for the tying arrangement claim against Subaru was sale of all automobiles. 858 F.2d 792, 797 (1st Cir. 1988). Though the court did not address the interchangeability of products when defining the market it did later note that "plaintiff has made no showing that Subarus had any special or unique features" in reference to market power. *Id.* at 798.

(explaining that "market power is key" when evaluating a tying arrangements). Defined as the seller's ability to unilaterally "raise price and restrict output," market power is generally "inferred from the seller's possession of a predominate share of the market." *Kodak*, 504 U.S. at 462; *see also Am. Express Co.*, 585 U.S. at 549 ("Market power is the ability to raise prices profitably by restricting output."). Though there is no bright line as to what constitutes market power, courts have found that the seller must have more than a thirty percent share of the market. *See Jefferson*, 466 U.S. at 17–18.

Market power must be alleged, regardless of whether the plaintiff is pursuing a Rule of Reason or per se theory. *See Ill. Tool Works Inc. u. Indep. Ink, Inc.*, 547 U.S.28, 46 (2006); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020).

The market power element is a "moderately high" hurdle that is not "surmounted simply by pointing to the fact of the tie itself or to a handful of objecting customers[.]" *Grappone, Inc. v. Subaru of New England, Inc.,* 858 F.2d 792, 796 (1st Cir. 1988). A plaintiff may show market power through uniqueness of the product. *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 672 (7th Cir. 1985). However, uniqueness alone is not enough. *U. S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 621 (1977). Rather, if rivals may replicate the uniqueness or "offer a similar package for a similar cost, there is no barrier, and without a barrier there is no market power." *Will*, 776 F.2d at 672.

Plaintiffs launch the following theories in attempt to show market power: (1) market statistics (2) barriers to entry (3) *Kodak* "lock in" effect and (4) direct evidence of market power. Iaedp contends none of these are enough to survive dismissal. The Court will address each theory in turn.

### i.    Market Statistics

Plaintiffs first attempt to allege market power by providing statistics as to the relevant market. They allege that 1,375 clinicians maintain board certification. When describing the total consumers in the market, Plaintiffs state "there are approximately 4,500 to 6,000 potential eating-disorder–specialist clinicians nationwide for whom certification is plausibly economically valuable[.]" D. 110 at 9. They then conclude that iaedp has power over somewhere between a one quarter and one third of the market.[6] Yet, even the smaller end of that range would only result in iaedp possessing roughly thirty percent of the market. Courts routinely hold this is too small to establish market power. Even a favorable reading of the alleged market statistics does not permit the inference of market power. *See Grappone*, 858 F.2d at 796 (citing *Jefferson*, 466 U.S. at 7–8) (noting possessing thirty percent of the market is not sufficient to show market power).

### ii.    Barriers to Entry

Plaintiffs next claim that "iaedp's market power is protected by substantial barriers to entry and expansion." D. 110 at 10.  These alleged barriers relate to how third parties such as insurers and employers recognize "iaedp certification as a signal of competency." *Id*. According to Plaintiffs, other competing programs are unable to attain similar status given that it is both an uncertain, expensive and time-intensive process.

---

[6] Plaintiffs also contend that this Court made a prior judicial finding that 1,200 of the 1,375 certified members were forced into purchasing an iaedp membership. This is not correct. In the Court's prior Order it simply summarized the Plaintiffs' own pleading on this point, which it was required to take as true on a motion to dismiss. Even when doing so, the Court noted that the Plaintiffs' allegations were inconsistent:

> Plaintiffs' pleading is not consistent as to the number of board certified individuals who were forced to purchase and maintain iaedp membership. Compare D. 82 at ¶ 75 (stating that more than 3,000 board certified eating disorder specialists have been forced to purchase iaedp membership) with D. 82 at ¶ 63 (defining the Antitrust Class as comprised of 1200 members) and D. 93 at 7 (stating "[t]he tying arrangement forced at least 1,200 iaedp board certified professionals to purchase annual iaedp membership[.]").

D. 109 at 4 n. 3

23

Here, Plaintiffs allege that iaedp certification is unique because of the clout it carries within the eating disorder field. Under Plaintiffs' view, no other certification provides clinicians similar professional opportunities. At the outset, this allegation is difficult to reconcile with the definition of the market itself. As discussed, the only viable market Plaintiffs allege is the Recognized Certification Market which only includes certifications that carry the very recognition Plaintiffs are now claiming is unique to iaedp.

Even putting this inconsistency aside, uniqueness alone does not equate to market power where other competitors could replicate the product. *Will*, 776 F.2d at 672. Plaintiffs try to clear this additional hurdle, alleging other certifying bodies cannot attain this third party recognition because it involves a "multi-year, uncertain, and capital-intensive process…..which typically rel[ies] on historical usage, institutional familiarity, and existing provider networks rather than de novo evaluation of new credentials." D. 110 at 11. The adequacy of this barrier is difficult to assess given its vagueness. But even assuming its adequacy, Plaintiffs fail to allege that iaedp did not face and overcome a similar barrier. *See United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 908 (N.D. Ill. 2019) (quoting *Will*, 776 F.2d at 672)("[i]f rivals may design and offer a similar package for a similar cost, there is no barrier, and without a barrier there is no market power."). Thus, Plaintiffs fail to allege barriers to entry and the resulting market power.

### iii.    *Kodak* "lock in" effect

Plaintiffs next try to leverage *Kodak* to establish market power, alleging that they were "locked in" to iaedp's certification program because switching would subject them to "sunk costs, including years of supervised practice, examination fees, professional reliance on certification

24

status, and integration of certification into their employment, insurance participation, and patient relationships." D. 110 at 11.

This "lock in" theory stems from *Kodak*. 504 U.S 451. Recall, defendant in *Kodak* changed its policy to effectively eliminate competitors in the repair service market, forcing its consumers to purchase such services from Kodak at a supracompetitive price. The Court noted Kodak may have market power, even though some consumers could choose to purchase a different copier at the outset, because it may be too costly for those consumer who had already purchased the product to switch to a different competitor.

This "lock in" theory is not available to Plaintiffs here. Courts have recognized that the timing of the tie-in is critical when determining whether a consumer is "locked-in." *See Queen City Pizza, Inc.*, 124 F.3d at 440. ("Because [Kodak's] change in policy was not foreseen at the time of sale, buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision."); *see also In re Harley*, 151 F.4th at 936 (rejecting the lock in theory where plaintiff "could have factored the costs of any alleged tie into his purchasing decision" given that the tie was in place at the time of purchase).

Plaintiffs knew from the outset that iaedp certification was not a one and done arrangement. Because they were aware of these annual payments and mandated symposium attendance, unlike the consumers in *Kodak*, they had the opportunity to consider these future expenses when deciding whether to obtain certification. *See Digital Equipment Corp. v. Uniq Digital Technologies*, 73 F.3d 756, 763 (7th Cir. 1996) ("The Court did not doubt in *Kodak* that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive life-cycle prices.").

25

Given that Plaintiffs knew of the tying arrangement when they first purchased their certification, they cannot establish market power through Kodak's "lock in" theory.

### iv.    Direct evidence

Lastly, Plaintiffs attempt to establish market power through what they classify as "direct evidence." D. 110 at 12. Plaintiffs state that iaedp did not lose clinicians even after it "impose[d] unwanted terms on certified specialists, year after year, without competitive constraint constitutes direct evidence of market power." D. 110 at 12.  But this alone does not state market power. *See Grappone,* 858 F.2d at 796 (noting neither the "tie itself" nor "a handful of objecting customers" shows market power). Though Plaintiffs may show market power through iaedp's ability to raise prices, there are no allegations as to the effect the institution of this policy had on its certifications. The tying arrangement went into effect on January 1, 2017, but Plaintiffs do not allege how this increase in price affected the number of certified clinicians when imposed. Rather, their allegations focus on the fact that some clinicians were not deterred by the tying arrangement. Even still, the Complaint describes those clinicians as the minority noting that iaedp has only thirty percent of the market and less than half of its own members pursue this certification.

Because the Plaintiffs fail to allege market power in the Recognized Certification Market, iaedp's Motion to Dismiss is GRANTED.[7] Because Plaintiffs cannot state a tying arrangement claim, their related request for injunctive relief is DENIED.

### IV.    LEAVE TO AMEND

A court's granting of a motion to dismiss operates as an adjudication on the merits and so, the dismissal is typically with prejudice unless otherwise specified. *Ryder v. Hyles*, 27 F.4th 1253,

---

[7] Iaedp also moved to dismiss based on failure to allege an anti-competitive effect in the tied market of professional memberships and for failure to plead antitrust injury. Because the Court finds the market power point persuasive, it will not reach these other arguments.

1257-58 (7th Cir. 2022). This is Plaintiffs' fifth attempt to state a claim. In its prior Order the Court warned them that this would be their last opportunity to surpass the pleading stages. D. 109 at 31. Because they were unable to do so, the Court finds that further amend would be futile and dismissal is with prejudice.

## V.    CONCLUSION

For the above reasons, Plaintiffs' [135] Motion to File First Supplemental Complaint is DENIED; iaedp's [128] Motion to Defer is GRANTED in part and DISMISSED in part; iaedp's [114] Motion to Dismiss is GRANTED; [120] Plaintiffs' Motion for Class Certification is DISMISSED as MOOT. Plaintiffs' [110] Complaint is DISMISSED with prejudice. The Clerk is ordered to enter judgment and close this case.

Entered on July 27, 2025.

s/Michael M. Mihm
Michael M. Mihm
United States District Judge